UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| Milton Ciplet, Individually and on behalf of all others similarly situated, | : |
| | : Civil Action No. 08-CV-4580 |
| Plaintiff, | : |
| | : CLASS ACTION COMPLAINT |
| -- against -- | : |
| | : JURY TRIAL DEMANDED |
| JP Morgan Chase & Co. and J.P. Morgan Securities, Inc., | : |
| Defendants. | x |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## INTRODUCTION

Plaintiff, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys, which investigation included a review of public documents and news articles concerning the defendants.

## NATURE OF ACTION

1.      This is a class action on behalf of all persons or entities who purchased auction rate securities from Defendants during the period from May 16, 2003 to February 13, 2008 (the "Class Period"). Defendants are charged with violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act.

2.      During the Class Period, defendants deceptively offered for sale auction rate securities, and represented to investors that these securities were the equivalent of cash or

money-market substitutes, and/or other short-term investments that were highly liquid and could be purchased with a minimum investment of $25,000.

3. Defendants continuously failed to disclose to investors material facts about auction rate securities that misrepresented and omitted material facts concerning such investments and substantially harmed the investors in said securities. In particular, defendants failed to disclose that auction rate securities are long-term financial instruments with maturities of 30 years to perpetuity. Defendants also failed to disclose that the auction rate securities were only liquid because said defendants and other broker-dealers created an artificial market for auction rate securities by manipulating the auction process. Defendants failed to disclose that without their manipulation of the auction rate securities market, many of the auctions would have failed with the underlying securities becoming illiquid.

4. On or about February 13, 2008, defendants and other major broker-dealers withdrew their support for the auctions of these securities. As a result, holders of auction rate securities offered by the defendants as being highly-liquid investments were left with no means of liquidating their investments.

## JURISDICTION AND VENUE

5. The claims asserted below arise under §§10(b) and 20(a) of the Exchange Act, 15U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b.

6. Jurisdiction is conferred upon this Court by § 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

7.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. § 1391(b) since defendants have their principal places of business in this District, and many of the acts alleged herein occurred in substantial part in this District.

8.      In connection with the acts, conduct and other wrongs alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephonic communications and the facilities of the national securities exchanges.

## PARTIES

9.      Plaintiff Milton Ciplet, as set forth in the accompanying certification, incorporated by reference herein, purchased auction rate securities from JPMorgan Chase & Co. and J.P. Morgan Securities, Inc. during the Class Period and continues to hold these securities.

10.     Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is incorporated in Delaware with its principal executive offices located at 270 Park Avenue, New York, New York. JPMorgan Chase is one of the leading global financial services firms with assets of $1.6 trillion.

11.     Defendant J.P. Morgan Securities, Inc. ("J.P. Morgan Securities") is incorporated in Delaware with its principal executive offices located at 270 Park Avenue, New York, New York. J.P. Morgan Securities is the primary nonbank subsidiary of JPMorgan Chase, and engages in investment banking activities in the U.S. and elsewhere. J.P. Morgan Securities, Inc. is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act, and is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA").

12.     Unless specifically noted, "J.P. Morgan" refers collectively to Defendants JPMorgan Chase and J.P. Morgan Securities.

**CLASS ACTION ALLEGATIONS**

13.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who acquired auction rate securities from J.P. Morgan from May 16, 2003 through February 13, 2008, both dates inclusive, and continued to hold said securities as of February 13, 2008 (the "Class"). Excluded from the Class are defendants, the officers and directors of any defendant, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any defendant has or had a controlling interest.

14.     The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable. Throughout the Class Period, there were more than $300 billion of auction rate securities outstanding in the United States, and J.P. Morgan was one of the largest underwriters and broker-dealers of auction rate securities during the Class Period. While the exact number of the Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are, at a minimum, thousands of members of the Class who acquired auction rate securities from J.P. Morgan during the Class Period.

15.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

      a.     whether defendants engaged in acts or conduct in violation of the federal securities laws alleged herein;

   b. whether defendants issued false and misleading statements and/or caused omissions about the risks of auction rate securities during the Class Period;

   c. whether defendants' actions complained of herein during the Class Period artificially inflated the market prices and liquidity of auction rate securities; and

   d. whether the members of the Class have sustained damages, and if so, the proper measure of damages.

  16. Plaintiff's claims are typical of the claims of the members of the Class, as plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal laws as complained of herein.

  17. Plaintiff will fairly and adequately protect the interests of members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

  18. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **SUBSTANTIVE ALLEGATIONS**

**The Auction Rate Securities Market**

19.     Auction rate securities are municipal bonds, corporate bonds, and preferred stocks with interest rates or dividend yields that are periodically reset through auctions, typically every 7, 14, 28, or 35 days.  Auction rate securities are usually issued with maturities of 30 years, but the maturities can range from 5 years to perpetuity.

20.     Auction rate securities were first developed in 1984, and the auction rate securities market has grown to over $300 billion at present.  Initially, mostly institutional investors participated in the auction rate securities markets, however, broker-dealers thereafter reduced the minimum investments in auction rate securities from $250,000 to $25,000, which encouraged the participation of individual investors.

21.     Auction rate securities are auctioned at par so the return on the investment to the investor and the cost of financing to the issuer between auction dates is determined by the interest rate or dividend yield set through auctions.

22.     According to the prospectus[1] for each such security, the interest rate or dividend yield is set through an auction (commonly referred to as a "Dutch" auction) in which bids with successively higher rates are accepted until all of the securities in the auction are sold.

23.     Investors can typically only submit the following types of orders: 1) a "hold" order, which is the default order for current investors (i.e., the order that is entered for a current holder if the holder takes no action), where a current investor will keep the securities at which the auction clears; 2) a "hold-at-rate" bid, where a current investor will only keep the securities if

---

[1] Investors of auction rate securities were not provided with prospectuses outlining the details of how auctions are held and the risks of the securities.  Unlike primary issues, such as initial public offerings, auction rate securities are secondary issues and do not require the delivery of offering circulars.

the clearing rate is at or above the specified rate; 3) a "sell" order, where a current investor will sell the securities regardless of the clearing rate; or 4) a "buy" bid, where a prospective investor, or a current investor who wants more securities, will buy securities if the clearing rate is at or above the specified rate.

24.     The final rate at which all of the securities are sold is the "clearing rate" that applies to all of the securities in the auction until the next auction. Bids with the lowest rate and then successively higher rates are accepted until all of the sell orders are filled. The "clearing rate" is the lowest rate bid sufficient to cover all of the securities for sale in the auction.

25.     If there were not enough bids to purchase all of the auction rate securities offered for sale, then the auction fails. If this occurs, the issuer pays an above-market rate set by a pre-determined formula described in the prospectus, and all the holders continue to hold the securities, with minor exceptions. If all the holders of the security elect to hold their positions without bidding a particular rate, then the clearing rate is the all-hold rate, a below-market rate set by a formula described in the prospectus. When the auction failed for the securities at issue, the holders of the securities could not sell their shares, notwithstanding the type of order they submitted.

26.     The issuer of each security selects one or more broker-dealers to underwrite the offering and/or manage the auction process. Investors can only submit orders through the selected broker-dealers. During the Class Period, JP Morgan was a broker-dealer in the auction rate securities market. The issuer also retains an auction agent who collects the orders and determines the clearing rate for the auction.

27.     The issuers paid an annualized fee to each broker-dealer engaged to manage an auction. Typically, the fee paid to the broker-dealer is 25 basis points (.25% of 1%) of the par

value of the securities managed by the broker dealer. This fee is paid to the broker-dealer notwithstanding the failure of any auctions.

28. Investors were required to submit orders for an auction to the broker-dealer by a specified time. Typically, this deadline allowed the broker-dealer to process and submit the orders to an auction agent, as well as, to determine what orders the broker-dealer would submit on its own behalf.

29. After receiving the orders from the broker-dealers, the auction agent calculates the clearing rate that will apply until the next auction. In practice, however, if there is only one broker-dealer, the broker-dealer can discern the clearing rate before submitting the orders to the auction agent, thereby enabling the broker-dealer to use the clearing rate to manipulate the auction to its own advantage.

30. The auction agent then allocates the subject securities to the broker-dealers based on the orders submitted. The auction procedures generally state that orders are filled in the following order: hold orders, hold-at-rate and buy bids with a rate below the clearing rate, hold-at-rate orders with a rate at the clearing rate, and buy bids with a rate at the clearing rate. When there are more bids for securities at the clearing rate than securities remaining for sale, the securities are allocated on a pro rata basis first to the hold-at-rate bidders and then to the buy bidders. Generally, the auction procedures require broker-dealers to follow the same hierarchy in allocating the securities to their customers.

31. Broker-dealers often engaged in practices to manipulate the auction process, which projected a false sense of demand in the auction rate securities market. In a May 31, 2006 Settlement Order between the SEC and a number of major broker-dealers, including J.P. Morgan, the SEC detailed the various illegal practices that certain broker-dealers used to

manipulate the auction process. In addition, J.P. Morgan was required to pay $1.5 million in settlement of the matters addressed in the Settlement Order. Through the illegal practices addressed therein, the broker-dealers, including J.P. Morgan, intervened in auctions for their own benefit.

32.     In 2007, the United States economy experienced a credit crisis whereby banks stopped financing private equity deals, the prices of U.S. residential real estate suffered a steep decline, and the mortgage market was crippled due to extreme declines in the value of collateralized debt obligations backed by failing subprime mortgages. This collapse of the credit markets forced financial institutions to report more than $50 billion in losses. The resultant credit crunch adversely affected the auction rate securities market, and, in fact, caused the cessation of this market.

33.     In March 2007, the Financial Accounting Standards Board (FASB) decided that auction rate securities should no longer be listed as "cash equivalents" on corporate balance sheets, but rather, they should be classified in the same way as other short-term investments are characterized on balance sheets.

34.     Corporations responded to this accounting edict by moving their money out of auction rate securities so that their balance sheet cash positions would not be reduced as a result of the aforesaid FASB decision. For purposes of the auctions, this meant that many corporations no longer wanted to buy auction rate securities. As corporate demand for auction rate securities vanished, J.P. Morgan had to keep more auction rate securities on its own books.

35.     As of July 1, 2007, corporations owned $170 billion of auction-rate securities, or just over half of the total outstanding. But by the end of 2007, corporate investors had dumped a significant portion of their stakes and cut their holdings of auction rate securities to $98 billion.

**J.P. Morgan's Conduct During the Class Period**

36. While corporations were decreasing their holdings in auction rate securities, rather than disclosing the weakening demand for auction rate securities, J.P. Morgan persuaded many individual investors to buy auction-rate securities for the first time.

37. During the Class Period, JP Morgan promoted its auction-rate securities as short-term fixed income investments. For example, on J.P. Morgan's website www.jpmorgan.com, under a section entitled "Short-term Fixed Income Investments," dated August 26, 2007, JP Morgan represented that "JPMorgan Chase Treasury Services offers a comprehensive and diverse range of **Short-term Fixed Income Investments**..." (emphasis in original). On the same page, JP Morgan lists its short-term fixed income investments products to include: Commercial paper, Auction rate securities, U.S. government securities, Agency discount notes, Asset-backed commercial paper, Loan participating, and Corporate debt. The page continues, "**Why use Short-term Fixed Income Investments?**...React with flexibility to changing market conditions...Optimize working capital with services that are integrated with your JPMorgan Chase Treasury Services operating accounts." (emphasis in original).

38. J.P. Morgan promoted its short-term fixed income investments, which included auction-rate securities as liquid investments. On JP Morgan's website www.jpmorgan.com, under a section entitled "Liquidity & Investments," JP Morgan promoted its short-term fixed income investments. In this section, JP Morgan represented, "[o]ptimizing your working capital helps maintain adequate liquidity for daily operations while maximizing self-funding and short-term investment yields.

39. During the Class Period, on monthly statements sent to investors of auction rate securities, J.P. Morgan classified the "Account Type" of said auction rate securities as "CASH."

40. By August 16, 2007, several monthly auctions had failed amid the turmoil in the credit markets. Thereafter, auctions began failing with some regularity, and those that did succeed, would have failed but for the broker-dealer's intervention. The broker-dealers continued to intervene in order to prop-up the auction market by bidding with knowledge of other bids, submitting bids after the internal bidding deadline imposed on investors, and by directly or indirectly influencing or setting the clearing rates with considerable frequency.

41. During the auction process, J.P. Morgan failed to disclose how many investors there were participating in the auctions, how often the brokerage firms were stepping in to make the auction system work, and that their support of the auction system could terminate without notice.

42. After unloading a substantial amount of auction rate securities from its balance sheet onto individual investors without disclosing the risk of auction failures, on or about February 13, 2008, J.P. Morgan stopped committing additional capital to buy auction rate securities.

43. On February 14, 2008, 50 out of 93 of J.P. Morgan's auction rate securities auctions failed. In the aggregate, 87% of the auctions held for auction rate securities failed when the broker-dealers, including J.P. Morgan, withdrew from their support of the auction rate securities market. As a result, thousands of investors holding millions of dollars of auction rate securities purchased from J.P. Morgan are now left with illiquid auction rate securities. These auction rate securities holders have no ability to sell their securities by means of an auction

market that has been exposed as being artificial and manipulated by the broker-dealers running the market.

44. For investors in auction-rate securities that need liquidity, they are left with the option of trying to sell their illiquid auction rate securities at a steep discount to par value or taking out a loan against their auction rate securities. The Restricted Securities Trading Network (RSTN) recently began listing auction-rate securities on its electronic trading network. According to Barry Silbert, CEO of RSTN, 700 RSTN members, mostly hedge funds and institutional investors, have expressed interest in purchasing auction-rate securities.  To date, investors of municipal auction-rate securities who list their securities on RSTN are incurring discounts of at least 10% of par value, with auction-rate preferred securities incurring discounts between 10 % and 20 %, and student loan auction-rate securities incurring discounts of 25% and up.

45. The other remaining option for holders of auction rate securities in need of liquidity is to borrow from the broker-dealer against their auction rate securities, thereby paying interest to the very broker-dealer that misled them.  To complicate matters for the investor, if the loan comes due before the underlying auction rate security can be redeemed or auctioned, the investor would be forced to sell his securities at a loss in order to pay the loan.

46. Accordingly, Plaintiff seeks injunctive relief to compel J.P. Morgan to rescind billions of dollars of auction rate securities transactions involving their customers during the Class Period, and to recover compensatory and punitive damages on behalf of the Class who have suffered and continue to suffer damages as a result of J.P. Morgan's deceptive conduct.

**Additional Scienter Allegations**

47. The defendants have acted with scienter in that they knew that the statements issued or disseminated about auction rate securities were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced to the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth herein in detail, defendants by virtue of their receipt of information reflecting the true facts regarding the auction rate securities market, their control over and/or their associations with the auction rate securities market which made them privy to confidential proprietary information concerning the auction rate securities market, participated in the fraudulent scheme alleged herein.

48. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described could not have been perpetrated over a substantial period of time, as described herein, without the knowledge and complicity of the executive personnel at the highest levels of J.P. Morgan. Defendants were motivated to materially misrepresent the true nature of the auction rate securities auction market in order to: (i) attract new investors who would invest in auction rate securities if they believed a highly liquid auction market existed; (ii) unload auction rate securities from their inventory to unsuspecting investors who believed they were purchasing a liquid investment; and (iii) continue collecting substantial fees of approximately 25 basis points per year for managing the auction rate securities auctions on behalf of issuers.

**NO STATUTORY SAFE HARBOR**

49.     The statutory safe harbor under the Private Securities Litigation Reform Act of 1995 provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was authorized and/or approved by an executive officer of J.P. Morgan who knew that those statements were false, misleading, or omitted necessary information when they were made.

## LOSS CAUSATION / ECONOMIC LOSS

50.     During the Class Period, as detailed herein, defendants engaged in a scheme and course of conduct to deceive the market and to artificially inflate the value and liquidity of auction rate securities sold by J.P. Morgan, which operated as a fraud and deceit on the purchasers of auction rate securities sold by J.P. Morgan.

51.     When the true nature of the auction rate securities market was revealed, the auction rate securities market collapsed and the auction rate securities held by the members of the Class became illiquid and as a result, declined in value.  This decline in the liquidity and value of auction rate securities was a direct result of the nature and extent of defendants' fraud

finally being revealed to investors and the market. The plaintiff and the other members of the class suffered economic loss, i.e., damages, suffered under the federal securities laws, as a direct result of defendants' fraudulent scheme to artificially inflate the value of auction rate securities by manipulating the auction markets.

52. At all relevant times, the defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the plaintiff and the other Class members. The statements were materially false and misleading because they failed to disclose a true and accurate picture of the auction market for the auction rate securities as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and made omissions of material facts, causing the market price of auction rate securities to be artificially inflated. Plaintiff and the other Class members purchased auction rate securities at these artificially inflated prices and were damaged thereby.

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder)

53. Plaintiff incorporates by reference, the allegations set forth above as if fully set forth herein.

54. During the Class Period, defendants carried out a plan, scheme and course of conduct that was intended to and did: (i) deceive the investing public, including the plaintiff and the other Class members, as alleged herein; (ii) artificially inflated the market price and liquidity of auction rate securities; (iii) caused plaintiff and the other Class members to purchase or otherwise acquire auction rate securities from J.P. Morgan at artificially inflated prices.

55. In furtherance of this unlawful plan, scheme and course of conduct, defendants employed artifices to defraud and engaged in acts, practices and a course of business which

operated as a fraud and deceit upon the investing public, in connection with the purchase of auction rate securities, in violation of section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

56. Defendant's fraudulent devices, schemes, and artifices and deceptive acts, practices and course of business included, inter alia, the following: (i) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from J.P. Morgan in an effort to maintain artificially high sales and market prices for said securities.

57. Consistent with this scheme, defendant knowingly or recklessly issued the challenged materially false and misleading statements on auction rate securities.

58. Defendants acted knowingly or recklessly and for the purpose and effect of, *inter alia*, inducing plaintiff and the other members of the Class to purchase auction rate securities during the Class Period at artificially inflated prices and under false pretenses that the market for auction rate securities was liquid and healthy.

59. Plaintiff and the other members of the Class reasonably relied upon the integrity of the auction market in which auction rate securities traded.

60. Plaintiff and the other members of the Class were ignorant of defendant's fraudulent scheme. Had the plaintiff and the other members of the Class known of defendant's unlawful scheme, they would not have purchased or otherwise acquired auction rate securities, or if they had, they would not have purchased or otherwise acquired them at the artificially inflated prices.Plaintiffs and the other members of the Class were injured because the risks that materialized were risks of which they were unaware as a result of defendants's scheme to

defraud as alleged herein. Absent defendant's wrongful conduct, Plaintiffs and the other members of the Class would not have been injured.

61.    In connection with their unlawful plan, scheme and course of conduct alleged herein, defendant used the means or instrumentalities of interstate commerce and the mails.

62.    By virtue of the foregoing, defendant violated section 10(b) of the Exchange Act and Rule 10b-5.

63.    As a direct and proximate result of defendant's scheme to defraud, the plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of auction rate securities in an amount to be proven at trial.

## COUNT II
### Violation of Section 20(a) of the Exchange Act (Against JPMorgan Chase & Co.)

64.    Plaintiffs repeat and reallege each and every allegation set forth above.

65.    Defendant JPMorgan Chase & Co. acted as a control person of defendant J.P. Morgan Securities, Inc. within the meaning of Section 20(a) of the Exchange Act as alleged herein.

66.    By virtue of its 100% ownership of J.P. Morgan Securities, Inc., JPMorgan Chase & Co. had the power to influence and control and did influence and control, directly or indirectly, the decision-making by J.P. Morgan Securities, Inc. including the content and dissemination of the various statements which plaintiff contends are false and misleading. JPMorgan Chase & Co. was provided with or had unlimited access to copies of the reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67. As set forth above, J.P. Morgan Securities, Inc. have violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of its position as a controlling person, JPMorgan Chase & Co. is liable pursuant to Section 20(a) of the Exchange Act.

68. As a direct and proximate result of defendant's wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of auction rate securities in an amount to be proven at trial.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

i) Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and plaintiff's counsel as Lead Counsel, and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

ii) Awarding compensatory damages in favor of plaintiff and the other Class members against the defendants for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

iii) Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder;

iv) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

v) Such other and further relief as the Court may deem just and proper.

### .**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  New York, New York
         May 16, 2008

               LAW OFFICES OF CURTIS V. TRINKO, LLP

               /s/ Curtis V. Trinko
               Curtis V. Trinko (CT 1838)
               Wai K. Chan (WC 0743)
               16 West 46th Street, 7th Floor
               New York, NY 10036
               Tel: (212) 490-9550
               Fax: (212) 986-0158
               email:  ctrinko@trinko.com
                      kchan@trinko.com

               **ATTORNEYS FOR PLAINTIFF**