**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
|                            x | |

MILTON CIPLET, Individually and on Behalf  :   Civil Action No. 08-CV-4580 (RMB)
of Himself and All Others Similarly Situated,  :

                               :   <u>CLASS ACTION</u>

               Plaintiff,  :

                               :

     vs.  :

JPMORGAN CHASE & CO. and J.P.  :
MORGAN SECURITIES INC,  :

               Defendants.  :

---

MARK SCHARFF, PINE SASH DOOR &  :
LUMBER CO., INC., MARK SCHARFF &  :
ASSOCIATES LLC, 2170 MILL AVENUE  :
LLC, 6202-6217 REALTY LLC, MARK  :   Civil Action No. 08-CV-5026 (RMB)
SCHARFF ITF MICHAEL SCHARFF,  :
MARK SCHARFF ITF DANIEL SCHARFF  :   <u>CLASS ACTION</u>
And MARK SCHARFF ITF ARIEL  :
SCHARFF, Individually and On Behalf of All  :
Others Similarly Situated,  :

               Plaintiffs,  :

                               :

     vs.  :

JPMORGAN CHASE BANK & CO., J.P.  :
MORGAN SECURITIES, INC. and CHASE  :
INVESTMENT SERVICES CORP.,  :

               Defendants.  :

---

**DECLARATION OF CURTIS V. TRINKO, ESQ IN OPPOSITION TO**
**COMPETING MOTIONS AND IN FURTHER SUPPORT OF THE MOTION OF**
**MILTON CIPLET, MARK SCHARFF, PINE SASH DOOR & LUMBER CO., INC.,**
**MARK SCHARFF & ASSOCIATES LLC, 2170 MILL AVENUE LLC, 6202-6217**
**REALTY LLC, MARK SCHARFF ITF MICHAEL SCHARFF, MARK SCHARFF ITF**
**DANIEL SCHARFF AND MARK SCHARFF ITF ARIEL SCHARFF FOR**
**CONSOLIDATION OF ALL RELATED ACTIONS; APPOINTMENT AS LEAD**
**<u>PLAINTIFF; AND APPROVAL OF ITS SELECTION OF CO-LEAD COUNSEL</u>**

CURTIS V. TRINKO, ESQ. an attorney duly admitted to practice before this Court hereby declares pursuant to 28 U.S.C. § 1746, that the following is true and correct.

1.      I am the principal attorney of the Law Offices of Curtis V. Trinko, LLP, counsel for Plaintiff Milton Ciplet, and I submit this Declaration in opposition to competing motions and in further support of Milton Ciplet, Mark Scharff, Pine Sash Door & Lumber Co., Inc., Mark Scharff & Associates LLC, 2170 Mill Avenue LLC, 6202-6217 Realty LLC, Mark Scharff ITF Michael Scharff, Mark Scharff ITF Daniel Scharff and Mark Scharff ITF Ariel Scharff's (collectively "ARS Investors Group") motion to consolidate all related securities class actions pursuant to Fed. R. Civ. P. 42(a), to be appointed as Lead Plaintiff in the consolidated action, and to have their counsel the Law Offices of Curtis V. Trinko, LLP ("Trinko") and the Law Offices of Marc E. Scollar ("Scollar") appointed as Co-Lead Counsel for the Class.

2.      A true and accurate copy of the July 22, 2008 Notice of Redemption of the Triborough Bridge and Tunnel Authority Subordinate Revenue Variable Rate Bonds is attached hereto as Exhibit A.

3.      A true and accurate copy of the prospectus for the Triborough Bridge and Tunnel Authority Subordinate Revenue Variable Rate Bonds is attached hereto as Exhibit B.

4.      A true and accurate copy of Plaintiff Scharff's certification dated August 4, 2008 is attached hereto as Exhibit C.

5.      The ARS Investors Group's counsel has been informed that approximately eight to ten lawyers from the three firms representing the Assif Group are working on their entire inventory of auction rate securities cases.

6.      The Scharff certification electronically filed on August 4, 2008 and August 5, 2008 is the same certification as that presented as Exhibit C hereto.

7.    On August 4, 2008, due to a transmission error when our firm was electronically filing through the S.D.N.Y.'s E.C.F. system, the Scharff certification was missing one of its two pages.

8.    Soon after the aforementioned transmission error was identified on August 5, 2008, my offices electronically re-filed the Scharff certification through the S.D.N.Y.'s E.C.F. system so that the entire certification was made available on the action's docket.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 5th day of September, 2008:

_____/s/ Curtis V. Trinko_____

Curtis V. Trinko

## NOTICE OF REDEMPTION

### TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY

### SUBORDINATE REVENUE VARIABLE RATE BONDS, SUBSERIES 2002D-1, 2002D-2 AND 2002D-3 (AUCTION RATE SECURITIES), SUBSERIES 2002G-1 AND 2002G-2 (AUCTION RATE SECURITIES) AND SUBSERIES 2004A-3 (AUCTION RATE SECURITIES)

**[Subseries, redemption dates, and CUSIP # as derived from Schedule A hereto]** [*]

NOTICE IS HEREBY GIVEN to the holders of the Triborough Bridge and Tunnel Authority's Subordinate Revenue Variable Rate Bonds described above (the "Refunded Bonds") that such Refunded Bonds have been called for redemption prior to maturity on the respective redemption dates and at the redemption amount set forth on Schedule A hereto, plus accrued interest up to but not including such date of redemption.

As permitted by Section A-405 of the Triborough Bridge and Tunnel Authority Subordinate Revenue Resolution, as amended and supplemented, redemption of the Refunded Bonds on the redemption date set forth on Schedule A hereto is subject to and conditioned upon there being sufficient money on such redemption date to pay the redemption price of the Bonds to be redeemed on such date.

The Refunded Bonds will become due and payable on the respective redemption dates set forth on Schedule A hereto, and will be redeemed only upon presentation and surrender of such Refunded Bonds at the office of The Bank of New York Mellon as follows:

| If by Mail: | If in Person: | If by Courier: |
|---|---|---|
| The Bank of New York Mellon 111 Sanders Creek Parkway East Syracuse, New York 13057 | The Bank of New York Mellon Debt Processing Window 101 Barclay Street New York, New York 10286 | The Bank of New York Mellon Debt Processing Window 101 Barclay Street New York, New York 10286 |

Upon presentation and surrender of the Refunded Bonds the holder will receive the redemption price thereof. Holders of Refunded Bonds will receive their interest due on the respective redemption dates by check mailed directly to the registered holder in the usual manner. Interest on all Refunded Bonds will cease to accrue on the respective redemption dates.

Under the provisions of the Economic Growth and Tax Relief Act of 2001, paying agents making payments of interest or principal on municipal securities may be obligated to withhold a 30% tax from remittance to individuals who have failed to furnish the paying agent with a valid taxpayer identification number. Owners of the Refunded Bonds who wish to avoid the imposition of the tax should submit certified taxpayer identification numbers when presenting their Refunded Bonds for payment.

### TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY

By:    **THE BANK OF NEW YORK MELLON**
as Trustee

**Dated:  July 22, 2008**

---

[*]    No representation is made as to the accuracy of the CUSIP number either as printed on the Refunded Bonds or as set forth in this Notice of Redemption.

546833.1 032005 NTC

## SCHEDULE A

| REFUNDED BONDS | CUSIP NO.[1] | REDEMPTION DATE | REDEMPTION AMOUNT |
|---|---|---|---|
| Suberies 2002D-1 | 89602N AK0 | August 21, 2008 | Full par amount of outstanding bonds |
| Subseries 2002D-2 | 89602N AL8 | August 22, 2008 | Full par amount of outstanding bonds |
| Subseries 2002D-3 | 89602N AM6 | September 17, 2008 | Full par amount of outstanding bonds |
| Subseries 2002G-1 | 89602N CE2 | September 10, 2008 | Full par amount of outstanding bonds |
| Subseries 2002G-2 | 89602N CF9 | September 17, 2008 | Full par amount of outstanding bonds |
| Subseries 2004A-3 | 89602N GM0 | August 22, 2008 | Full par amount of outstanding bonds |

---

[1] No representation is made as to the accuracy of the CUSIP number either as printed on the Refunded Bonds or as set forth in this Notice of Redemption.

# EXHIBIT B

**NEW ISSUE**

**BOOK-ENTRY-ONLY**

**$181,025,000**

# Triborough Bridge and Tunnel Authority

## Subordinate Revenue Variable Rate Refunding Bonds, Series 2002G
## (Auction Rate Securities)

consisting of

**$90,500,000 Subseries 2002G-1**          **$90,525,000 Subseries 2002G-2**

**DATED:** Date of Delivery                                              **DUE:** November 1, 2032

The Series 2002G Bonds are being issued to refund certain TBTA bonds.

The Series 2002G Bonds –

- are special obligations of TBTA, payable from the net revenues collected on the bridges and tunnels operated by TBTA as described herein, after the payment of operating expenses and debt service as required by TBTA's Senior Resolution, and

- are not a debt of the State or The City of New York or any other local government unit.

TBTA has no taxing power.

The Series 2002G Bonds initially will be in an Auction Rate Mode. **For a description of the method of determination of interest rates, interest periods, interest payment dates and certain other terms applicable to the Series 2002G Bonds, see the inside cover page.**

Each subseries of the Series 2002G Bonds will bear interest in an Auction Rate Mode from and including their date of delivery to but excluding the date on which the Mode applicable to such subseries is changed to another Mode, in which event that subseries will be subject to mandatory tender for purchase on such date at the purchase price equal to the principal amount thereof. **This official statement, in general, describes the Series 2002G Bonds only during the Auction Rate Mode.**

*In the opinion of Hawkins, Delafield & Wood, Bond Counsel to TBTA, under existing law and relying on certain representations by TBTA and assuming the compliance by TBTA with certain covenants, interest on the Series 2002G Bonds is*

- *excluded from a bondholder's federal gross income under the Internal Revenue Code of 1986,*

- *not a preference item for a bondholder under the federal alternative minimum tax, and*

- *included in the adjusted current earnings of a corporation under the federal corporate alternative minimum tax.*

*Also in Bond Counsel's opinion, under existing law interest on the Series 2002G Bonds is exempt from personal income taxes of New York State or any political subdivisions of the State, including The City of New York.*

---

Payment of the principal of and interest on the Series 2002G Bonds, when due, will be insured by a financial guaranty insurance policy to be issued by MBIA Insurance Corporation simultaneously with the delivery of the Series 2002G Bonds.

**MBIA**

---

**Price – 100%**

The Series 2002G Bonds are subject to redemption prior to maturity as described herein.

The Series 2002G Bonds are offered when, as, and if issued, subject to certain conditions, and are expected to be delivered through the facilities of The Depository Trust Company, on or about November 26, 2002.

This cover page contains certain information for general reference only. It is not intended to be a summary of the security or terms of the Series 2002G Bonds. Investors are advised to read the entire official statement, including all portions hereof included by specific reference, to obtain information essential to making an informed decision.

---

**JPMorgan**                                              **UBS PaineWebber Inc.**

November 15, 2002

**$181,025,000**
**Triborough Bridge and Tunnel Authority**
**Subordinate Revenue Variable Rate Refunding Bonds, Series 2002G**
**(Auction Rate Securities)**

consisting of

$90,500,000 Subseries 2002G-1          $90,525,000 Subseries 2002G-2

The initial interest rate established by TBTA for each subseries of the Series 2002G Bonds will apply to the period commencing on their date of issuance to and including the applicable initial Auction Date. Thereafter, each subseries will bear interest at an Auction Rate resulting from an Auction conducted for each Auction Period on each Auction Date in accordance with the Auction Procedures described in this official statement, subject to certain conditions and exceptions. Interest on each subseries of Series 2002G Bonds will be payable commencing on the initial Interest Payment Date for each such subseries, and on each Interest Payment Date thereafter. The initial Auction Date and each Auction Date thereafter and the initial Interest Payment Date and each Interest Payment Date thereafter are set forth below for each subseries of Series 2002G Bonds.

| Subseries | Initial Auction Date | Auction Date* | Auction Period** | Initial Interest Payment Date | Interest Payment Date*** |
|---|---|---|---|---|---|
| Subseries 2002G-1 | January 14, 2003 | each fifth Tuesday | 35-day | January 15, 2003 | each fifth Wednesday |
| Subseries 2002G-2 | January 21, 2003 | each fifth Tuesday | 35-day | January 22, 2003 | each fifth Wednesday |

| * | Subject to certain conditions and exceptions as described herein. |
|---|---|
| ** | Subject to certain exceptions (*see* **Attachment 4**-Auction Procedures-Definitions-Auction Period.) |
| *** | Subject to certain exceptions (*see* **Attachment 4**-Auction Procedures-Definitions-Interest Payment Date.) |

Prospective purchasers of each subseries of Series 2002G Bonds should carefully review the Auction Procedures described in **Attachment 4**, and should note that such procedures provide that (i) a Bid or Sell Order constitutes a commitment to purchase or sell Series 2002G Bonds based upon the results of an Auction, (ii) Auctions will be conducted through telephone, facsimile transmission or other similar electronic means of communication and (iii) settlement for purchases and sales will be made on the Business Day following an Auction. Beneficial interests in Series 2002G Bonds may be transferred only pursuant to a Bid or Sell Order placed in an Auction or to or through a Broker-Dealer.

The length of an Auction Period for each subseries of Series 2002G Bonds may be changed as described herein. The Series 2002G Bonds of each subseries will not be subject to mandatory tender for purchase upon a change in the length of an Auction Period; however, notice of such change will be given as further described herein, and, in such case, any Series 2002G Bonds that are not the subject of a specific Order shall be deemed to be subject to a Sell Order.

The Bank of New York will serve as Auction Agent. J.P. Morgan Securities Inc. and UBS PaineWebber Inc. will serve as Broker-Dealers for each subseries of the Series 2002G Bonds.

*The Underwriters may overallot or effect transactions which stabilize or maintain the market price of the Series 2002G Bonds at a level above that which might otherwise prevail in the open market. The Underwriters are not obligated to do this and are free to discontinue it at any time.*

# Triborough Bridge and Tunnel Authority

TRIBOROUGH STATION, BOX 35
New York, New York 10035
(212) 360-3000
Website: www.mta.info

Peter S. Kalikow ............................................................................................................. *Chairman*
David S. Mack ............................................................................................................. *Vice-Chairman*
Ronnie P. Ackman .................................................................................................... *Non-Voting Member*
Andrew B. Albert ..................................................................................................... *Non-Voting Member*
Nancy Shevell Blakeman ........................................................................................... *Member*
Anthony J. Bottalico ................................................................................................. *Non-Voting Member*
Kenneth A. Caruso ..................................................................................................... *Member*
Thomas J. Cassano ................................................................................................... *Non-Voting Member*
Edward B. Dunn ......................................................................................................... *Member*
Barry L. Feinstein ..................................................................................................... *Member*
Lawrence W. Gamache ............................................................................................... *Member*
James H. Harding, Jr. ................................................................................................. *Member*
Susan L. Kupferman ................................................................................................... *Member*
Mark D. Lebow ........................................................................................................... *Member*
James L. McGovern ................................................................................................... *Non-Voting Member*
Joseph Rutigliano ...................................................................................................... *Non-Voting Member*
Ernest J. Salerno ....................................................................................................... *Member*
Andrew M. Saul .......................................................................................................... *Member*
James L. Sedore, Jr .................................................................................................... *Member*
James S. Simpson ....................................................................................................... *Member*
Edward A. Vrooman .................................................................................................... *Member*
Rudy Washington ....................................................................................................... *Member*
Alfred E. Werner ....................................................................................................... *Member*

-----------------

Katherine N. Lapp ..................................................................... *Executive Director and Chief Operating Officer*
Michael C. Ascher ................................................................................................... *President*
Stanley Vonasek ..................................................................... *Vice President and Chief Engineer*
Robert M. O'Brien, Esq. ....................................................................................... *General Counsel*
David Moretti ......................................................................................................... *Chief Financial Officer*

HAWKINS, DELAFIELD & WOOD
New York, New York
*Bond Counsel*

GOLDMAN, SACHS & CO.
New York, New York
*Financial Advisor*

URS CORPORATION-NY
New York, New York
*Independent Engineers*

## SUMMARY OF TERMS

TBTA has prepared this Summary of Terms to describe the specific terms of the Series 2002G Bonds. The information in this official statement, including the materials filed with the repositories and included by specific reference as described herein, provides a more detailed description of matters relating to TBTA and to TBTA's Subordinate Revenue Bonds. Investors should carefully review that detailed information in its entirety before making a decision to purchase any of the bonds being offered.

Issuer .............................................. Triborough Bridge and Tunnel Authority, a public benefit corporation of the State of New York.

Bonds Being Offered ...................... Subordinate Revenue Variable Rate Refunding Bonds, Series 2002G.

Purpose of Issue ............................... To refund certain TBTA bonds listed in **Attachment 6**.

Rates and Maturity ........................... *See* cover and inside cover.

Denominations ................................. $25,000 and integral multiples of $25,000.

Auction Rate, Auction Dates,
Auction Periods and Interest
Payment Dates ................................. *See* inside cover.

Redemption ...................................... *See* DESCRIPTION OF SERIES 2002G BONDS – Redemption Prior to Maturity *in Part I*.

Sources of Payment and Security .... Net revenues collected on the bridges and tunnels operated by TBTA, after the payment of operating expenses and debt service as required by TBTA's Senior Resolution.

Credit Enhancement ........................ MBIA financial guaranty insurance policy.

Registration of the Bonds ............... DTC Book-Entry-Only System. No physical certificates evidencing ownership of a bond will be delivered, except to DTC.

Trustee, Paying Agent and Tender
Agent ............................................... The Bank of New York.

Bond Counsel .................................. Hawkins, Delafield & Wood, New York, New York.

Tax Status ....................................... *See* TAX MATTERS *in Part III*.

Expected Ratings ............................

| Rating Agency | Ratings |
|---|---|
| Moody's: | Aaa |
| Standard & Poor's: | AAA |
| Fitch: | AAA |

*See* RATINGS *in Part III*.

Financial Advisor ............................ Goldman, Sachs & Co.

Underwriters and Broker-Dealers .... *See* cover page. J.P. Morgan Securities Inc. is the representative of the Underwriters for the Series 2002G Bonds.

Auction Agent ................................. The Bank of New York.

Purchase Price/Underwriters'
Discount ........................................... *See* UNDERWRITING *in Part III*.

Verification Agent .......................... Samuel Klein & Co.

Counsel to the Underwriters ............ Orrick, Herrington & Sutcliffe LLP, New York, New York.

MTA Special Counsel .................... Nixon Peabody LLP *and* Squire, Sanders & Dempsey L.L.P, New York, New York.

Independent Engineers .................... URS Corporation – NY, New York, New York.

---

- *No Unauthorized Offer.* This official statement is not an offer to sell, or the solicitation of an offer to buy, the Series 2002G Bonds, in any jurisdiction where that would be unlawful. TBTA has not authorized any dealer, salesperson or anyone else to give any information or make any representation in connection with the offering of the Series 2002G Bonds, except as set forth in this official statement. No other information or representations should be relied upon.

- *No Contract or Investment Advice.* This official statement is not a contract and does not provide investment advice. Investors should consult their financial advisors and legal counsel with questions about this official statement and the Series 2002G Bonds being offered, and anything else related to this bond issue.

- *Information Subject to Change.* Information and expressions of opinion are subject to change without notice, and it should not be inferred that there have been no changes since the date of this document. Neither the delivery of, nor any sale made under, this official statement shall under any circumstances create any implication that there has been no change in TBTA's affairs or in any other matters described herein.

- *Forward-Looking Statements.* Many statements contained in this official statement, including the documents included by specific reference, that are not historical facts are forward-looking statements, which are based on TBTA's and the Independent Engineers' beliefs, as well as assumptions made by, and information currently available to, the management and staff of TBTA and the Independent Engineers. Because the statements are based on expectations about future events and economic performance and are not statements of fact, actual results may differ materially from those projected. The words "anticipate," "assume," "estimate," "expect," "objective," "projection," "forecast," "goal," "budget" or similar words are intended to identify forward-looking statements. The words or phrases "to date," "now," "currently," and the like are intended to mean as of the date of this official statement.

- *No Guarantee of Information by Underwriters.* The Underwriters have provided the following sentence for inclusion in this official statement: The Underwriters have reviewed the information in this official statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

- *Bond Insurer Information.* Other than with respect to information concerning the Insurer contained under the caption DESCRIPTION OF SERIES 2002G BONDS – Bond Insurance *in Part 1* and in Attachment 5 of this official statement, none of the information in this official statement has been supplied or verified by the Insurer and the Insurer makes no representation or warranty, express or implied, as to
  - the accuracy or completeness of information it has neither supplied nor verified,
  - the validity of the Series 2002G Bonds, or
  - the tax-exempt status of the interest on the Series 2002G Bonds.

---

## TABLE OF CONTENTS

**Page**

SUMMARY OF TERMS ........................................................................................................................... ii

**INTRODUCTION** ..................................................................................................................................... 1
TBTA, MTA and Other Related Entities ............................................................................................... 1
Where to Find Information .................................................................................................................... 1
Subordinate Revenue Bonds ................................................................................................................. 2
Debt Restructuring Program ................................................................................................................. 3
Defined Terms ....................................................................................................................................... 4
2003-2004 Financial Plan ...................................................................................................................... 4
Insurance Coverage Effective October 31, 2002 .................................................................................. 5

**PART I. SERIES 2002G BONDS** ............................................................................................................ 6
REFUNDING PLAN AND APPLICATION OF PROCEEDS .............................................................. 6
Use of Proceeds ..................................................................................................................................... 6
Escrow of Government Securities .......................................................................................................... 6
Interest Rate Swap ................................................................................................................................. 6
DESCRIPTION OF SERIES 2002G BONDS ....................................................................................... 6
General ................................................................................................................................................... 7
Determination of Interest Rates and Auction Periods for Series 2002G Bonds ................................... 7
Changes in Mode ................................................................................................................................... 10
Mandatory Tender for Purchase of Series 2002G Bonds on Any Mode Change Date .......................... 11
Notice of Mandatory Tender for Purchase ............................................................................................ 11
Remarketing of Series 2002G Bonds of a Subseries; Notices ............................................................... 11
Source of Funds for Purchase of Series 2002G Bonds .......................................................................... 12
Delivery of Remarketed Series 2002G Bonds ....................................................................................... 12
Delivery and Payment for Purchased Remarketed Series 2002G Bonds of a Subseries; Undelivered Series
2002G Bonds ...................................................................................................................................... 12
Redemption Prior to Maturity ............................................................................................................... 13
Bond Insurance ...................................................................................................................................... 14
Certain Rights of Insurer ....................................................................................................................... 16
Debt Service on the Senior and Subordinate Revenue Bonds ............................................................... 16

**PART II. SOURCES OF PAYMENT AND SECURITY FOR TBTA SUBORDINATE
REVENUE BONDS** ........................................................................................................................... 18
SOURCES OF PAYMENT ..................................................................................................................... 18
SECURITY .............................................................................................................................................. 20
Pledge Effected by the Subordinate Revenue Resolution ..................................................................... 20
Revenues and Additional Subordinate TBTA Projects .......................................................................... 20
Flow of Revenues .................................................................................................................................. 21
Rate Covenant ....................................................................................................................................... 21
Additional Subordinate Revenue Bonds ............................................................................................... 21
Refunding Subordinate Revenue Bonds ................................................................................................. 22

**PART III. OTHER INFORMATION ABOUT THE SERIES 2002G BONDS** ................................ 23
TAX MATTERS ...................................................................................................................................... 23
VERIFICATION OF MATHEMATICAL COMPUTATIONS .............................................................. 23
LEGALITY FOR INVESTMENT .......................................................................................................... 24
LITIGATION ........................................................................................................................................... 24
FINANCIAL ADVISOR .......................................................................................................................... 24
UNDERWRITING ................................................................................................................................... 24
RATINGS ................................................................................................................................................. 24
LEGAL MATTERS ................................................................................................................................. 25
CONTINUING DISCLOSURE ............................................................................................................... 25
FURTHER INFORMATION ................................................................................................................... 26

**Attachment 1 –** Book-Entry-Only System
**Attachment 2 –** Continuing Disclosure Under SEC Rule 15c2-12
**Attachment 3 –** Form of Opinion of Bond Counsel
**Attachment 4 –** Auction Procedures
**Attachment 5 –** Specimen Financial Guaranty Insurance Policy
**Attachment 6 –** Information Relating to the Refunded Bonds

*Information Included by Specific Reference.* The following portions of MTA's 2002 Combined Continuing Disclosure Filings, dated April 19, 2002, and filed with the repositories identified in the Introduction to this official statement are included by specific reference in this official statement, along with material that updates this official statement and that is either filed with those repositories or, in the case of official statements, filed with the Municipal Securities Rulemaking Board (MSRB) prior to the delivery date of the Series 2002G Bonds, together with any supplements or amendments thereto:

- **Appendix A –** The Related Entities*
- **Appendix D –** Audited Financial Statements of Triborough Bridge and Tunnel Authority for the Years Ended December 31, 2001 and 2000

The following documents have also been filed with the repositories identified in the Introduction and are included by specific reference in this official statement:

- Summary of Certain Provisions of the Subordinate Revenue Resolution
- Definitions and Summary of Certain Provisions of the Standard Resolution Provisions
- Definitions and Summary of Certain Provisions of the TBTA Resolution (*i.e.*, as used in this official statement, the Senior Resolution)
- History and Projection of Traffic, Toll Revenues and Expenses and Review of Physical Condition of the Facilities of Triborough Bridge and Tunnel Authority (Report of the Independent Engineers, URS Corporation – NY, dated September 4, 2002)

---

* The facilities listed under the caption "THE TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY – Present Facilities" in **Appendix A** include TBTA's seven bridges and two tunnels and the Battery Parking Garage. Only the bridges and tunnels constitute TBTA Facilities under the Senior Resolution (as herein defined), though the net revenues derived from the operation of the Battery Parking Garage are included as net revenues that are pledged to the payment of the Bonds (as herein defined). Capital projects at the Battery Parking Garage cannot be financed under the Senior Resolution unless the Battery Parking Garage qualifies as an Additional TBTA Project thereunder.

[THIS PAGE INTENTIONALLY LEFT BLANK]

# INTRODUCTION

**TBTA, MTA and Other Related Entities**

Triborough Bridge and Tunnel Authority, or TBTA, is a public benefit corporation, which means that it is a corporate entity separate and apart from the State, without any power of taxation – frequently called a "public authority". TBTA is empowered to construct and operate toll bridges and tunnels and other public facilities in New York City. TBTA issues debt obligations to finance the capital costs of its facilities and the transit and commuter systems operated by other affiliates and subsidiaries of the Metropolitan Transportation Authority, or MTA. TBTA's surplus amounts are used to fund transit and commuter operations and finance capital projects. The board members of MTA also serve as the board members of MTA's affiliates and subsidiaries, including TBTA.

MTA has responsibility for developing and implementing a single, integrated mass transportation policy for New York City and the seven New York metropolitan-area counties of Dutchess, Nassau, Orange, Putnam, Rockland, Suffolk and Westchester. It carries out some of those responsibilities by operating the transit and commuter systems through its subsidiary and affiliate entities: the New York City Transit Authority (the Transit Authority) and its subsidiary, the Manhattan and Bronx Surface Transit Operating Authority (MaBSTOA); the Staten Island Rapid Transit Operating Authority (SIRTOA); The Long Island Rail Road Company (LIRR); the Metro-North Commuter Railroad Company (MNCRC); and the Metropolitan Suburban Bus Authority (MSBA). MTA issues debt obligations to finance a substantial portion of the capital costs of these systems, other than MSBA.

MTA, TBTA and the other related entities are described in detail in **Appendix A** to MTA's 2002 Combined Continuing Disclosure Filings, which is included by specific reference in this official statement. Also included in **Appendix A** is a description of the impact on the Related Entities, including TBTA, of the terrorist attack on the World Trade Center (WTC).

On October 9, 2002, MTA announced plans to effect a corporate restructuring to create five distinct companies under MTA's governance:

- MTA Subways, that would include the Transit Authority's subway operations and SIRTOA,
- MTA Bus, that would include the Transit Authority's and MaBSTOA's bus operations and MSBA, and could in the future include one or more bus lines currently operated by private companies in New York City and Westchester,
- MTA Rail, that would include LIRR and MNCRC,
- MTA Bridges and Tunnels, that will retain the corporate structure of TBTA, and
- MTA Capital, a new company that would be in charge of overseeing the system expansion projects for all MTA companies.

This corporate restructuring along business lines is designed to streamline administrative functions and provide each entity with a single transportation focus. The initiative, which is expected to be implemented over a two year time frame, will be in compliance with all applicable provisions of the resolutions and laws under which MTA and TBTA issue bonds, notes and other obligations.

**Where to Find Information**

*Information in this Official Statement.*  This official statement is organized as follows:

- This *Introduction* provides certain information relating to the restructuring of public debt securities by MTA and its affiliates, TBTA and the Transit Authority.
- *Part I* provides specific information about the Series 2002G Bonds.
- *Part II* describes the sources of payment and security for all TBTA Subordinate Revenue Bonds, including the Series 2002G Bonds.
- *Part III* provides miscellaneous information relating to the Series 2002G Bonds.
- *Attachment 1* sets forth certain provisions applicable to the book-entry system of registration to be used for the Series 2002G Bonds.

- *Attachment 2* sets forth a summary of certain provisions of a continuing disclosure agreement relating to the Series 2002G Bonds.
- *Attachment 3* is the form of opinion of Bond Counsel in connection with the Series 2002G Bonds.
- *Attachment 4* sets forth a summary of the Auction Procedures.
- *Attachment 5* sets forth the specimen financial guaranty insurance policy.
- *Attachment 6* sets forth certain information relating to the bonds being refunded by the Series 2002G Bonds.
- *Information Included by Specific Reference* in this official statement and identified in the Table of Contents may be obtained, as described below, from the repositories or the MSRB and from MTA.

*Information from Repositories.* MTA and TBTA file annual and other information with each Nationally Recognized Municipal Securities Information Repository. Documents filed by MTA and TBTA should be available from those repositories designated as such at the time of the filing. The repositories may charge a fee for access to those documents. The current repositories are as follows:

*Bloomberg Municipal Repository*
100 Business Park Drive
Skillman, NJ 08558
Phone: (609) 279-3225
Fax: (609) 279-5962
Email: munis@bloomberg.com

*FT Interactive Data*
Attn: NRMSIR
100 William Street
New York, NY 10038
Phone: (212) 771-6999
Fax: (212) 771-7390 (Secondary Market Information)
     (212) 771-7391 (Primary Market Information)
Email: NRMSIR@FTID.com

*DPC Data Inc.*
One Executive Drive
Fort Lee, NJ 07024
Phone: (201) 346-0701
Fax: (201) 947-0107
Email: nrmsir@dpcdata.com

*Standard & Poor's J.J. Kenny Repository*
55 Water Street
45th Floor
New York, NY 10041
Phone: (212) 438-4595
Fax: (212) 438-3975
Email: nrmsir_repository@sandp.com

*Information Included by Specific Reference.* The information listed under the caption "Information Included by Specific Reference" in the Table of Contents, as filed with the repositories to date, is "included by specific reference" in this official statement. This means that important information is disclosed by referring to those documents and that the specified portions of those documents are considered to be part of this official statement. **This official statement, which includes those filings, should be read in its entirety in order to obtain essential information for making an informed decision in connection with the Series 2002G Bonds.**

*Information Available at No Cost.* Information filed with the repositories is also available, at no cost, on MTA's website or by contacting MTA, Attn.: Finance Department, at 347 Madison Avenue, New York, New York 10017. For important information about MTA's website, *see* – FURTHER INFORMATION below.

## Subordinate Revenue Bonds

The Subordinate Revenue Bonds are special obligations of TBTA issued in accordance with the 2001 Subordinate Revenue Resolution Authorizing Subordinate Revenue Obligations (as supplemented, the "Subordinate Revenue Resolution") adopted by the TBTA Board on March 26, 2002. The Subordinate Revenue Bonds are payable generally from the net revenues derived from the bridges and tunnels operated by TBTA as described herein, after the application of such net revenues as required by TBTA's General Resolution Authorizing General Revenue Obligations (the Senior Resolution), adopted by the TBTA Board on March 26, 2002.

**Debt Restructuring Program**

*Background*. As part of the process of determining funding sources for its transit and commuter capital programs for the years 2000-2004, and in order to increase bonding capacity, release existing reserve funds and simplify its current credit structure, MTA developed a program to restructure its, the Transit Authority's and TBTA's debt by consolidating most existing credits into four principal new credits:

- MTA Transportation Revenue Bonds,
- MTA State Service Contract Bonds,
- MTA Dedicated Tax Fund Bonds, and
- TBTA General Revenue Bonds and TBTA Subordinate Revenue Bonds.

*Portions of Debt Restructuring Completed*. MTA and TBTA have fully defeased the resolutions and/or trust agreements relating to the following bonds and notes:

- MTA Transit Facilities Revenue Bonds and Bond Anticipation Notes,
- MTA Commuter Facilities Revenue Bonds and Bond Anticipation Notes,
- MTA Subordinated Commuter Facilities Revenue Bonds (Grand Central Terminal Redevelopment Project),
- Transit Authority Subordinated Transit Facilities Revenue Bonds (Livingston Plaza Project),
- MTA Transit Facilities Service Contract Bonds (1982 and 1987 Resolutions),
- MTA Commuter Facilities Service Contract Bonds (1982 and 1987 Resolutions),
- MTA Dedicated Tax Fund Bonds,
- TBTA Special Obligation Bonds (1991 Resolution), and
- TBTA Beneficial Interest Certificates.

*Effect of Debt Restructuring on MTA Capital Programs*. Based on amounts currently estimated to have been generated by the completed portions of the program, and depending on market conditions as MTA issues the remaining new money bonds related to the debt restructuring, less than the $4.5 billion of restructuring proceeds originally forecast may be available for the 2000-2004 Capital Programs. (MTA currently estimates that the $4.5 billion can be achieved, depending on interest rate assumptions for the remaining issues). MTA annually evaluates the status of all funding sources and projects and may, from time to time, submit amendments to the 2000-2004 Capital Programs needed to bring funding sources and expected project costs into balance. *See* DEBT RESTRUCTURING and 2002-2003 FINANCIAL PLAN AND 2000-2004 CAPITAL PROGRAMS in Appendix A.

*TBTA Senior and Subordinate Revenue Bonds*. On October 8, 2002, TBTA issued the following approximate aggregate principal amounts of bonds to refund outstanding TBTA bonds and all beneficial interest certificates:

- $2.1 billion fixed rate General Revenue Refunding Bonds, Series 2002B (the Series 2002B General Revenue Bonds),
- $103 million variable rate General Revenue Variable Rate Refunding Bonds, Series 2002C (the Series 2002C General Revenue Bonds), and
- $262 million auction rate Subordinate Revenue Variable Rate Refunding Bonds, Series 2002D (the Series 2002D Bonds).

On October 8, 2002, TBTA substituted the TBTA General Revenue Bond Resolution (the Senior Resolution) for the TBTA general purpose revenue bond resolution adopted in 1980 as the resolution securing the following outstanding bonds and notes:

- $23,530,000 General Purpose Revenue Bonds, Series EFC 1996A, that were issued as security for repayment of a loan in the same principal amount from the New York State Environmental Facilities Corporation from a portion of the proceeds of the $102,515,000 New York State Environmental

3

Facilities Corporation State Water Pollution Control Revolving Fund Revenue Bonds, Series 1996C (Pooled Loan Issue), dated June 1, 1996,

- $807,190,000 General Purpose Revenue Bond Anticipation Notes, Series 2000A, maturing on January 1, 2003 (the Series 2000A BANs)[1],
- $1,125,720,000 General Purpose Revenue Bonds, Series 2001A,
- $296,400,000 General Purpose Variable Rate Revenue Bonds, Series 2001B and 2001C, and
- $268,300,000 General Purpose Revenue Bonds, Series 2002A.

On October 8, 2002, TBTA also substituted the Subordinate Revenue Resolution for the TBTA 1991 special obligation bond resolution as the resolution securing the following outstanding bonds:

- $181,300,000 Special Obligation Variable Rate Refunding Bonds (1991 Resolution), Series 2000A,
- $72,500,000 Special Obligation Variable Rate Refunding Bonds (1991 Resolution), Series 2000B,
- $157,200,000 Special Obligation Variable Rate Refunding Bonds (1991 Resolution), Series 2000C, and
- $96,600,000 Special Obligation Variable Rate Refunding Bonds (1991 Resolution), Series 2000D.

In addition, approximately $234 million was applied on October 8, 2002 to the purchase of government securities sufficient to defease additional TBTA bonds.

On November 13, 2002, TBTA issued the following aggregate principal amounts of bonds to refund additional outstanding TBTA bonds:

- $756,095,000 Subordinate Revenue Refunding Bonds, Series 2002E, and
- $246,480,000 General Revenue Refunding Bonds, Series 2002F.

These Series 2002G Bonds are expected to be delivered on or about November 26, 2002 in order to refund and defease in full the remaining TBTA senior and subordinate bonds outstanding under the old resolutions (the Old TBTA Resolutions) in order to complete TBTA's refunding portion of the debt restructuring.

Upon issuance of the Series 2002G Bonds, the entire refunding portion of the debt restructuring will be completed.

*Release of Existing Reserve Funds.* Once the defeasance of the old TBTA Resolutions and all TBTA bonds and notes issued thereunder has been accomplished, approximately $413 million in reserves will be released to TBTA and are expected to be used primarily to finance transit and commuter capital projects.

For a more detailed description of the debt restructuring, *see* DEBT RESTRUCTURING in **Appendix A**.

**Defined Terms**

Capitalized terms not otherwise defined in this official statement have the meanings provided by **Attachment 4**.

**2003-2004 Financial Plan**

MTA had previously adopted a financial plan for the years 2000 through 2004 for itself and the other Related Entities, including TBTA, which paralleled the various Capital Programs for the 2000 through 2004 period. In the case of LIRR, MNCRC, the Transit Authority, and MaBSTOA, the financial plan had projected significant operating deficits for 2003 and 2004 which MTA anticipated would be closed by a variety of actions taken before or

---

[1] On or about November 20, 2002, MTA expects to issue approximately $846 million aggregate principal amount of its Transportation Revenue Bonds to provide for the payment of the Series 2000A BANs.

during those years. As a result of the extraordinary circumstances relating to the terrorist attack on the WTC and its aftermath, the MTA determined that it was appropriate to limit the scope of its financial plan to the 2002-2003 period (the 2002-2003 Financial Plan). The 2002-2003 Financial Plan reflects a balanced budget for 2002 for the MTA and each of the Related Entities, including TBTA. The 2002-2003 Financial Plan also reflects a budget gap currently projected at $663.3 million for MTA and the Related Entities other than TBTA for 2003. As part of its annual process of preparing budgets, MTA and the other Related Entities are developing information regarding expenses and fare revenues and other receipts for 2003 to serve as the basis for determining the actual size of the 2003 gap which will need to be closed in the adopted budgets as well as proposed measures to close the projected gap. Estimates, both official and unofficial, as to the size of the projected gap and proposals as to the package of gap closing measures to be adopted are expected to be disseminated in the public media from time to time until the MTA and the other Related Entities adopt their actual budgets for 2003. The size of the gap included in the estimates of different parties could vary significantly from that currently included in the 2002-2003 Financial Plan. In addition, proposed gap closing measures may also change over time and include differing elements depending on the source of the proposals. MTA and the other Related Entities expect to adopt balanced budgets for 2003 prior to December 31, 2002. It is currently anticipated that in conjunction with the adoption of the 2003 budgets, MTA will adopt a financial plan covering the years 2003 and 2004 and may also include amendments to TBTA's 2000-2004 Capital Program and proposed amendments to the 2000-2004 Capital Programs for the other Related Entities. Such financial plan may continue to show operating gaps for 2004 for Related Entities other than TBTA which could be significant. TBTA is not expected to have a budget gap in the years 2003 and 2004.

**Insurance Coverage Effective October 31, 2002**

Effective October 31, 2002, MTA, on behalf of the Related Entities, procured property insurance coverage with $750 million in limits excess of a $30 million per occurrence self-insured retention. MTA is currently in the process of purchasing additional coverage to bring the limit up to $1 billion. The property insurance provides replacement cost coverage for all risks of direct physical loss or damage to all real and personal property, with minor exceptions, but excludes coverage for acts of terrorism and sabotage. The policy also provides business interruption coverage.

MTA, on behalf of the Related Entities, has acquired separate coverage for acts of terrorism and sabotage in the amount of $70 million in limits excess of a $30 million per occurrence self-insured retention. The terrorism and sabotage policy provides business interruption coverage only for TBTA's bridges and tunnels.

In addition, excess liability insurance was renewed to provide a $150 million in limits excess of a $50 million per occurrence self-insured retention provided by the MTA's Excess Loss Fund. This program covers third-party liability occurrences arising out of the operations of the Related Entities.

5

## PART I. SERIES 2002G BONDS

*Part I* of this official statement, together with the Summary of Terms, provides specific information about the Series 2002G Bonds.

## REFUNDING PLAN AND APPLICATION OF PROCEEDS

**Use of Proceeds**

Upon the issuance and delivery of these Series 2002G Bonds, currently expected on or about November 26, 2002, all bonds and notes outstanding under the Old TBTA Resolutions will have been refunded, paid and/or defeased. The series designations, CUSIP numbers, maturities and principal amounts of all TBTA bonds and notes that were outstanding under the Old TBTA Resolutions that have been and are being refunded in connection with the debt restructuring, including those bonds that are being refunded with the proceeds of the Series 2002G Bonds (the Refunded Bonds), and the redemption dates and redemption prices applicable thereto are set forth in **Attachment 6**.

TBTA will retain its right to redeem prior to maturity those TBTA bonds indicated on **Attachment 6**.

**Escrow of Government Securities**

A portion of the net proceeds of the Series 2002G Bonds will be used to acquire direct obligations of, or obligations guaranteed by, the United States of America (Government Securities), the principal of and interest on which, when due, will provide, together with any moneys which may be deposited by TBTA with the trustees under the applicable Old TBTA Resolutions (the Prior Trustees), moneys sufficient to pay the principal or redemption price of the Refunded Bonds and the interest to become due on such Refunded Bonds on and prior to their respective maturity or redemption dates.

The Government Securities and such other moneys, if any, will be deposited with the Prior Trustees upon the issuance and delivery of the Series 2002G Bonds and will be held in trust for the payment of the principal or redemption price of and interest on the Refunded Bonds. Upon making such deposit with the Prior Trustees and the issuance of certain irrevocable instructions to the Prior Trustees pursuant to the applicable Old TBTA Resolutions, the Refunded Bonds will, under the terms of the applicable Old TBTA Resolutions, be deemed to have been paid and will no longer be outstanding under the applicable Old TBTA Resolutions and will cease to be entitled to any lien, benefit or security under the applicable Old TBTA Resolutions.

**Interest Rate Swap**

In connection with the issuance of the Series 2002G Bonds, TBTA expects to enter into an interest rate swap agreement or agreements with JPMorgan Chase Bank (the Counterparty) for the purpose of converting TBTA's variable rate exposure relating to the Series 2002G Bonds to a fixed rate (the Interest Rate Swap). The Interest Rate Swap is expected to have a notional amount equal to the par amount of the Series 2002G Bonds and an effective date equal to the date of delivery of the Series 2002G Bonds. The Interest Rate Swap is expected to have a term ending no earlier than January 1, 2010 and may end prior to the maturity of the Series 2002G Bonds. Under the terms of the Interest Rate Swap, MTA will pay a fixed rate to the Counterparty and receive a variable rate. The Interest Rate Swap will be a Qualified Swap under the Subordinate Revenue Resolution and, as such, TBTA's scheduled interest obligations under the Interest Rate Swap will constitute Parity Swap Obligations under the Subordinate Revenue Resolution.

## DESCRIPTION OF SERIES 2002G BONDS

**Unless the context otherwise indicates, references in the following description to the "Series 2002G Bonds" apply to each subseries of the Series 2002G Bonds independently. Actions may be taken, or determinations made, with respect to one subseries that are not taken or made with respect to any other.**

**General**

*Auction Rate Bonds.* The Series 2002G Bonds will be dated the date of their initial delivery (the Closing Date) and will mature at the times and in the principal amounts as set forth on the **cover page** of this official statement. The Series 2002G Bonds initially will be in an Auction Rate Mode. While in an Auction Rate Mode, the Series 2002G Bonds will bear interest at an interest rate determined as described below under Determination of Interest Rates and Auction Periods for Series 2002G Bonds. **This official statement, in general, describes the Series 2002G Bonds only during the Auction Rate Mode.**

Interest on Series 2002G Bonds that are in an Auction Period of 180 days or less shall be calculated on the basis of a 360-day year for the actual number of days elapsed to the Interest Payment Date. Interest on Series 2002G Bonds that are in an Auction Period of over 180 days shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

*Credit Enhancement.* The scheduled payment of principal of and interest on the Series 2002G Bonds when due will be guaranteed under a financial guaranty insurance policy (the Insurance Policy) to be issued by MBIA Insurance Corporation (the Insurer). *See* Bond Insurance *below.*

*Book-Entry-Only System.* The Series 2002G Bonds will be issued as registered bonds, registered in the name of The Depository Trust Company or its nominee (together, DTC), New York, New York, which will act as securities depository for the Series 2002G Bonds. Individual purchases will be made in book-entry-only form, in the principal amount of $25,000 or integral multiples thereof (Authorized Denominations). So long as DTC is the registered owner of the Series 2002G Bonds, all payments on the Series 2002G Bonds will be made directly to DTC. DTC is responsible for disbursement of those payments to its participants, and DTC participants and indirect participants are responsible for making those payments to beneficial owners. *See* **Attachment 1 – Book-Entry Only System.**

*Interest Payments.* Interest on the Series 2002G Bonds is payable on each Interest Payment Date as described below under the caption Determination of Interest Rates and Auction Periods for Series 2002G Bonds – Interest Payment Dates. So long as DTC is the sole registered owner of all of the Series 2002G Bonds, all interest payments will be made to DTC by wire transfer of immediately available funds, and DTC's participants will be responsible for payment of interest to beneficial owners. All Series 2002G Bonds are fully registered in Authorized Denominations.

*Transfers and Exchanges.* So long as DTC is the securities depository for the Series 2002G Bonds, it will be the sole registered owner of the Series 2002G Bonds, and transfers of ownership interests in the Series 2002G Bonds will occur through the DTC Book-Entry-Only System.

*Trustee, Paying Agent and Tender Agent.* The Bank of New York is Trustee, Paying Agent and Tender Agent with respect to the Series 2002G Bonds.

**Determination of Interest Rates and Auction Periods for Series 2002G Bonds**

The initial interest rate for each subseries of the Series 2002G Bonds will be established by TBTA and will apply to the period commencing on the Closing Date to and including the initial Auction Date specified below for each such subseries. Thereafter, each subseries of the Series 2002G Bonds will bear interest at an Auction Period Rate (as defined below) determined on each Auction Date for each Auction Period pursuant to the Auction Procedures set forth in **Attachment 4.** The Auction Period and Auction Date applicable to a subseries of the Series 2002G Bonds will be the Auction Period and Auction Date set forth below until the length of such Auction Period is changed to a daily, seven-day, 28-day, 35-day, three-month, six-month or Special Auction Period, as described *below* under *Change in the Length of the Auction Period.*

| Subseries | Initial Auction Date | Auction Date* | Auction Period** | Initial Interest Payment Date | Interest Payment Date*** |
|---|---|---|---|---|---|
| Subseries 2002G-1 | January 14, 2003 | each fifth Tuesday | 35-day | January 15, 2003 | each fifth Wednesday |
| Subseries 2002G-2 | January 21, 2003 | each fifth Tuesday | 35-day | January 22, 2003 | each fifth Wednesday |

\*     If such day is not a Business Day, the Auction Date will be the Business Day immediately preceding such day.
\*\*    Subject to certain exceptions (*see* **Attachment 4**-Auction Procedures-Definitions-Auction Period.)
\*\*\*   If such day is not a Business Day, interest will be payable on the Business Day immediately following such day.

**Auction Period Rate** means with respect to each subseries of the Series 2002G Bonds, the rate of interest to be borne by that subseries during each Auction Period, which shall equal the Auction Rate (as defined below) for each Auction Period, subject to the following exceptions:

- If the Auction Agent shall have failed to calculate or, for any reason, fails to timely provide the Auction Rate for any Auction Period, (a) if the preceding Auction Period was a period of 35 days or less, the new Auction Period and Auction Period Rate shall be the same as the preceding Auction Period and the Auction Period Rate, respectively, and (b) if the preceding Auction Period was a period of greater than 35 days, it shall be extended to the seventh day following the day that would have been the last day of such Auction Period (or if such seventh day is not followed by a Business Day then to the next succeeding day which is followed by a Business Day) and the Auction Period Rate will continue in effect for the Auction Period as so extended.
- If a default in the payment of principal or interest on any Series 2002G Bonds of a subseries when due has occurred and is continuing and the Insurer is in default under the Insurance Policy, the Auction Period Rate for the Auction Period commencing on or after the date on which the Auction Agent receives notice of such default and each Auction Period thereafter commencing prior to the date on which such default shall have ceased to be continuing, shall be the Default Rate.
- In the event that all conditions for a change in the Mode from an Auction Rate Mode to another Mode, or the conversion from one Auction Period to another Auction Period have not been met, the applicable Series 2002G Bonds of a subseries will continue to be in an Auction Rate Mode, with a seven-day Auction Period, and bear interest at the Maximum Auction Rate for the next Auction Period.
- If the Series 2002G Bonds of a subseries are not rated or if the Series 2002G Bonds of a subseries are no longer maintained in book-entry form by the Securities Depository, then the Auction Period Rate shall be the Maximum Auction Rate.

**Auction Rate** means the interest rate that the Auction Agent advises results from an Auction conducted in accordance with the Auction Procedures, which rate shall be as follows:

- If Sufficient Clearing Bids exist, the Winning Bid Rate.
- If Sufficient Clearing Bids do not exist, the Maximum Auction Rate.
- If all Series 2002G Bonds of a subseries are the subject of Submitted Hold Orders, the All Hold Rate.

In no event may the Auction Period Rate exceed the Maximum Rate. *See* **Attachment 4** – Auction Procedures – Determination of Auction Period Rate.

*Interest Payment Dates.* Interest on each subseries of Series 2002G Bonds will be payable on the initial Interest Payment Date and on each Interest Payment Date thereafter. The initial Interest Payment Date and each Interest Payment Date thereafter are set forth above for each subseries of Series 2002G Bonds. In the event of a conversion from the Auction Period then applicable to a subseries of Series 2002G Bonds to another Auction Period, interest on the applicable subseries will be payable on each Interest Payment Date (as defined in **Attachment 4**) for such new Auction Period.

8

*Auction Date*. An Auction to determine the interest rate for each subseries of Series 2002G Bonds for each Auction Period will be held on the initial Auction Date and each Auction Date thereafter. The initial Auction Date and each Auction Date thereafter are set forth above for each subseries of Series 2002G Bonds. In the event of a conversion from an Auction Period then applicable to a subseries of Series 2002G Bonds to another Auction Period, Auctions will be held on each Auction Date (as defined in **Attachment 4**) for such new Auction Period. The day of the week on which Auctions are held may be changed by the Auction Agent in accordance with **Attachment 4**. *See* **Attachment 4** – Auction Procedures – Changes in Auction Period or Auction Date.

*Auction Agent*. The Trustee will enter into the Auction Agreement with The Bank of New York (the Auction Agent) and TBTA, pursuant to which the Auction Agent, as agent for the Trustee, shall perform the duties of Auction Agent. The Auction Agreement will provide, among other things, that the Auction Agent will determine the Auction Rate for each Auction in accordance with the Auction Procedures set forth in **Attachment 4**.

*Auction Procedures*. The procedure for submitting orders prior to the Submission Deadline on each Auction Date is described in **Attachment 4**, as are the particulars with regard to the determination of the Auction Period Rate (collectively, the Auction Procedures). *See* **Attachment 4** – Auction Procedures.

*Amendment of the Subordinate Revenue Resolution*. The provisions of the Subordinate Revenue Resolution, with respect to a subseries of Series 2002G Bonds, including without limitation the Auction Procedures and the definitions of Default Rate, Maximum Auction Rate, All Hold Rate, Index, Auction Multiple and Auction Period Rate, may be amended pursuant to the Subordinate Revenue Resolution by obtaining, when required by the Subordinate Revenue Resolution, the consent of the owners of all Series 2002G Bonds of a subseries or, in lieu thereof as permitted by the Subordinate Revenue Resolution, the Insurer for the Series 2002G Bonds of such subseries. All owners will be deemed to have consented if on the first Auction Date occurring at least 20 days after the Trustee mailed notice to such owners (i) the Auction Period Rate determined for such date is the Winning Bid Rate and (ii) there has been delivered to TBTA and the Trustee a Favorable Opinion of Bond Counsel. *See* **Attachment 4** – Auction Procedures – Miscellaneous Provisions Regarding Auctions.

Changes in Auction Periods and Auction Dates do not require the amendment of the Auction Procedures or any consents. *See* **Attachment 4** – Auction Procedures – Changes in Auction Period or Auction Date.

*Change in the Length of the Auction Period*. TBTA may from time to time on the last Interest Payment Date for an Auction Period, change the length of the Auction Period with respect to all of the Series 2002G Bonds of any subseries among a daily, seven-day, 28-day, 35-day, three-month, six-month and a Special Auction Period. No such change shall be effective unless Sufficient Clearing Bids existed at the Auction for such new Auction Period. On the date of that change, any Series 2002G Bonds of such subseries which are not the subject of a specific Hold Order or Bid will be deemed to be subject to a Sell Order. In the event of a failed conversion to another Auction Period due to the lack of Sufficient Clearing Bids, the Series 2002G Bonds of such subseries will automatically convert to a seven-day Auction Period and will bear interest for the next Auction Period at the Maximum Auction Rate. In connection with a conversion from one Auction Period to another Auction Period, written notice of such conversion will be given in accordance with the Auction Procedures; however, the Series 2002G Bonds of a subseries will not be subject to mandatory tender on such conversion date. *See* **Attachment 4** – Auction Procedures – Changes in Auction Period or Auction Date.

*Record Date*. The record date for the Series 2002G Bonds will be the opening of business on the Business Day next preceding an Interest Payment Date.

*Special Considerations Relating to the Series 2002G Bonds in an Auction Rate Mode*. The Subordinate Revenue Resolution provides that the Auction Agent may resign from its duties as Auction Agent by giving at least 90-days notice or 30-days notice, if it has not been paid, to TBTA, each Broker-Dealer and the Trustee and does not require, as a condition to the effectiveness of such resignation, that a replacement Auction Agent be in place if its fee has not been paid. Each Broker-Dealer Agreement provides that the Broker-Dealer thereunder may resign upon five-business-days notice or immediately, in certain circumstances, and does not require, as a condition to the effectiveness of such resignation, that a replacement Broker-Dealer be in place. For any Auction Period during which there is no duly appointed Auction Agent, or during which there is no duly appointed Broker-Dealer, it will not be possible to hold Auctions, with the result that the interest rate on the Series 2002G Bonds will be determined

as if the Auction Agent failed to calculate or timely provide the Auction Rate. For more information, *see* **Auction Period Rate** *above* and subsection (d) in **Attachment 4**– Auction Procedures – Determination of Auction Period Rate.

Each Broker-Dealer Agreement provides that a Broker-Dealer may submit an Order in Auctions for its own account. If a Broker-Dealer submits an Order for its own account, it might have an advantage over other Bidders in that it would have knowledge of orders placed through it in that Auction; such Broker-Dealer, however, would not have knowledge of Orders submitted by other Broker-Dealers (if any) in that Auction. In the Broker-Dealer Agreement, Broker-Dealers agree to handle customer orders in accordance with their respective duties under applicable securities laws and rules.

During an Auction Rate Mode the beneficial owner of a Series 2002G Bond may sell, transfer or dispose of a Series 2002G Bond only pursuant to a Bid or Sell Order in accordance with the Auction Procedures or through a Broker-Dealer. *See* **Attachment 4** – Auction Procedures. The ability to sell a Series 2002G Bond in an Auction may be adversely affected if there are not sufficient buyers willing to purchase all the Series 2002G Bonds at a rate equal to or less than the Maximum Auction Rate. The Broker-Dealers have advised TBTA that they intend initially to make a market in the Series 2002G Bonds of a subseries between Auctions; however, the Broker-Dealers are not obligated to make such markets, and no assurance can be given that secondary markets therefor will develop.

### Changes in Mode

*General*. Any subseries of the Series 2002G Bonds may be changed to any other Mode at the times and in the manner as summarized herein.

If the Auction Period Rate for a subseries of the Series 2002G Bonds is equal to the Maximum Auction Rate or the Default Rate for the longer of (i) two consecutive Auction Dates or (ii) 90 days, the Insurer shall have the right to direct TBTA to change the Mode applicable to such subseries to the fixed rate mode and TBTA has agreed in the Subordinate Revenue Resolution that in such case it would change such Mode to the fixed rate mode as described below.

*Notice of Intention to Change Mode*. TBTA shall give written notice to the Trustee, the Tender Agent, the Remarketing Agent, each Broker-Dealer, the Auction Agent and the Insurer (the Notice Parties) of its intention to effect a change in the Mode from the Mode then prevailing (the Current Mode) to another Mode (the New Mode) specified in such written notice, together with the proposed effective date of such change in the Mode (the Mode Change Date). Such notice shall be given at least 20 days prior to the Mode Change Date.

*General Provisions Applying to Changes from One Mode to Another.*

1.     The Mode Change Date must be an Interest Payment Date following the last day of an Auction Period.

2.     On or prior to the date TBTA provides the notice to the Notice Parties, TBTA shall deliver to the Trustee (with a copy to all other Notice Parties) a letter from Bond Counsel addressed to the Trustee to the effect that it expects to be able to deliver a Favorable Opinion of Bond Counsel on the Mode Change Date.

3.     No change in Mode will become effective unless all conditions precedent thereto have been met and the following items shall have been delivered to the Trustee and the Remarketing Agent by 11:00 a.m., or such later time as is acceptable to TBTA, the Trustee and the Remarketing Agent, on the Mode Change Date:

- a Favorable Opinion of Bond Counsel dated the Mode Change Date,
- a Tender Agency Agreement and a Remarketing Agreement if required for the New Mode, and
- a certificate of an authorized officer of the Tender Agent to the effect that all of the Series 2002G Bonds of a subseries tendered or deemed tendered, unless otherwise redeemed, have been purchased at a price at least equal to the principal amount thereof.

4.      If all conditions to the Mode change are met, the interest period for the New Mode shall commence on the Mode Change Date and the interest rate shall be determined by the Remarketing Agent.

5.      In the event the foregoing conditions have not been satisfied by the Mode Change Date, the New Mode shall not take effect and the Series 2002G Bonds of a subseries that are the subject of the Mode change:

- will not be subject to mandatory tender for purchase,
- will continue to be in the Auction Rate Mode,
- will be in seven-day Auction Periods on and after the failed Mode Change Date until the length of the Auction Period is changed as described above, and
- will bear interest at an Auction Period Rate which for (a) the Auction Period commencing on the failed Mode Change Date shall be equal to the Maximum Auction Rate as determined on the Auction Date for such Auction Period and (b) which for each Auction Period thereafter will be determined in accordance with the Auction Procedures.

## Mandatory Tender for Purchase of Series 2002G Bonds on Any Mode Change Date

Any subseries of the Series 2002G Bonds to be changed to any Mode from the Auction Rate Mode are subject to mandatory tender for purchase on the Mode Change Date at the purchase price equal to the principal amount thereof (the Purchase Price).

The Purchase Price of Series 2002G Bonds that are subject to mandatory tender for purchase on a Mode Change Date is payable only from the proceeds of the remarketing thereof and any funds advanced by TBTA for such purpose at its option. Although TBTA has the option to purchase Series 2002G Bonds that are subject to mandatory tender for purchase and that have not been remarketed on the Mode Change Date, it is not obligated to do so. If any Series 2002G Bonds of a subseries subject to mandatory tender for purchase on a Mode Change Date are not purchased, then the Existing Owners of all of the Series 2002G Bonds of such subseries will continue to hold such Series 2002G Bonds in a seven-day Auction Period at the Maximum Auction Rate for the Auction Period commencing on the failed Mode Change Date.

## Notice of Mandatory Tender for Purchase

The Trustee shall, at least 15 days prior to any Mode Change Date for the Series 2002G Bonds of a subseries, give notice of the mandatory tender for purchase of the Series 2002G Bonds of such subseries on such Date.

Notice of any mandatory tender of Series 2002G Bonds of a subseries shall be provided by the Trustee or caused to be provided by the Trustee by mailing a copy of the notice of mandatory tender by first-class mail to each bondholder at the respective addresses shown on the registry books. Each notice shall identify the reason for the mandatory tender for purchase, and specify the Mode Change Date, the Purchase Price, the place and manner of payment, that the bondholder has no right to retain such Series 2002G Bonds and that no further interest will accrue from and after the Mode Change Date to such bondholder. Each notice shall also specify the conditions that have to be satisfied pursuant to the Subordinate Revenue Resolution in order for the New Mode to become effective, as well as the consequences that the failure to satisfy any of such conditions would have. Any notice mailed as described above shall be conclusively presumed to have been duly given, whether or not the bondholder receives the notice, and the failure of such bondholder to receive any such notice shall not affect the validity of the action described in such notice. Failure by the Trustee to give a notice as provided under this caption would not affect the obligation of the Tender Agent to purchase the Series 2002G Bonds of a subseries subject to mandatory tender for purchase on the Mode Change Date.

## Remarketing of Series 2002G Bonds of a Subseries; Notices

The Remarketing Agent for Series 2002G Bonds being changed to a new Mode shall offer for sale and use its best efforts to find purchasers for all Series 2002G Bonds required to be tendered for purchase.

*Notice of Remarketing; Registration Instructions; New Series 2002G Bonds*.

(i)     The Remarketing Agent shall notify the Tender Agent not later than 11:45 a.m. on the Mode Change Date of the registration instructions as may be necessary to re-register Series 2002G Bonds; and

(ii)    Unless otherwise permitted by the Securities Depository and the book-entry-only system applicable to a subseries of Series 2002G Bonds, the Tender Agent shall authenticate and have available for delivery to the Remarketing Agent prior to 12:30 p.m. on the Mode Change Date new Series 2002G Bonds of a subseries for the respective purchasers thereof.

*Transfer of Funds*. The Remarketing Agent shall at or before 11:45 a.m. on the Mode Change Date notify the Tender Agent and TBTA of the amount of tendered Series 2002G Bonds of a subseries that were not successfully remarketed. In the event that all of the Series 2002G Bonds of such subseries are successfully remarketed, the Remarketing Agent shall confirm to the Tender Agent the transfer of the Purchase Price of all of the Series 2002G Bonds of such subseries to the Tender Agent in immediately available funds at or before 12:00 noon on the Mode Change Date. In the event that any Series 2002G Bonds of such subseries are not successfully remarketed, TBTA shall have the option, but shall not be obligated, to purchase such Series 2002G Bonds. If any Series 2002G Bonds of a subseries are not purchased on the Mode Change Date, the Existing Owners of all of the Series 2002G Bonds of such subseries will continue to hold such Series 2002G Bonds in a seven-day Auction Period at the Maximum Auction Rate for the Auction Period commencing on the failed Mode Change Date.

### Source of Funds for Purchase of Series 2002G Bonds

On or before the close of business on the Mode Change Date with respect to Series 2002G Bonds of a subseries, the Tender Agent shall purchase those Series 2002G Bonds from the bondholders at the Purchase Price. Funds for the payment of that Purchase Price shall be derived only from remarketing proceeds or any funds advanced by TBTA at its option. Although TBTA has the option to purchase Series 2002G Bonds that are subject to mandatory tender for purchase and that have not been remarketed on the Mode Change Date, it is not obligated to do so. If any Series 2002G Bonds subject to mandatory tender for purchase on a Mode Change Date are not purchased, then the Existing Owners of all of the Series 2002G Bonds of that subseries will continue to hold such Series 2002G Bonds in a seven-day Auction Period at the Maximum Auction Rate for the Auction Period commencing on the failed Mode Change Date.

### Delivery of Remarketed Series 2002G Bonds

Except as otherwise required or permitted by the book-entry-only system of the Securities Depository, remarketed Series 2002G Bonds sold by a Remarketing Agent shall be delivered by the Remarketing Agent to the purchasers of those remarketed Series 2002G Bonds by 3:00 p.m., on the Mode Change Date.

### Delivery and Payment for Purchased Remarketed Series 2002G Bonds of a Subseries; Undelivered Series 2002G Bonds

Except as otherwise required or permitted by the book-entry-only system of the Securities Depository, remarketed Series 2002G Bonds purchased as set forth above shall be delivered (with all necessary endorsements) at or before 12:00 noon on the Mode Change Date at the office of the Tender Agent in New York, New York; provided, however, that payment of the Purchase Price of any remarketed Series 2002G Bond purchased shall be made only if such Series 2002G Bond so delivered to the Tender Agent conforms in all respects to the description thereof in the notice of tender. Payment of the Purchase Price shall be made by wire transfer in immediately available funds by the Tender Agent by the close of business on the Mode Change Date, or, if the bondholder has not provided or caused to be provided wire transfer instructions, by check mailed to the bondholder at the address appearing in the books required to be kept by the Trustee pursuant to the Subordinate Revenue Resolution. If Series 2002G Bonds of a subseries to be purchased are not delivered by the bondholders to the Tender Agent by 12:00 noon on the Mode Change Date, the Tender Agent shall hold any funds received for the purchase of those Series 2002G Bonds in trust in a separate account uninvested, and shall pay such funds to the former bondholders upon presentation of the Series 2002G Bonds subject to tender. Undelivered Series 2002G Bonds are tendered and cease

to accrue interest as to the former bondholders on the Mode Change Date and moneys representing the Purchase Price shall be available against delivery of those Series 2002G Bonds at the Principal Office of the Tender Agent; provided, however, that any funds so held by the Tender Agent that remain unclaimed by the former holder of any such Series 2002G Bond not presented for purchase for a period of two years after delivery of such funds to the Tender Agent shall, to the extent permitted by law, upon request in writing by TBTA and the furnishing of security or indemnity to the Tender Agent's satisfaction, be paid to TBTA free of any trust or lien and thereafter the former holder of such Series 2002G Bond shall look only to TBTA and then only to the extent of the amounts so received by TBTA without any interest thereon and the Tender Agent shall have no further responsibility with respect to such moneys or payment of the Purchase Price of such Series 2002G Bonds. The Tender Agent shall authenticate a replacement Series 2002G Bond for any undelivered Series 2002G Bond which may then be remarketed by the Remarketing Agent.

### Redemption Prior to Maturity

*Mandatory Sinking Fund Redemption*. The Series 2002G Bonds are subject to redemption in part on November 1 of each year and in the respective principal amounts set forth below at 100% of the principal amount thereof, plus accrued interest to the redemption date, from sinking fund installments which are required to be made in amounts sufficient to redeem on November 1 of each year set forth below the principal amount of such respective Series 2002G Bonds specified for each of the years shown below:

| Year | Sinking Fund Installments |
|------|---------------------------|
| 2024 | $16,400,000 |
| 2025 | 18,100,000 |
| 2026 | 18,250,000 |
| 2027 | 19,525,000 |
| 2028 | 19,850,000 |
| 2029 | 21,050,000 |
| 2030 | 21,600,000 |
| 2031 | 22,725,000 |
| 2032* | 23,525,000 |

* Final maturity

Unless otherwise directed by TBTA, each subseries of the Series 2002G Bonds shall be redeemed with the proceeds from such Sinking Fund Installments *pro rata*, subject to rounding in accordance with authorized denominations. The date on which a sinking fund installment will be due when the Series 2002G Bonds of a subseries entitled to such sinking fund installment are in the Auction Rate Mode will be either the dates set forth above, or if any such date is not an Interest Payment Date, then the Interest Payment Date immediately preceding the date set forth above.

*Credit Toward Mandatory Sinking Fund Redemption*. TBTA may take credit toward mandatory Sinking Fund Installment requirements as follows, and if taken, thereafter reduce the amount of term Series 2002G Bonds of any subseries otherwise subject to mandatory Sinking Fund Installments on the date for which credit is taken:

- If TBTA directs the Trustee to purchase term Series 2002G Bonds with money in the Debt Service Fund (at a price not greater than par plus accrued interest to the date of purchase), then a credit of 100% of the principal amount of bonds purchased will be made against the next Sinking Fund Installment due.

- If TBTA purchases or redeems term Series 2002G Bonds with other available moneys, then the principal amount of those bonds will be credited against future Sinking Fund Installments in any order, and in any annual amount, that TBTA may direct.

*Optional Redemption*. Each subseries of Series 2002G Bonds shall be subject to optional redemption by TBTA, in whole or in part, on any Interest Payment Date immediately following an Auction Period, at a Redemption

Price equal to the principal amount thereof, plus accrued interest to the redemption date; provided, however, that in the event of a partial redemption of Series 2002G Bonds of a subseries, the aggregate principal amount of Series 2002G Bonds of such subseries which will remain outstanding shall be equal to or more than $10,000,000 unless otherwise consented to by the related Broker-Dealers.

*State and City Redemption*. Pursuant to the TBTA Act, the State or the City, upon providing sufficient funds, may require TBTA to redeem the Series 2002G Bonds as a whole at the time and at the price and in accordance with the terms upon which the Series 2002G Bonds are otherwise redeemable.

*Redemption Notices*. So long as DTC is the securities depository for the Series 2002G Bonds, the Trustee must mail redemption notices to DTC at least 30 days before the redemption date. If the Series 2002G Bonds are *not* held in book-entry-only form, then the Trustee must mail redemption notices directly to bondholders within the same time frame. A redemption of the Series 2002G Bonds is valid and effective even if DTC's procedures for notice should fail. Beneficial owners should consider arranging to receive redemption notices or other communications to DTC affecting them, including notice of interest payments through DTC participants. Any notice of optional redemption may state that it is conditional upon receipt by the Trustee of money sufficient to pay the Redemption Price or upon the satisfaction of any other condition, or that it may be rescinded upon the occurrence of any other event, and any conditional notice so given may be rescinded at any time before the payment of the Redemption Price if any such condition so specified is not satisfied or if any such other event occurs. **Please note that all redemptions are final - even if beneficial owners did not receive their notice, and even if that notice had a defect.**

*Effect of Call for Redemption*. If the Trustee gives an unconditional notice of redemption, then on the redemption date the Series 2002G Bonds called for redemption will become due and payable. If the Trustee gives a conditional notice of redemption and holds money to pay the redemption price of the affected Series 2002G Bonds, then on the redemption date the Series 2002G Bonds called for redemption will become due and payable. In either case, if on the redemption date the Trustee holds money to pay the Series 2002G Bonds called for redemption, thereafter, no interest will accrue on those Series 2002G Bonds, and a bondholder's only right will be to receive payment of the redemption price upon surrender of those Series 2002G Bonds.

## Bond Insurance

The following information has been furnished by MBIA Insurance Corporation (the Insurer) for use in this official statement. Reference is made to **Attachment 5** for a specimen of the financial guaranty insurance policy (the Insurance Policy).

*Insurance Policy*. The Insurance Policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of TBTA to the Paying Agent or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Series 2002G Bonds as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the Insurance Policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner of the Series 2002G Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law (a Preference).

The Insurance Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Series 2002G Bond. The Insurance Policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of purchase price of Series 2002G Bonds upon tender by an owner thereof; or (iv) any Preference relating to (i) and (iii) above. The Insurance Policy also does not insure against nonpayment of principal of or interest on the Series 2002G Bonds resulting from the insolvency, negligence or any other act or omission of the Paying Agent or any other paying agent for the Series 2002G Bonds.

14

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Series 2002G Bond the payment of an insured amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such Series 2002G Bonds or presentment of such other proof of ownership of the Series 2002G Bonds, together with any appropriate instruments of assignment to evidence the assignment of the insured amounts due on the Series 2002G Bonds as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Series 2002G Bonds in any legal proceeding related to payment of insured amounts on the Series 2002G Bonds, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners or the Paying Agent payment of the insured amounts due on such Series 2002G Bonds, less any amount held by the Paying Agent for the payment of such insured amounts and legally available therefor.

*The Insurer*. The Insurer is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company (the Company). The Company is not obligated to pay the debts of or claims against the Insurer. The Insurer is domiciled in the State of New York and licensed to do business in and subject to regulation under the laws of all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the Virgin Islands of the United States and the Territory of Guam. The Insurer has three branches, one in the Republic of France, one in the Republic of Singapore and one in the Kingdom of Spain. New York has laws prescribing minimum capital requirements, limiting classes and concentrations of investments and requiring the approval of policy rates and forms. State laws also regulate the amount of both the aggregate and individual risks that may be insured, the payment of dividends by the Insurer, changes in control and transactions among affiliates. Additionally, the Insurer is required to maintain contingency reserves on its liabilities in certain amounts and for certain periods of time.

The Insurer does not accept any responsibility for the accuracy or completeness of this official statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding the Insurance Policy and the Insurer set forth under this caption "Bond Insurance" and in **Attachment 5**. Additionally, the Insurer makes no representation regarding the Series 2002G Bonds or the advisability of investing in the Series 2002G Bonds.

The Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

*Insurer Information*. The following documents filed by the Company with the Securities and Exchange Commission (the "SEC") is incorporated herein by reference:

(1)     The Company's Annual Report on Form 10-K for the year ended December 31, 2001; and

(2)     The Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002.

Any documents filed by the Company pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act of 1934, as amended, after the date of this official statement and prior to the termination of the offering of the Series 2002G Bonds offered hereby shall be deemed to be incorporated by reference in this official statement and to be a part hereof. Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this official statement, shall be deemed to be modified or superseded for purposes of this official statement to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this official statement.

The Company files annual, quarterly and special reports, information statements and other information with the SEC under File No. 1-9583. Copies of the SEC filings (including (1) the Company's Annual Report on Form 10-

K for the year ended December 31, 2001, and (2) the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002, are available (i) over the Internet at the SEC's web site at *http://www.sec.gov*; (ii) the SEC's public reference room in Washington D.C.; (iii) over the Internet at the Company's web site at http://www.mbia.com; and (iv) at no cost, upon request to MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504. The telephone number of MBIA is (914) 273-4545.

As of December 31, 2001, the Insurer had admitted assets of $8.5 billion (audited), total liabilities of $5.6 billion (audited), and total capital and surplus of $2.9 billion (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of June 30, 2002, the Insurer had admitted assets of $8.7 billion (unaudited), total liabilities of $5.7 billion (unaudited), and total capital and surplus of $3.0 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

*Financial Strength Ratings of the Insurer.*

Moody's Investors Service, Inc. rates the financial strength of the Insurer "Aaa."

Standard & Poor's, a division of The McGraw-Hill Companies, Inc., rates the financial strength of the Insurer "AAA."

Fitch Ratings rates the financial strength of the Insurer "AAA."

Each rating of the Insurer should be evaluated independently. The ratings reflect the respective rating agency's current assessment of the creditworthiness of the Insurer and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the Series 2002G Bonds, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the Series 2002G Bonds. The Insurer does not guaranty the market price of the Series 2002G Bonds nor does it guaranty that the ratings on the Series 2002G Bonds will not be revised or withdrawn.

The Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

**Certain Rights of Insurer**

TBTA has granted to the Insurer certain rights authorized under Section A-202 of the Subordinate Revenue Resolution, including the right to be deemed the sole owner of the Series 2002G Bonds whenever the approval, consent or action of the owners is required. *See* Definitions and Summary of Certain Provisions of the Standard Resolution Provisions *included by specific reference herein.*

**Debt Service on the Senior and Subordinate Revenue Bonds.**

**Table 1** on the following page sets forth, on a cash basis, estimated debt service on the (1) senior lien bonds, (2) outstanding Subordinate Revenue Bonds, (3) Series 2002G Bonds, and (4) aggregate senior lien and subordinate lien bonds after the issuance of the Series 2002G Bonds.

**Table 1**
**Estimated Aggregate Senior and Subordinate Debt Service**
**(In Thousands)**

Subordinate Revenue Bonds

| Year Ending December 31 | Senior Lien Bonds[1] | Outstanding Bonds[2] | Series 2002G Bonds[3] | Aggregate Senior and Subordinate Debt Service[4] |
|---|---|---|---|---|
| 2002 | $ 42,591 | $ 34,146 | $ 0 | $ 76,737 |
| 2003 | 220,951 | 99,691 | 7,764 | 328,406 |
| 2004 | 247,704 | 98,888 | 7,392 | 353,984 |
| 2005 | 279,834 | 98,924 | 7,040 | 385,798 |
| 2006 | 279,834 | 98,980 | 7,744 | 386,558 |
| 2007 | 279,907 | 105,001 | 7,040 | 391,948 |
| 2008 | 279,851 | 105,043 | 7,744 | 392,639 |
| 2009 | 279,851 | 105,030 | 7,040 | 391,921 |
| 2010 | 279,851 | 105,109 | 7,392 | 392,352 |
| 2011 | 279,852 | 105,169 | 7,392 | 392,413 |
| 2012 | 279,850 | 105,229 | 7,040 | 392,119 |
| 2013 | 279,850 | 105,281 | 7,754 | 392,885 |
| 2014 | 278,347 | 105,393 | 7,030 | 390,770 |
| 2015 | 278,354 | 105,453 | 7,744 | 391,551 |
| 2016 | 278,355 | 105,581 | 7,040 | 390,975 |
| 2017 | 278,357 | 105,662 | 7,392 | 391,410 |
| 2018 | 278,350 | 110,810 | 7,392 | 396,553 |
| 2019 | 278,348 | 110,245 | 7,040 | 395,633 |
| 2020 | 278,354 | 109,695 | 7,744 | 395,793 |
| 2021 | 278,349 | 109,149 | 7,040 | 394,538 |
| 2022 | 278,358 | 98,589 | 7,744 | 384,691 |
| 2023 | 279,852 | 98,588 | 7,040 | 385,481 |
| 2024 | 278,353 | 76,640 | 23,706 | 378,669 |
| 2025 | 278,358 | 76,874 | 24,672 | 379,904 |
| 2026 | 278,348 | 77,147 | 24,127 | 379,621 |
| 2027 | 278,347 | 77,401 | 24,611 | 380,359 |
| 2028 | 278,353 | 77,634 | 24,002 | 379,989 |
| 2029 | 278,355 | 77,897 | 24,684 | 380,936 |
| 2030 | 278,351 | 78,135 | 24,113 | 380,598 |
| 2031 | 278,357 | 78,377 | 24,527 | 381,261 |
| 2032 | 243,579 | 78,981 | 24,334 | 346,893 |
| Total | $8,285,351 | $2,924,745 | $373,319 | $11,583,415 |

[1] Includes the following variable rate assumptions for senior lien debt service: $296,400,000 General Revenue Variable Rate Bonds, Series 2001B and C (at an assumed interest rate of 4% per annum and including net payments made by TBTA under the swap agreement relating thereto); $103,305,000 General Revenue Variable Rate Refunding Bonds, Series 2002C (at an assumed interest rate of 4% per annum and including net payments made by TBTA under the swap agreement relating thereto); and the $246,480,000 General Revenue Variable Rate Refunding Bonds, Series 2002F (at an assumed interest rate of 4% per annum). It does not include debt service on the $807,190,000 Series 2000A BANs – MTA expects to issue its Transportation Revenue Bonds to provide for the payment of the Series 2000A BANs on or about November 20, 2002.
[2] Includes the following variable rate assumptions for subordinate lien debt service: $507,600,000 Subordinate Revenue Variable Rate Refunding Bonds, Series 2000A – D at an assumed interest rate of 4% per annum and including net payments made by TBTA under the swap agreements relating thereto; and $261,700,000 Subordinate Revenue Variable Rate Refunding Bonds, Series 2002D at an assumed interest rate of 4% per annum.
[3] Assumes variable interest rate of 4% per annum.
[4] Totals may not add due to rounding. Includes the assumptions set forth in footnotes 1, 2 and 3.

## PART II.  SOURCES OF PAYMENT AND SECURITY FOR TBTA SUBORDINATE REVENUE BONDS

*Part II* of this official statement describes the sources of payment and security for all TBTA Subordinate Revenue Bonds, including the Series 2002G Bonds.

### SOURCES OF PAYMENT

TBTA receives its revenues from all tolls, rates, fees, charges, rents, proceeds of use and occupancy insurance on any portion of its tunnels, bridges and other facilities, including the net revenues of the Battery Parking Garage, and TBTA's receipts from those sources, after payment of TBTA's operating expenses and after the application of such net revenues to the payment of debt service as required by TBTA's Senior Resolution, are pledged to the holders of the Subordinate Revenue Bonds for payment, as described below.

The following 7 bridges and 2 tunnels constitute TBTA Facilities for purposes of the Subordinate Revenue Resolution:

- Triborough Bridge,
- Verrazano-Narrows Bridge,
- Bronx-Whitestone Bridge,
- Throgs Neck Bridge,
- Henry Hudson Bridge,
- Marine Parkway-Gil Hodges Memorial Bridge,
- Cross Bay Veterans Memorial Bridge,
- Brooklyn-Battery Tunnel, and
- Queens Midtown Tunnel.

In addition, but only for purposes of determining Revenues under the Subordinate Revenue Resolution, the net revenues of the Battery Parking Garage are included.

TBTA is required to fix and collect tolls for the TBTA Facilities, and TBTA's power to establish toll rates is not subject to the approval of any governmental entity. For more information relating to TBTA's power to establish tolls, *see* **Appendix A** – THE RELATED ENTITIES – The Triborough Bridge and Tunnel Authority – *Toll Rates*.

For more detailed information about TBTA's tolls, *see* the report of the Independent Engineers – History and Projection of Traffic, Toll Revenues and Expenses and Review of Physical Condition of the Facilities of Triborough Bridge and Tunnel Authority *included by specific reference herein*.

From time to time legislation has been introduced by various State legislators seeking, among other things, to restrict the level of tolls on certain of TBTA's Facilities, to require approval of future toll increases by the Governor, or to eliminate minimum tolls or to require discounts or free passage to be accorded to certain users of TBTA's Facilities. Under the TBTA Act, however, the State has covenanted to holders of TBTA's bonds that it will not limit or alter the rights vested in TBTA to establish and collect such charges and tolls as may be convenient or necessary to produce sufficient revenue to fulfill the terms of any agreements made with the holders of TBTA bonds or in any way to impair rights and remedies of those bondholders.

**Table 2** sets forth, by TBTA Facility, the amount of revenues for each of the last 5 years on a cash basis, as well as operating expenses. For a description of the effects on the operations of the TBTA Facilities due to the terrorist attack on WTC on September 11, 2001, *see* **Appendix A** – THE RELATED ENTITIES – Terrorist Attack on World Trade Center, *and* History and Projection of Traffic, Toll Revenues and Expenses and Review of Physical Condition of the Facilities of Triborough Bridge and Tunnel Authority *included by specific reference herein*.

**Table 2**

**Triborough Bridge and Tunnel Authority**
**Traffic, Revenues And Operating Expenses**
**(In Thousands)**

Years Ended December 31,

|  | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| Bridge and Tunnel Revenues: |  |  |  |  |  |
| Triborough Bridge | $200,451 | $208,325 | $216,413 | $222,612 | $215,241 |
| Verrazano-Narrows Bridge | 185,130 | 192,788 | 196,556 | 203,172 | 208,164 |
| Bronx-Whitestone Bridge | 135,593 | 140,083 | 147,597 | 155,938 | 152,881 |
| Throgs Neck Bridge | 147,106 | 149,711 | 152,134 | 152,453 | 150,764 |
| Henry Hudson Bridge | 28,687 | 28,731 | 30,068 | 31,938 | 32,242 |
| Marine Parkway-Gil Hodges Memorial Bridge | 8,589 | 8,577 | 8,461 | 8,374 | 8,344 |
| Cross Bay Veterans' Memorial Bridge | 6,727 | 7,021 | 7,199 | 7,651 | 7,965 |
| Queens Midtown Tunnel | 83,543 | 85,628 | 87,284 | 89,451 | 87,067 |
| Brooklyn-Battery Tunnel | 56,167 | 63,576 | 67,080 | 69,018 | 52,188 |
| Total Bridge and Tunnel Revenues: | $851,993 | $884,440 | $912,792 | $940,607 | $914,856 |
| Investment Income and Other[1] | 48,612 | 54,111 | 39,314 | 58,205 | 56,681 |
| **Total Revenues** | **$900,605** | **$938,551** | **$952,106** | **$998,812** | **$971,537** |
| Operating Expenses[2]: |  |  |  |  |  |
| Personnel Costs | $111,651 | $106,603 | $107,430 | $112,256 | $123,316 |
| Maintenance and Other Operating Expenses | 112,222 | 101,587 | 120,561 | 129,807 | 133,198 |
| **Total Operating Expenses** | **$223,873** | **$208,190** | **$227,991** | **$242,063** | **$256,514** |
| **Net Revenues Available for Debt Service** | **$676,732** | **$730,361** | **$724,115** | **$756,749** | **$715,023** |
| **TBTA Senior Lien Debt Service[3]** | **$271,856** | **$291,918** | **$295,652** | **$311,610** | **$320,451** |
| Subordinate Bond Fund Investment Earnings[4] | $ 4,201 | $ 4,992 | $ 3,836 | $ 4,110 | $ 1,716 |
| **Net Revenues Available for Subordinate Debt Service[5]** | **$409,077** | **$443,435** | **$432,299** | **$449,249** | **$396,288** |
| **Debt Service on Subordinate Revenue Bonds[6]** | **$110,989** | **$115,895** | **$113,464** | **$114,887** | **$ 87,340** |
| **Total Debt Service (Senior and Subordinate)** | **$382,845** | **$407,813** | **$409,116** | **$426,497** | **$407,791** |
| **Combined Debt Service Coverage Ratio** | **1.78x** | **1.80x** | **1.78x** | **1.78x** | **1.76x** |

---

[1] Investment earnings include interest earned on bond funds, including debt service and debt service reserve funds, that were applied to the payment of debt service as follows for the years 1997 through 2001, respectively: $12,227; $17,581; $12,205; $14,659; and $25,696. Readers should note that, since there is no debt service reserve fund in the Senior Resolution, investment earnings are expected to be substantially lower in future years. Figures are net of Other Income as included on the TBTA audited financial statements (rail car leases), as follows for the years 1997 through 2001, respectively: $5,258; $5,258; $6,683; $805; and $620.

[2] Excludes depreciation.

[3] Represents debt service on bonds outstanding under TBTA's 1980 Resolution.

[4] Includes investment earnings on the Beneficial Interest Certificates (BICs) debt service fund and on the following debt service reserve funds: 1991 Resolution (MRT); 1994 Resolution; and BICs. Readers should note that, since there is no debt service reserve fund in the Subordinate Revenue Resolution, investment earnings are expected to be substantially lower in future years.

[5] Does not include certain mortgage recording tax revenues that were pledged to the payment of TBTA 1991 Mortgage Recording Tax Special Obligation Bonds.

[6] Includes debt service on the 1991 MRT Resolution Bonds (presented as if TBTA paid gross debt service from its own revenues without deducting available mortgage recording tax revenues), 1994 Resolution bonds and BICs, all of which are expected to be refunded as part of the debt restructuring.

## SECURITY

TBTA Subordinate Revenue Bonds, including the Series 2002G Bonds, are special obligations of TBTA payable solely from the trust estate (described below) pledged for the payment of the Subordinate Revenue Bonds and Parity Debt pursuant to the terms of the Subordinate Revenue Resolution, after the payment of Operating Expenses and after payment of debt service as required by TBTA's Senior Resolution. Summaries of certain provisions of the Subordinate Revenue Resolution, including the Standard Resolution Provisions, are *included by specific reference herein.*

TBTA Subordinate Revenue Bonds are not a debt of the State or The City of New York, or any local governmental unit. TBTA has no taxing power.

### Pledge Effected by the Subordinate Revenue Resolution

The lien on the trust estate described below created by the Subordinate Revenue Resolution is junior and subordinate to the lien created by TBTA's Senior Resolution.

Pursuant to, and in accordance with, the Subordinate Revenue Resolution, TBTA has pledged to the holders of the Subordinate Revenue Bonds and Parity Debt a "trust estate," which consists of

- Revenues (after the application of such Revenues as required by TBTA's Senior Resolution, including to the payment of Operating Expenses and Senior Resolution debt service),
- the proceeds from the sale of the Subordinate Revenue Bonds, and
- all funds, accounts and subaccounts established by the Subordinate Revenue Resolution (except those established by a supplemental obligation resolution for variable interest rate obligations, put obligations, parity debt, subordinated contract obligations or subordinated debt).

### Revenues and Additional Subordinate TBTA Projects

***Revenues from TBTA Facilities.*** For purposes of the pledge under the Subordinate Revenue Resolution, revenues of TBTA generally include all tolls, revenues, rates, fees, charges, rents, proceeds of use and occupancy insurance on any portion of the TBTA Facilities (including net revenues derived from the Battery Parking Garage) and of any other insurance which insures against loss of revenues therefrom payable to or for the account of TBTA, and other income and receipts, as received by TBTA directly or indirectly from any of TBTA's operations, including the ownership or operation of any TBTA Facilities, subject to certain exceptions.

TBTA does not currently derive any significant recurring Revenues from any sources other than the TBTA Facilities and investment income. Income from the TBTA Transit and Commuter Project (the transit and commuter systems) is not derived by or for the account of TBTA; consequently, no revenues from any portion of the TBTA Transit and Commuter Project are pledged to the payment of debt service on the Bonds.

For a discussion of other projects that TBTA is authorized to undertake, *see* **Appendix A – THE RELATED ENTITIES** – The Triborough Bridge and Tunnel Authority – *Authorized Projects of TBTA.*

***Additional Subordinate TBTA Projects.*** One or more projects owned or to be owned by TBTA or another Related Entity may become an Additional Subordinate TBTA Project without satisfying any earnings or coverage test if:

- TBTA is authorized to undertake that project, and
- the project is designated by TBTA to be an Additional Subordinate TBTA Project.

Upon satisfaction of certain conditions, TBTA is authorized to issue Subordinate Revenue Bonds to fund the Capital Costs of Additional Subordinate TBTA Projects. *See* Additional Subordinate Revenue Bonds *below.*

**Flow of Revenues**

The Subordinate Revenue Resolution establishes the following funds and accounts, each held by TBTA:

- Proceeds Fund, and
- Debt Service Fund.

TBTA is required to transfer to the Debt Service Fund under the Subordinate Revenue Resolution, from time to time, but no less frequently than on or before the 25th day of each calendar month, from such amounts as shall from time to time be available for transfer from the Revenue Fund under the Senior Resolution, free and clear of the lien of the Senior Resolution, the amount, if any, required so that the balance in the fund is equal to Accrued Debt Service to the last day of the current calendar month; *provided, however, that* in no event shall the amount to be so transferred be less than the amount required for all payment dates occurring prior to the 25th day of the next succeeding calendar month.

**Rate Covenant**

TBTA is required at all times to establish, levy, maintain and collect, or cause to be established, levied, maintained and collected, such tolls, rentals and other charges in connection with the TBTA Facilities as shall always be sufficient, together with other money available therefor (including the anticipated receipt of proceeds of sale of Obligations or other bonds, notes or other obligations or evidences of indebtedness of TBTA that will be used to pay the principal of Obligations issued in anticipation of such receipt, but not including any anticipated or actual proceeds from the sale of TBTA Facilities), to equal or exceed in each calendar year **the greater of**

- an amount equal to the sum of amounts necessary in such calendar year

  - to pay all Operating Expenses of TBTA, plus
  - to pay Calculated Debt Service on all senior lien and subordinate lien bonds and parity debt, plus
  - to maintain any reserve established by TBTA pursuant to the Senior Resolution, in such amount as may be determined from time to time by TBTA in its judgment, or

- an amount such that Revenues less Operating Expenses shall equal at least **1.10 times** Calculated Debt Service on all senior lien and subordinate lien bonds and parity debt for such calendar year.

For a more detailed description of the rate covenant and a description of the minimum tolls that can be charged at the TBTA Facilities, *see* SUMMARY OF CERTAIN PROVISIONS OF THE TBTA RESOLUTION – Rates and Fees *included by specific reference herein*, and SUMMARY OF CERTAIN PROVISIONS OF THE SUBORDINATE REVENUE RESOLUTION – Additional Provisions Relating to the Series 2002D Bonds – *Rate Covenant, included by specific reference herein (with the reference to Series 2002D Bonds also being deemed to be a reference to Series 2002G Bonds).*

**Additional Subordinate Revenue Bonds**

Under the provisions of the Subordinate Revenue Resolution, TBTA may issue one or more series of Additional Subordinate Revenue Bonds to pay or provide for the payment of all or part of Capital Costs relating to any of the following purposes:

- TBTA Facilities,
- TBTA Transit and Commuter Project, or
- any Additional Subordinate TBTA Project.

In addition to meeting certain other conditions, all as more fully described in SUMMARY OF CERTAIN PROVISIONS OF THE SUBORDINATE REVENUE RESOLUTION – Special Provisions for Capital Cost Obligations *included by specific reference herein*, an Authorized Officer must certify that the Twelve Month Period Net Revenues are at least equal to **1.10 times** the Combined Maximum Annual Calculated Debt Service for all Subordinate Revenue Obligations, Parity Debt, Senior Obligations and Senior Parity Debt.

In addition, TBTA covenants that, prior to the issuance of senior lien bonds, an Authorized Officer must certify that the Twelve Month Period Net Revenues are at least equal to **1.10 times** the Combined Maximum Annual Calculated Debt Service for all Subordinate Revenue Obligations, Parity Debt, Senior Obligations and Senior Parity Debt. *See* SUMMARY OF CERTAIN PROVISIONS OF THE SUBORDINATE REVENUE RESOLUTION – Additional Provisions Relating to the Series 2002D Bonds – *Covenant Regarding Senior Resolution, included by specific reference herein (with the reference to Series 2002D Bonds also being deemed to be a reference to Series 2002G Bonds).*

**Refunding Subordinate Revenue Bonds**

Subordinate Revenue Bonds may be issued for the purpose of refunding Subordinate Revenue Bonds, Parity Debt, Senior Obligations or Senior Parity Debt if

- the Combined Maximum Annual Calculated Debt Service (including the refunding Subordinate Revenue Bonds then proposed to be issued, but not including the Subordinate Revenue Bonds, Parity Debt, Senior Obligations or Senior Parity Debt to be refunded) is equal to or less than the Combined Maximum Annual Calculated Debt Service as calculated immediately prior to the refunding (including the refunded Subordinate Revenue Bonds, Parity Debt, Senior Obligations or Senior Parity Debt, but not including the refunding Subordinate Revenue Bonds), or

- the conditions referred to above *under* Additional Subordinate Revenue Bonds are satisfied.

For a more detailed description of the conditions that must be satisfied before issuing refunding Subordinate Revenue Bonds, *see* SUMMARY OF CERTAIN PROVISIONS OF THE SUBORDINATE REVENUE RESOLUTION – Refunding Subordinate Revenue Obligations *included by specific reference herein.*

## PART III.  OTHER INFORMATION ABOUT THE SERIES 2002G BONDS

*Part III* of this official statement provides miscellaneous additional information relating to the Series 2002G Bonds.

### TAX MATTERS

Hawkins, Delafield & Wood is Bond Counsel for the Series 2002G Bonds. Their opinion under existing law, relying on certain statements by TBTA and assuming compliance by TBTA with certain covenants, is that interest on the Series 2002G Bonds is:

- excluded from a bondholder's federal gross income under the Internal Revenue Code of 1986,
- not a preference item for a bondholder under the federal alternative minimum tax, and
- included in the adjusted current earnings of a corporation under the federal corporate alternative minimum tax.

Their opinion is also that under existing law interest on the Series 2002G Bonds is exempt from personal income taxes of New York State and any political subdivisions of the State, including The City of New York. *See* **Attachment 3** to this official statement for the form of the opinion that Bond Counsel expects to deliver when the Series 2002G Bonds are delivered.

The Internal Revenue Code imposes requirements on the Series 2002G Bonds that TBTA must continue to meet after the Series 2002G Bonds are issued. These requirements generally involve the way that Series 2002G Bond proceeds must be used and invested. If TBTA does not meet these requirements, it is possible that a bondholder may have to include interest on the Series 2002G Bonds in its federal gross income on a retroactive basis to the date of issue. TBTA has covenanted to do everything necessary to meet the requirements of the Internal Revenue Code.

A bondholder who is a particular kind of taxpayer may also have additional tax consequences from owning the Series 2002G Bonds. This is possible if a bondholder is

- an S corporation,
- a United States branch of a foreign corporation,
- a financial institution,
- a property and casualty or a life insurance company,
- an individual receiving Social Security or railroad retirement benefits,
- an individual claiming the earned income credit or
- a borrower of money to purchase or carry the Series 2002G Bonds.

If a bondholder is in any of these categories, it should consult its tax advisor.

Bond Counsel is not responsible for updating its opinion in the future. It is possible that something may happen in the future that could change the tax treatment of the interest on the Series 2002G Bonds or affect the market price of the Series 2002G Bonds. For example, the Internal Revenue Code could be changed.

Bond Counsel expresses no opinion on the effect of any action taken or not taken in reliance upon an opinion of other counsel on the federal income tax treatment of interest on the Series 2002G Bonds, or under State, local or foreign tax law.

### VERIFICATION OF MATHEMATICAL COMPUTATIONS

The arithmetical accuracy of (a) the mathematical computations of the adequacy of the outstanding maturing amount of principal of and interest on the Government Securities and other available moneys to be deposited in escrow to pay the maturing amounts or redemption prices of the Refunded Bonds on their respective maturity or redemption dates, together with all payments of interest thereon coming due on or prior to such dates and (b) mathematical computations supporting the conclusion of Bond Counsel that the Series 2002G Bonds are not "arbitrage bonds" under Section 148 of the Code, will be verified by Samuel Klein & Co., Certified Public Accountants.

23

## LEGALITY FOR INVESTMENT

The TBTA Act provides that the Series 2002G Bonds are securities in which the following investors may properly and legally invest funds, including capital in their control or belonging to them:

- all public officers and bodies of the State and all municipalities and political subdivisions in the State,
- all insurance companies and associations and other persons carrying on an insurance business, all banks, bankers, trust companies, savings banks and savings associations, including savings and loan associations, building and loan associations, investment companies and other persons carrying on a banking business,
- all administrators, guardians, executors, trustees and other fiduciaries, and
- all other persons whatsoever who are now or who may hereafter be authorized to invest in the obligations of the State.

Certain of those investors, however, may be subject to separate restrictions which limit or prevent their investment in the Series 2002G Bonds.

## LITIGATION

There is no pending litigation concerning the bonds being offered.

TBTA is the defendant in numerous claims and actions. TBTA does not believe that any of these claims and actions are material to the payment of principal and interest on the Series 2002G Bonds. A summary of certain of these potentially material claims and actions is set forth in **Appendix A** – THE RELATED ENTITIES – Litigation - TBTA, as that filing may be amended or supplemented to date.

## FINANCIAL ADVISOR

Goldman, Sachs & Co. is TBTA's financial advisor for the Series 2002G Bonds and the debt restructuring. The financial advisor has provided TBTA advice on the plan of financing and reviewed the pricing of the Series 2002G Bonds. The financial advisor has not independently verified the information contained in this official statement and does not assume responsibility for the accuracy, completeness or fairness of such information. The financial advisor's fees for serving as financial advisor are contingent upon the issuance of the Series 2002G Bonds.

## UNDERWRITING

The Underwriters for the Series 2002G Bonds, acting through J.P. Morgan Securities Inc., as Representative, have jointly and severally agreed, subject to certain conditions, to purchase from TBTA the Series 2002G Bonds at an aggregate purchase price of $180,246,497.81, reflecting an Underwriters' discount of $778,502.19, and to reoffer such Series 2002G Bonds at par.

The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Series 2002G Bonds if any Series 2002G Bonds are purchased.

## RATINGS

The Summary of Terms identifies the ratings of the credit rating agencies that are expected to be assigned to the Series 2002G Bonds. Those expected ratings reflect only the views of the organizations assigning them. An explanation of the significance of the ratings from each identified agency may be obtained as follows:

| Fitch Ratings | Moody's Investors Service, Inc. | Standard & Poor's Ratings Services |
|---|---|---|
| One State Street Plaza | 99 Church Street | 55 Water Street |
| New York, New York 10004 | New York, New York 10007 | New York, New York 10041 |
| (212) 908-0500 | (212) 553-0300 | (212) 438-2000 |

TBTA has furnished to each rating agency rating the bonds being offered information, including information not included in this official statement, about TBTA and the bonds. Generally, rating agencies base their ratings on that information and on independent investigations, studies and assumptions made by each rating agency. There can be no assurance that ratings will continue for any given period of time or that they will not be revised downward or withdrawn entirely by a rating agency if, in the judgment of that rating agency, circumstances warrant the revision or withdrawal. Those circumstances may include, among other things, changes in or unavailability of information relating to TBTA or the bonds. Any downward revision or withdrawal of a rating may have an adverse effect on the market price of the bonds.

*The expected ratings on the bonds identified in the Summary of Terms generally reflects the ratings of the Insurer providing credit enhancement for the Series 2002G Bonds.*

## LEGAL MATTERS

All legal proceedings in connection with the issuance of the bonds being offered are subject to the approval of the nationally-recognized bond counsel firm identified on the cover page and in the Summary of Terms. The form of the opinion of Bond Counsel is **Attachment 3** to this official statement.

Certain legal matters regarding TBTA will be passed upon by its General Counsel. In addition, certain legal matters will be passed upon by TBTA's special counsel or the counsel to the Underwriters, or both, as also indicated in the Summary of Terms.

## CONTINUING DISCLOSURE

As more fully stated in **Attachment 2**, TBTA has agreed to provide certain financial information and operating data by no later than 120 days following the end of each fiscal year. That information is to include, among other things, TBTA annual audited financial statements prepared in accordance with generally accepted accounting principles, or if unavailable, unaudited financial statements until audited statements become available. TBTA has undertaken to file such above information with each Nationally Recognized Municipal Securities Information Repository and a New York State Information Depository (the SID), if and when one is established.

TBTA has further agreed to deliver notice to each Repository or the Municipal Securities Rulemaking Board (MSRB) and to the SID of any failure to provide the Annual Information. TBTA is also obligated to deliver notices of the following events, if material, to each repository, or to the MSRB or the SID:

- principal and interest delinquencies;
- non-payment related defaults;
- unscheduled draws on debt service reserves reflecting financial difficulties;
- unscheduled draws on credit enhancements reflecting financial difficulties;
- substitution of credit or liquidity providers, or their failure to perform;
- adverse tax opinions or events affecting the tax exempt status of the security;
- modifications to the rights of security holders;
- bond calls;
- defeasance;
- release, substitution, or sale of property securing repayment of the securities; and
- rating changes.

TBTA has not failed to comply in any material respect with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of Rule 15c2-12 under the Securities Exchange Act of 1934, as amended.

**FURTHER INFORMATION**

TBTA may place a copy of this official statement on MTA's website at *"www.mta.info"*. No statement on the MTA's website or any other website is included by specific reference herein.

Although TBTA and MTA have prepared the information on the MTA's website for the convenience of those seeking that information, no decision in reliance upon that information should be made. Typographical or other errors may have occurred in converting the original source documents to their digital format, and MTA and TBTA assume no liability or responsibility for errors or omissions contained on any website. Further, MTA and TBTA disclaim any duty or obligation to update or maintain the availability of the information contained on any website or any responsibility or liability for any damages caused by viruses contained within the electronic files on any website. TBTA and MTA also assume no liability or responsibility for any errors or omissions or for any updates to dated information contained on any website.

**TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY**

By:_____/s/ Gary G. Caplan_____
Director, Budgets and Financial Management
of the Metropolitan Transportation Authority

**ATTACHMENT 1**

**BOOK-ENTRY ONLY SYSTEM**

1.      The Depository Trust Company (DTC), New York, NY, will act as securities depository for the Series 2002G Bonds. The Series 2002G Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Series 2002G Bond will be issued for each maturity of the Series 2002G Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. If, however, the aggregate principal amount of any maturity of the Series 2002G Bonds exceeds $500 million, one Bond of such maturity will be issued with respect to each $500 million of principal amount, and an additional Bond will be issued with respect to any remaining principal amount of such maturity.

2.      DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over two million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 85 countries that DTC's participants (Direct Participants) deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation (DTCC). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Government Securities Clearing Corporation, MBS Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, GSCC, MBSCC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly (Indirect Participants). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

3.      Purchases of Series 2002G Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2002G Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 2002G Bond (Beneficial Owner) is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2002G Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Series 2002G Bonds, except in the event that use of the book-entry system for the Series 2002G Bonds is discontinued.

4.      To facilitate subsequent transfers, all Series 2002G Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Series 2002G Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 2002G Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2002G Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

5.    Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Series 2002G Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Series 2002G Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Series 2002G Bond documents. For example, Beneficial Owners of the Series 2002G Bonds may wish to ascertain that the nominee holding the Series 2002G Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

6.    Redemption notices shall be sent to DTC. If less than all of the Series 2002G Bonds of any maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

7.    Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Series 2002G Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to TBTA as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts Series 2002G Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

8.    Redemption proceeds and principal and interest payments on the Series 2002G Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detailed information from TBTA or the Trustee, on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee or TBTA, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds and principal and interest payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of TBTA or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

9.    DTC may discontinue providing its services as depository with respect to the Series 2002G Bonds at any time by giving reasonable notice to TBTA or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, certificates for the Series 2002G Bonds are required to be printed and delivered.

10.    TBTA may decide to discontinue use of the system of book-entry transfers through DTC (or a successor depository). In that event, certificates for the Series 2002G Bonds will be printed and delivered

THE ABOVE INFORMATION CONCERNING DTC AND DTC'S BOOK-ENTRY SYSTEM HAS BEEN OBTAINED FROM SOURCES THAT TBTA BELIEVES TO BE RELIABLE, BUT TBTA TAKES NO RESPONSIBILITY FOR THE ACCURACY THEREOF.

ATTACHMENT 1-2

**ATTACHMENT 2**

**CONTINUING DISCLOSURE UNDER SEC RULE 15c2-12**

In order to assist the Underwriters in complying with the provisions of Rule 15c2-12 under the Securities Exchange Act of 1934, as amended ("Rule 15c2-12"), TBTA and the Trustee will enter into a written agreement (the "Disclosure Agreement") for the benefit of holders of the Series 2002G Bonds to provide continuing disclosure. TBTA will undertake to provide certain financial information and operating data by no later than 120 days after the end of each TBTA fiscal year, commencing with the fiscal year ending December 31, 2002 (the "Annual Information"), and to provide notices of the occurrence of certain enumerated events, if material. The Annual Information will be filed by or on behalf of TBTA with each Nationally Recognized Municipal Securities Information Repository (the "NRMSIRs") and with the state information depository for the State, if and to the extent it shall have been established and shall be in existence and operating as a state information depository within the meaning of Rule 15c2-12 (the "State Depository"). Notices of material events will be filed by or on behalf of TBTA with NRMSIRs or the Municipal Securities Rulemaking Board (the "MSRB") and with the State Depository. The nature of the information to be provided in the Annual Information and the notices of material events is set forth below.

Pursuant to Rule 15c2-12 TBTA will undertake for the benefit of holders of Series 2002G Bonds to provide or cause to be provided either directly or through the Trustee, audited financial statements by no later than 120 days after the end of each fiscal year commencing with the fiscal year ending December 31, 2002, when and if such audited financial statements become available and, if such audited financial statements are not available on the date which is 120 days after the end of a fiscal year, the unaudited financial statements for such fiscal year. TBTA annual financial statements will be filed with each NRMSIR and the State Depository.

The required Annual Information shall include at least the following:

1.　information of the type included in **Appendix A** under the following captions:

    a.　"The Triborough Bridge and Tunnel Authority – Authorized Projects of TBTA",

    b.　"The Triborough Bridge and Tunnel Authority – Present Facilities",

    c.　"The Triborough Bridge and Tunnel Authority – Toll Rates",

    d.　"The Triborough Bridge and Tunnel Authority – Competing Facilities and Other Matters", and

    e.　"The Triborough Bridge and Tunnel Authority – Employees, Labor Relations and Pension Obligations",

2.　information regarding the capital programs of TBTA, as well as of related public authorities whose operating needs, financing activities and capital programs may have a material impact on the operations and financing activities of TBTA,

3.　a presentation of changes to indebtedness issued by TBTA under both the Senior Resolution and the Subordinate Revenue Resolution, as well as information concerning changes to TBTA's debt service requirements on such indebtedness payable from Revenues,

4.　historical information concerning traffic, revenues, operating expenses, Subordinate Revenue Resolution debt service and debt service coverage of the type included in this Official Statement in **Table 2** and included by specific reference in **Appendix A** under the heading "REVENUES OF THE RELATED ENTITIES – TBTA Surplus",

5.　material litigation related to any of the foregoing, and

6.  such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of financial information and operating data concerning, and in judging the financial condition of, TBTA.

All or any portion of the Annual Information as well as required audited financial statements may be incorporated therein by specific reference to any other documents which have been filed with (a) the NRMSIRs and the State Depository or (b) the Securities and Exchange Commission; provided, however, that if the document is an official statement, it shall have been filed with the MSRB and need not have been filed elsewhere. Annual Information for any fiscal year containing any amended operating data or financial information for such fiscal year shall explain, in narrative form, the reasons for such amendment and the impact of the change on the type of operating data or financial information in the Annual Information being provided for such fiscal year. If a change in accounting principles is included in any such amendment, such information shall present a comparison between the financial statements or information prepared on the basis of the amended accounting principles and those prepared on the basis of the former accounting principles. Such comparison shall include a qualitative discussion of the differences in the accounting principles and the impact of the change in the accounting principles on the presentation of the financial information. To the extent feasible, such comparison shall also be quantitative. A notice of any such change in accounting principles shall be sent to each NRMSIR or to the MSRB, and to the State Depository.

TBTA will undertake, for the benefit of holders of the Series 2002G Bonds, to provide or cause to be provided:

1.  to each NRMSIR or to the MSRB and to the State Depository, in a timely manner, notice of any of the events listed under the heading "CONTINUING DISCLOSURE" in this Official Statement with respect to the Series 2002G Bonds, if material, and

2.  to each NRMSIR or to the MSRB, and to the State Depository, in a timely manner, notice of a failure to provide any Annual Information required by such undertaking or any required audited financial statements.

The Disclosure Agreement provides that if any party to the Disclosure Agreement fails to comply with any provisions of its undertaking described herein, then any holder of the Series 2002G Bonds (which will include beneficial owners during any period that DTC acts as securities depository for, and DTC or its nominee is the registered owner of, the Series 2002G Bonds) may enforce, for the equal benefit and protection of all holders similarly situated, by mandamus or other suit or proceeding at law or in equity, the undertaking against such party and any of its officers, agents and employees, and may compel such party or any of its officers, agents or employees to perform and carry out their duties thereunder; provided that the sole and exclusive remedy for breach under the undertaking is an action to compel specific performance, and no person or entity, including any holder of Series 2002G Bonds, may recover monetary damages thereunder under any circumstances, and provided further that any challenge to the adequacy of any information under the undertaking may be brought only by the Trustee or the holders of 25 percent in aggregate principal amount of the Series 2002G Bonds at the time Outstanding which are affected thereby. Each of the TBTA and the Trustee reserves the right, but shall not be obligated to, enforce the obligations of the others. Failure to comply with any provisions of the undertaking shall not constitute a default under the Subordinate Revenue Resolution nor give right to the Trustee or any Bondholder to exercise any remedies under the Subordinate Revenue Resolution. In addition, if all or any part of Rule 15c2-12 ceases to be in effect for any reason, then the information required to be provided under the undertaking insofar as the provision of Rule 15c2-12 no longer in effect required the provision of such information, shall no longer be required to be provided.

The foregoing is intended to set forth a general description of the type of financial information and operating data that will be provided; the descriptions are not intended to state more than general categories of financial information and operating data; and where TBTA's undertaking calls for information that no longer can be generated or is no longer relevant because the operations to which it related have been materially changed or discontinued, a statement to that effect will be provided. TBTA does not anticipate that it often will be necessary to amend the undertaking. The undertaking, however, may be amended or modified under certain circumstances set forth therein and the undertaking will continue until the earlier of the date the Series 2002G Bonds have been paid in full or legally defeased pursuant to the Subordinate Revenue Resolution or the date the undertaking is no longer required by law. Copies of the undertaking when executed by the parties will be on file at the office of MTA.

ATTACHMENT 2-2

## ATTACHMENT 3

### FORM OF OPINION OF BOND COUNSEL

**Upon delivery of the Series 2002G Bonds in definitive form, Hawkins, Delafield & Wood, New York, New York, Bond Counsel to TBTA, proposes to render its final approving opinion in substantially the following form:**

[Date of Closing]

Triborough Bridge and Tunnel Authority
New York, New York

Ladies and Gentlemen:

We have examined a certified copy of the record of proceedings of the Triborough Bridge and Tunnel Authority (the "TBTA") and other proofs submitted to us relative to the issuance of $181,025,000 aggregate principal amount of Triborough Bridge and Tunnel Authority Subordinate Revenue Variable Rate Refunding Bonds, Series 2002G (the "Series 2002G Bonds").

All terms defined in the Resolution (hereinafter defined) and used herein shall have the respective meanings assigned in the Resolution, except where the context hereof otherwise requires.

The Series 2002G Bonds are issued under and pursuant to the Constitution and statutes of the State of New York (the "State"), including the Triborough Bridge and Tunnel Authority Act, being Title 3 of Article 3 of the Public Authorities Law, Chapter 43-A of the Consolidated Laws of the State of New York, as amended to the date of this opinion letter (herein called the "Issuer Act"), and under and pursuant to proceedings of TBTA duly taken, including a resolution adopted by the members of TBTA on March 26, 2002 entitled "2001 Subordinate Revenue Resolution Authorizing Subordinate Revenue Obligations", as supplemented by a resolution of said members adopted on March 26, 2002 (collectively, the "Resolution").

The Series 2002G Bonds are dated, mature, are payable, bear interest and are subject to redemption, all as provided in the Resolution.

A portion of the proceeds of the Series 2002G Bonds is being used to refund certain of the outstanding bonds of TBTA issued pursuant to two of the resolutions pursuant to which the Prior Lien Obligations have been issued (collectively, referred to as, the "Prior Resolutions"), such bonds having been issued in multiple series and as described in the hereinafter defined Escrow Agreements as being refunded with proceeds of the Series 2002G Bonds (collectively, the "Refunded Bonds"). A portion of the proceeds of the Series 2002G Bonds together with any other amounts made available by TBTA (collectively, the "Defeasance Deposit") has been used to purchase direct obligations of the United States of America in an aggregate amount sufficient, together with any amounts held uninvested, to pay when due the principal or applicable redemption price of and interest due and to become due on said Refunded Bonds (the "Defeasance Requirement"). Such Defeasance Deposit is being held in trust under escrow agreements, each dated November __, 2002 (collectively, the "Escrow Agreements"), by and between TBTA and U.S. Bank Trust National Association and The Bank of New York, respectively, as escrow agents thereunder and as successor trustees under the applicable Prior Resolutions (the "Prior Trustees"). TBTA has given the Prior Trustees, in form satisfactory to each of them, irrevocable instructions to give notice in accordance with the Prior Resolutions of the redemption of those Refunded Bonds being redeemed prior to maturity and the deposit of the Defeasance Deposit. Samuel Klein & Co., certified public accountants, have prepared a report stating that they have reviewed the accuracy of the mathematical computations of the adequacy of the Defeasance Deposit, as invested, to pay in full the Defeasance Requirement when due. We have undertaken no independent verification of the adequacy of the Defeasance Deposit.

The Internal Revenue Code of 1986, as amended (the "Code"), establishes certain requirements that must be met subsequent to the issuance and delivery of the Series 2002G Bonds in order that interest on the Series 2002G Bonds be and remain excluded from gross income for federal income tax purposes under Section 103 of the Code. We have examined the Arbitrage and Use of Proceeds Certificate of the TBTA, dated the date hereof (the "Arbitrage and Use of Proceeds Certificate"), in which the TBTA has made representations, statements of intention and reasonable expectation, certifications of fact and covenants relating to the federal tax status of interest on the Series 2002G Bonds, including, but not limited to, certain representations with respect to the use of the proceeds of the Series 2002G Bonds and the investment of certain funds. The Arbitrage and Use of Proceeds Certificate obligates the TBTA to take certain actions necessary to cause interest on the Series 2002G Bonds to be excluded from gross income pursuant to Section 103 of the Code. Noncompliance with the requirements of the Code could cause interest on the Series 2002G Bonds to be included in gross income for federal income tax purposes retroactive to the date of issuance, irrespective of the date on which such noncompliance occurs or is ascertained. The TBTA has covenanted in the Resolution to maintain the exclusion of the interest on the Series 2002G Bonds from gross income for federal income tax purposes pursuant to Section 103(a) of the Code.

In rendering the opinion in paragraph 5 hereof, we have relied upon and assumed the material accuracy of the representations, statements of intention and reasonable expectation and certifications of fact contained in the Arbitrage and Use of Proceeds Certificate with respect to matters affecting the exclusion of interest on the Series 2002G Bonds from gross income for federal income tax purposes under Section 103 of the Code and compliance by the TBTA with procedures and covenants set forth in the Arbitrage and Use of Proceeds Certificate as to such tax matters.

We have also examined one of said Series 2002G Bonds as executed and, in our opinion, the form of said Series 2002G Bond and its execution are regular and proper.

We are of the opinion that:

1.      TBTA is duly created and validly existing under the laws of the State, including the Constitution of the State and the Issuer Act.

2.      TBTA has the right and power under the Issuer Act to adopt the Resolution. The Resolution has been duly and lawfully adopted by TBTA, is in full force and effect, is valid and binding upon TBTA, and is enforceable in accordance with its terms, and no other authorization for the Resolution is required. The Resolution creates the valid pledge which it purports to create of the Trust Estate, subject only to the provisions of the Resolution permitting the application thereof for the purposes and on the terms and conditions set forth in the Resolution, including the prior pledge of any Senior Obligations and Senior Parity Debt.

3.      The Series 2002G Bonds have been duly and validly authorized and issued in accordance with the laws of the State, including the Constitution of the State and the Issuer Act, and in accordance with the Resolution, and are valid and binding special obligations of TBTA, enforceable in accordance with their terms and the terms of the Resolution, payable solely from the Trust Estate subject and subordinate to the payments to be made with respect to Senior Obligations and Senior Parity Debt as provided in Sections 503, 507 and 604 of the Senior Resolution, and shall be secured by a lien on and pledge of the Trust Estate junior and inferior to the lien on and pledge of the Trust Estate created by the Senior Resolution for the payment of the Senior Obligations and Senior Parity Debt. The Subordinate Revenue Obligations shall be payable from such amounts as shall from time to time be available for transfer pursuant to either Section 503.1(c) or Section 506.2 of the Senior Resolution and are entitled to the benefits of the Issuer Act and the Resolution. TBTA has no taxing power and the Series 2002G Bonds are not debts of the State or of any other political subdivision thereof. TBTA reserves the right to issue Senior Obligations and Senior Parity Debt in accordance with the provisions of the Senior Resolution, and to issue additional Obligations and to incur Parity Debt on the terms and conditions, and for the purposes, provided in the Resolution, on a parity as to security and payment with the Series 2002G Bonds.

4.      The Series 2002G Bonds are securities in which all public officers and bodies of the State and all municipalities and political subdivisions, all insurance companies and associations and other persons carrying on an insurance business, all banks, bankers, trust companies, savings banks and savings associations, including savings and loan associations, building and loan associations, investment companies and other persons carrying on a banking

ATTACHMENT 3-2

business, all administrators, guardians, executors, trustees and other fiduciaries, and all other persons who are or may be authorized to invest in bonds or other obligations of the State, may properly and legally invest funds including capital in their control or belonging to them to the extent that the legality of such investment is governed by the laws of the State; and which may be deposited with and shall be received by all public officers and bodies of the State and all municipalities and political subdivisions for any purpose for which the deposit of bonds or other obligations of the State is or may be authorized.

5.      Under existing statutes and court decisions (i) interest on the Series 2002G Bonds is excluded from gross income for federal income tax purposes pursuant to Section 103 of the Code, and (ii) interest on the Series 2002G Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations.

6.      Under existing statutes, interest on the Series 2002G Bonds is exempt from personal income taxes imposed by the State or any political subdivision thereof.

7.      The Escrow Agreements have each been duly authorized, executed and delivered by TBTA, and, assuming the due authorization, execution and delivery of each of them by the respective Prior Trustees, each of the Escrow Agreements is a valid and binding obligation of TBTA, enforceable in accordance with its respective terms. The Refunded Bonds have been paid within the meaning and with the effect expressed in the Prior Resolutions, and the covenants, agreements and other obligations of TBTA to the holders of the Refunded Bonds have been discharged and satisfied.

The opinions expressed in paragraphs 2 and 3 above are subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws heretofore or hereafter enacted affecting creditors' rights and are subject to the application of principles of equity relating to or affecting the enforcement of contractual obligations, whether such enforcement is considered in a proceeding in equity or at law.

Except as stated in paragraphs 5 and 6, we express no opinion regarding any other federal, state, local or foreign tax consequences with respect to the Series 2002G Bonds. We express no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion from gross income for federal income tax purposes of interest on the Series 2002G Bonds, or under state, local and foreign tax law.

We express no opinion as to the accuracy or sufficiency of any financial or other information which has been or will be supplied to purchasers of the Series 2002G Bonds.

This opinion letter is rendered solely with regard to the matters expressly opined on above and does not consider or extend to any documents, agreements, representations or other material of any kind not specifically opined on above. No other opinions are intended nor should they be inferred. This opinion letter is issued as of the date hereof, and we assume no obligation to update, revise or supplement this opinion letter to reflect any future actions, facts or circumstances that may hereafter come to our attention, or any changes in law, or in interpretations thereof, that may hereafter occur, or for any reason whatsoever.

                                        Very truly yours,

ATTACHMENT 3-3

[THIS PAGE INTENTIONALLY LEFT BLANK]

## ATTACHMENT 4

## AUCTION PROCEDURES

The following sections contain definitions of certain terms used in this official statement and this **Attachment 4**. Capitalized terms not otherwise defined in this official statement have the meanings set forth in the Summary of Certain Provisions of the Subordinate Revenue Resolution or the Definitions and Summary of Certain Provisions of the Standard Resolution Provisions that are included by specific reference in this official statement.

Unless the context otherwise indicates, references in this Attachment 4 to the "Series 2002G Bonds" apply to each subseries of the Series 2002G Bonds independently. Actions may be taken, or determinations made, with respect to one subseries that are not taken or made with respect to the other.

**Definitions**

**Agent Member** means a member of, or participant in, the Securities Depository who shall act on behalf of a Bidder.

**All Hold Rate** means, as of any Auction Date, with respect to Series 2002G Bonds of a subseries, 45% of the Index in effect on such Auction Date.

**Auction** means each periodic implementation of the Auction Procedures.

**Auction Agent** means The Bank of New York, New York, New York, or any successor Auction Agent appointed by TBTA.

**Auction Agreement** means an agreement between TBTA, the Auction Agent and the Trustee pursuant to which the Auction Agent agrees to follow the procedures specified in this Attachment 4, with respect to the Series 2002G Bonds of a subseries in an Auction Rate Mode, as such agreement may from time to time be amended or supplemented.

**Auction Date** means during any period in which the Auction Procedures are not suspended in accordance with the provisions hereof:

(a) if the Series 2002G Bonds of a subseries are in a daily Auction Period, each Business Day;

(b) if the Series 2002G Bonds of a subseries are in a Special Auction Period, the last Business Day of the Special Auction Period; and

(c) if the Series 2002G Bonds of a subseries are in any other Auction Period, the Business Day next preceding each Interest Payment Date for such Series 2002G Bonds of a subseries (whether or not an Auction shall be conducted on such date);

provided, however, that the last Auction Date with respect to the Series 2002G Bonds of any subseries in an Auction Period other than a daily Auction Period or Special Auction Period shall be the earlier of (i) the Business Day next preceding the Interest Payment Date next preceding the Mode Change Date for such Series 2002G Bonds of a subseries and (ii) the Business Day next preceding the Interest Payment Date next preceding the maturity date for such Series 2002G Bonds; and provided further, that if the Series 2002G Bonds of a subseries are in a daily Auction Period, the last Auction Date shall be the earlier of (x) the Business Day next preceding the Mode Change Date for such Series 2002G Bonds and (y) the Business Day next preceding the maturity date for the Series 2002G Bonds of a subseries.

The last Business Day of a Special Auction Period shall be the Auction Date for the Auction Period which begins on the next succeeding Business Day, if any. On the Business Day preceding the conversion from a daily

Auction Period to another Auction Period, there shall be two Auctions, one for the last daily Auction Period and one for the first Auction Period following the conversion.

**Auction Multiple** means, as of any Auction Date, the Percentage of Index (in effect on such Auction Date) determined as set forth below, based on the Prevailing Rating of the Series 2002G Bonds of a subseries in effect at the close of business on the Business Day immediately preceding such Auction Date:

| Prevailing Rating | Percentage of Index |
|---|---|
| AAA/AAA/Aaa | 125% |
| AA/AA/Aa | 150 |
| A/A/A | 200 |
| BBB/BBB/Baa | 250 |
| Below BBB/BBB/Baa | 275 |

**Auction Period means:**

(a) a Special Auction Period;

(b) with respect to Series 2002G Bonds of a subseries in a daily Auction Period, a period beginning on each Business Day and extending to but not including the next succeeding Business Day;

(c) with respect to Series 2002G Bonds of a subseries in a seven day Auction Period and with Auctions generally conducted on (i) Fridays, a period of generally seven days beginning on a Monday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Sunday) and ending on the Sunday thereafter (unless such Sunday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (ii) Mondays, a period of generally seven days beginning on a Tuesday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Monday) and ending on the Monday thereafter (unless such Monday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (iii) Tuesdays, a period of generally seven days beginning on a Wednesday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Tuesday) and ending on the Tuesday thereafter (unless such Tuesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (iv) Wednesdays, a period of generally seven days beginning on a Thursday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Wednesday) and ending on the Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), and (v) Thursdays, a period of generally seven days beginning on a Friday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Thursday) and ending on the Thursday thereafter (unless such Thursday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day);

(d) with respect to Series 2002G Bonds of a subseries in a 28-day Auction Period and with Auctions generally conducted on (i) Fridays, a period of generally 28 days beginning on a Monday (or the last day of the prior Auction Period if the prior Auction Period does not end on a Sunday) and ending on the fourth Sunday thereafter (unless such Sunday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (ii) Mondays, a period of generally 28 days beginning on a Tuesday (or the last day of the prior Auction Period if the prior Auction Period does not end on a Monday) and ending on the fourth Monday thereafter (unless such Monday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (iii) Tuesdays, a period of generally 28 days beginning on a Wednesday (or the last day of the prior Auction Period if the prior Auction Period does not end on a Tuesday) and ending on the fourth Tuesday thereafter (unless such Tuesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (iv) Wednesdays, a period of generally 28 days beginning on a Thursday

ATTACHMENT 4 - 2

(or the last day of the prior Auction Period if the prior Auction Period does not end on a Wednesday) and ending on the fourth Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), and (v) Thursdays, a period of generally 28 days beginning on a Friday (or the last day of the prior Auction Period if the prior Auction Period does not end on a Thursday) and ending on the fourth Thursday thereafter (unless such Thursday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day);

(e) with respect to Series 2002G Bonds of a subseries in a 35-day Auction Period and with Auctions generally conducted on (i) Fridays, a period of generally 35 days beginning on a Monday (or the last day of the prior Auction Period if the prior Auction Period does not end on Sunday) and ending on the fifth Sunday thereafter (unless such Sunday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (ii) Mondays, a period of generally 35 days beginning on a Tuesday (or the last day of the prior Auction Period if the prior Auction Period does not end on Monday) and ending on the fifth Monday thereafter (unless such Monday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (iii) Tuesdays, a period of generally 35 days beginning on a Wednesday (or the last day of the prior Auction Period if the prior Auction Period does not end on Tuesday) and ending on the fifth Tuesday thereafter (unless such Tuesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (iv) Wednesdays, a period of generally 35 days beginning on a Thursday (or the last day of the prior Auction Period if the prior Auction Period does not end on Wednesday) and ending on the fifth Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), and (v) Thursdays, a period of generally 35 days beginning on a Friday (or the last day of the prior Auction Period if the prior Auction Period does not end on Thursday) and ending on the fifth Thursday thereafter (unless such Thursday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day);

(f) with respect to Series 2002G Bonds of a subseries in a three-month Auction Period, a period of generally three months (or shorter period upon a conversion from another Auction Period) beginning on the day following the last day of the prior Auction Period and ending on the first day of the month that is the third calendar month following the beginning date of such Auction Period (unless such first day of the month is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day); and

(g) with respect to Series 2002G Bonds of a subseries in a six-month Auction Period, a period of generally six months (or shorter period upon a conversion from another Auction Period) beginning on the day following the last day of the prior Auction Period and ending on the next succeeding April 30 or October 31;

provided, however, that

(a) if there is a conversion of Series 2002G Bonds of a subseries with Auctions generally conducted on Fridays (i) from a daily Auction Period to a seven-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on the next succeeding Sunday (unless such Sunday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (ii) from a daily Auction Period to a 28-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on the Sunday (unless such Sunday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day) which is more than 21 days but not more than 28 days from such date of conversion, and (iii) from a daily Auction Period to a 35-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on Sunday (unless such Sunday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day) which is more than 28 days but no more than 35 days from such date of conversion;

(b) if there is a conversion of Series 2002G Bonds of a subseries with Auctions generally conducted on Mondays (i) from a daily Auction Period to a seven-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on the next succeeding Monday (unless such Monday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (ii) from a daily Auction Period to a 28-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period)

and shall end on the Monday (unless such Monday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day) which is more than 21 days but not more than 28 days from such date of conversion, and (iii) from a daily Auction Period to a 35-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on Monday (unless such Monday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day) which is more than 28 days but no more than 35 days from such date of conversion;

(c) if there is a conversion of Series 2002G Bonds of a subseries with Auctions generally conducted on Tuesdays (i) from a daily Auction Period to a seven-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on the next succeeding Tuesday (unless such Tuesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (ii) from a daily Auction Period to a 28-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on the Tuesday (unless such Tuesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day) which is more than 21 days but not more than 28 days from such date of conversion, and (iii) from a daily Auction Period to a 35-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on Tuesday (unless such Tuesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day) which is more than 28 days but no more than 35 days from such date of conversion;

(d) if there is a conversion of Series 2002G Bonds of a subseries with Auctions generally conducted on Wednesdays (i) from a daily Auction Period to a seven-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on the next succeeding Wednesday (unless such Wednesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (ii) from a daily Auction Period to a 28-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on the Wednesday (unless such Wednesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day) which is more than 21 days but not more than 28 days from such date of conversion, and (iii) from a daily Auction Period to a 35-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on Wednesday (unless such Wednesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day) which is more than 28 days but no more than 35 days from such date of conversion; and

(e) if there is a conversion of Series 2002G Bonds of a subseries with Auctions generally conducted on Thursdays (i) from a daily Auction Period to a seven-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on the next succeeding Thursday (unless such Thursday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day), (ii) from a daily Auction Period to a 28-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on the Thursday (unless such Thursday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day) which is more than 21 days but not more than 28 days from such date of conversion, and (iii) from a daily Auction Period to a 35-day Auction Period, the next Auction Period shall begin on the date of the conversion (i.e. the Interest Payment Date for the prior Auction Period) and shall end on Thursday (unless such Thursday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day) which is more than 28 days but no more than 35 days from such date of conversion;

provided further, however, that any Auction Period that is greater than 35 days may be extended as described in paragraph (d) in the section entitled "Determination of Auction Period Rate" in this Attachment 4.

**Auction Period Rate** means with respect to Series 2002G Bonds of each subseries, the rate of interest to be borne by the Series 2002G Bonds of such subseries during each Auction Period determined in accordance with the

section entitled "Determination of Auction Period Rate" in this Attachment 4; provided, however, in no event may the Auction Rate exceed the Maximum Rate.

**Auction Procedures** means the procedures for conducting Auctions for Series 2002G Bonds of a subseries in an Auction Rate Mode set forth in this Attachment 4.

**Auction Rate** means for each series of Series 2002G Bonds for each Auction Period, (i) if Sufficient Clearing Bids exist, the Winning Bid Rate; provided, however, if all of such Series 2002G Bonds of a subseries are the subject of Submitted Hold Orders, the All Hold Rate with respect to such Series 2002G Bonds and (ii) if Sufficient Clearing Bids do not exist, the Maximum Auction Rate with respect to such Series 2002G Bonds.

**Auction Rate Mode** means the mode during which the duration of the Auction Period and the interest rate is determined in accordance with this Attachment 4.

**Authorized Denominations** means $25,000 and integral multiples thereof while the Series 2002G Bonds are in the Auction Rate Mode.

**Available Bonds** means for each series of Series 2002G Bonds on each Auction Date, the aggregate principal amount of such Series 2002G Bonds that are not the subject of Submitted Hold Orders.

**Bid** has the meaning specified in subsection (a) of "Orders by Existing Owners and Potential Owners" of this Attachment 4.

**Bidder** means each Existing Owner and Potential Owner who places an Order.

**Broker-Dealer** means, with respect to the Series 2002G Bonds of a subseries, (i) any entity that is specified as the Broker-Dealer for the Series 2002G Bonds of such subseries on the outside cover page of this official statement, and (ii) any entity that is permitted by law to perform the function required of a Broker-Dealer described in this Attachment 4 that is a member of, or a direct participant in, the Securities Depository, that has been selected by TBTA, and that is a party to a Broker-Dealer Agreement with the Auction Agent.

**Broker-Dealer Agreement** means an agreement among the Auction Agent, TBTA and a Broker-Dealer pursuant to which such Broker-Dealer agrees to follow the procedures described in this Attachment 4 as such agreement may from to time be amended or supplemented.

**Business Day** means a day other than (i) a Saturday and Sunday, (ii) a day on which the Trustee, the Tender Agent, the Auction Agent, the Broker-Dealers, the Insurer or banks and trust companies in New York, New York are authorized or required to remain closed, or (iii) a day on which the New York Stock Exchange is closed.

**Default Rate** means, in respect of any Auction Period other than a daily Auction Period, a per annum rate equal to two hundred three hundred percent (300%) of the Index determined on the Auction Date next preceding the first day of such Auction Period or in the case of Series 2002G Bonds of a subseries in a daily Auction Period, three hundred percent (300%) of the Index determined on the Auction Date which was the first day of such Auction Period; provided, however, the Default Rate shall not exceed the Maximum Rate.

**Existing Owner** means a Person who is listed as the beneficial owner of Series 2002G Bonds of a subseries in the records of the Auction Agent.

**Favorable Opinion of Bond Counsel** means, with respect to any action the occurrence of which requires such an opinion, an unqualified Counsel's Opinion to the effect that such action is permitted under the TBTA Act and the Subordinate Revenue Resolution and that such action will not impair the exclusion of interest on such Series 2002G Bonds from gross income for purposes of federal income taxation (subject to the inclusion of any exceptions contained in the opinion delivered upon original issuance of the Series 2002G Bonds).

**Fitch** means Fitch, Inc.

**Index** shall have the meaning specified in the section entitled "Index" in this Attachment 4.

**Interest Payment Date** means:

(a) when used with respect to any Auction Period other than a daily Auction Period or a Special Auction Period, the Business Day immediately following such Auction Period;

(b) when used with respect to a daily Auction Period, the first Business Day of the month immediately succeeding such Auction Period; and

(c) when used with respect to a Special Auction Period of (i) more than seven but fewer than 92 days, the Business Day immediately following such Special Auction Period, or (ii) 92 or more days, (A) in the case of Series 2002G Bonds of a subseries with Auctions generally conducted on Fridays, each thirteenth Monday after the first day of such Special Auction Period or the next Business Day if such Monday is not a Business Day and on the Business Day immediately following such Special Auction Period, (B) in the case of Series 2002G Bonds of a subseries with Auctions generally conducted on Mondays, each thirteenth Tuesday after the first day of such Special Auction Period or the next Business Day if such Tuesday is not a Business Day and on the Business Day immediately following such Special Auction Period, (C) in the case of Series 2002G Bonds of a subseries with Auctions generally conducted on Tuesdays, each thirteenth Wednesday after the first day of such Special Auction Period or the next Business Day if such Wednesday is not a Business Day and on the Business Day immediately following such Special Auction Period, (D) in the case of Series 2002G Bonds of a subseries with Auctions conducted on Wednesdays, each thirteenth Thursday after the first day of such Special Auction Period or the next Business Day if such Thursday is not a Business Day and on the Business Day immediately following such Special Auction Period and (E) in the case of Series 2002G Bonds of a subseries with Auctions generally conducted on Thursdays, each thirteenth Friday after the first day of such Special Auction Period or the next Business Day if such Friday is not a Business Day and on the Business Day immediately following such Special Auction Period.

**Maximum Auction Rate** means as of any Auction Date, the product of the Index multiplied by the Auction Multiple; provided, however, that in no event shall the Maximum Auction Rate exceed the Maximum Rate, anything herein to the contrary notwithstanding.

**Maximum Rate** means, with respect to Series 2002G Bonds of a subseries, twelve percent (12%) per annum; provided, however, that in no event shall the Maximum Rate on any such Series 2002G Bonds of a subseries exceed the maximum rate permitted by applicable law.

**Mode** means the commercial paper mode, the daily mode, the weekly mode, the term rate mode, the Auction Rate Mode or the fixed rate mode.

**Moody's** means Moody's Investors Service.

**Order** means a Hold Order, Bid or Sell Order.

**Potential Owner** means any Person, including any Existing Owner, who may be interested in acquiring a beneficial interest in the Series 2002G Bonds of a subseries in addition to the Series 2002G Bonds currently owned by such Person, if any.

**Prevailing Rating** means, when such term is used in the definition of the Auction Multiple, (a) AAA/AAA/Aaa, if the Series 2002G Bonds of a subseries shall have a rating of AAA or better by S&P and Fitch and a rating of Aaa or better by Moody's, (b) if not AAA/AAA/Aaa, AA/AA/Aa if the Series 2002G Bonds of a subseries shall have a rating of AA- or better by S&P and Fitch and a rating of Aa3 or better by Moody's, (c) if not AAA/AAA/Aaa or AA/AA/Aa, A/A/A if the Series 2002G Bonds of a subseries shall have a rating of A- or better by S&P and Fitch and a rating of A3 or better by Moody's, (d) if not AAA/AAA/Aaa, AA/AA/Aa or A/A/A, BBB/BBB/Baa if the Series 2002G Bonds of a subseries shall have a rating of BBB- or better by S&P and Fitch and a rating of Baa3 or better by Moody's, and (e) if not AAA/AAA/Aaa, AA/AA/Aa, A/A/A or BBB/BBB/Baa, then below BBB/BBB/Baa, whether or not the Series 2002G Bonds of a subseries are rated by any Rating Agency. For

purposes of this definition, S&P's and Fitch's rating categories of "AAA," "AA-," "A-" and "BBB-" and Moody's rating categories of "Aaa," "Aa3," "A3" and "Baa3" shall be deemed to refer to and include the respective rating categories correlative thereto in the event that any such Rating Agencies shall have changed or modified their generic rating categories or if any successor thereto appointed in accordance with the definitions thereof shall use different rating categories. If the Series 2002G Bonds of a subseries are not rated by a Rating Agency, the requirement of a rating by such Rating Agency shall be disregarded. If the ratings for the Series 2002G Bonds of a subseries are split between two of the foregoing categories, the lower rating shall determine the Prevailing Rating. If there is no rating, then the Auction Period Rate shall be the Maximum Auction Rate.

**Principal Office** means, with respect to the Auction Agent, the office thereof designated in the Auction Agreement as the office of the Auction Agent to which notices, requests or communications should be sent.

**Remarketing Agent** means the remarketing agent appointed by TBTA in connection with a Mode change.

**Remarketing Agreement** means the remarketing agreement entered into by and between TBTA and the Remarketing Agent with respect to the Series 2002G Bonds of a subseries pursuant to which the Remarketing Agent has agreed to remarket the Series 2002G Bonds of such subseries on the Mode Change Date at a price of not less then 100% of the principal amount thereof.

**Securities Depository** means The Depository Trust Company and its successors and assigns or any other securities depository selected by TBTA which agrees to follow the procedures required to be followed by such securities depository in connection with the Series 2002G Bonds of a subseries.

**Sell Order** has the meaning specified in subsection (a) of "Orders by Existing Owners and Potential Owners" of this Attachment 4.

**Special Auction Period** means any period of more than seven but less than 1,092 days which is not another Auction Period and which begins on an Interest Payment Date and ends (i) in the case of Series 2002G Bonds of a subseries with Auctions generally conducted on Fridays, on a Sunday unless such Sunday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day, (ii) in the case of Series 2002G Bonds of a subseries with Auctions generally conducted on Mondays, on a Monday unless such Monday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day, (iii) in the case of Series 2002G Bonds of a subseries with Auctions generally conducted on Tuesdays, on a Tuesday unless such Tuesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day, (iv) in the case of Series 2002G Bonds of a subseries with Auctions generally conducted on Wednesdays, on a Wednesday unless such Wednesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day, and (v) in the case of Series 2002G Bonds of a subseries with Auctions generally conducted on Thursdays, on a Thursday unless such Thursday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day.

**S&P** means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc.

**Submission Deadline** means 1:00 p.m., New York City time, on each Auction Date for Series 2002G Bonds of a subseries not in a daily Auction Period and 11:00 a.m., New York City time, on each Auction Date for Series 2002G Bonds of a subseries in a daily Auction Period, or such other time on such date as shall be specified from time to time by the Auction Agent pursuant to the Auction Agreement as the time by which Broker-Dealers are required to submit Orders to the Auction Agent.

**Submitted Bid** has the meaning specified in subsection (b) of "Determination of Auction Period Rate" of this Attachment 4.

**Submitted Hold Order** has the meaning specified in subsection (b) of "Determination of Auction Period Rate" of this Attachment 4.

**Submitted Order** has the meaning specified in subsection (b) of "Determination of Auction Period Rate" of this Attachment 4.

**Submitted Sell Order** has the meaning specified in subsection (b) of "Determination of Auction Period Rate" of this Attachment 4.

**Subordinate Revenue Resolution** means the 2001 Subordinate Revenue Resolution Authorizing Subordinate Revenue Obligations, adopted by members of TBTA on March 26, 2002, as amended and supplemented.

**Sufficient Clearing Bids** means with respect to Series 2002G Bonds of a subseries, an Auction for which the aggregate principal amount of Series 2002G Bonds of such subseries that are the subject of Submitted Bids by Potential Owners specifying one or more rates not higher than the Maximum Auction Rate is not less than the aggregate principal amount of Series 2002G Bonds of such subseries that are the subject of Submitted Sell Orders and of Submitted Bids by Existing Owners specifying rates higher than the Maximum Auction Rate. .

**Trustee** means The Bank of New York, New York, New York.

**Tender Agent** means The Bank of New York, New York, New York.

**Tender Agency Agreement** means the tender agency agreement entered into by and between the Tender Agent and TBTA with respect to the Series 2002G Bonds of a subseries.

**United States Treasury Securities** means direct obligations issued by the United States government.

**Winning Bid Rate** means with respect to Series 2002G Bonds of a subseries the lowest rate specified in any Submitted Bid for such subseries which if selected by the Auction Agent as the Auction Period Rate would cause the aggregate principal amount of Series 2002G Bonds of such subseries that are the subject of Submitted Bids specifying a rate not greater than such rate to be not less than the aggregate principal amount of Available Bonds of such series.

Orders by Existing Owners and Potential Owners

(a) Prior to the Submission Deadline on each Auction Date:

(i) each Existing Owner may submit to a Broker-Dealer, in writing or by such other method as shall be reasonably acceptable to such Broker-Dealer, information as to:

(A) the principal amount of Series 2002G Bonds of a subseries, if any, held by such Existing Owner which such Existing Owner irrevocably commits to continue to hold for the next succeeding Auction Period without regard to the rate determined by the Auction Procedures for such Auction Period,

(B) the principal amount of Series 2002G Bonds of a subseries, if any, held by such Existing Owner which such Existing Owner irrevocably commits to continue to hold for the next succeeding Auction Period if the rate determined by the Auction Procedures for such Auction Period shall not be less than the rate per annum then specified by such Existing Owner (and which such Existing Owner irrevocably offers to sell on the next succeeding Interest Payment Date (or the same day in the case of a daily Auction Period) if the rate determined by the Auction Procedures for the next succeeding Auction Period shall be less than the rate per annum then specified by such Existing Owner), and/or

(C) the principal amount of Series 2002G Bonds of a subseries, if any, held by such Existing Owner which such Existing Owner irrevocably offers to sell on the next succeeding

Interest Payment Date (or on the same day in the case of a daily Auction Period) without regard to the rate determined by the Auction Procedures for the next succeeding Auction Period: and

(ii) for the purpose of implementing the Auctions and thereby to achieve the lowest possible interest rate on the Series 2002G Bonds of a subseries, the Broker-Dealers shall contact Potential Owners, including Persons that are Existing Owners, to determine the principal amount of Series 2002G Bonds of a subseries, if any, which each such Potential Owner irrevocably offers to purchase if the rate determined by the Auction Procedures for the next succeeding Auction Period is not less than the rate per annum then specified by such Potential Owner.

For the purposes hereof, an Order containing the information referred to in clause (i) (A) above is herein referred to as a "Hold Order," an Order containing the information referred to in clause (i) (B) or (ii) above is herein referred to as a "Bid," and an Order containing the information referred to in clause (i) (C) above is herein referred to as a "Sell Order."

(b)        (i) A Bid by an Existing Owner shall constitute an irrevocable offer to sell:

(A) the principal amount of Series 2002G Bonds of a subseries specified in such Bid if the rate determined by the Auction Procedures on such Auction Date shall be less than the rate specified therein; or

(B) such principal amount or a lesser principal amount of Series 2002G Bonds of a subseries to be determined as described in subsection (a)(v) of "Allocation of Series 2002G Bonds of a Subseries" hereof if the rate determined by the Auction Procedures on such Auction Date shall be equal to such specified rate; or

(C) a lesser principal amount of Series 2002G Bonds of a subseries to be determined as described in subsection (b)(iv) of "Allocation of Series 2002G Bonds of a Subseries" hereof if such specified rate shall be higher than the Maximum Auction Rate and Sufficient Clearing Bids do not exist.

(ii) A Sell Order by an Existing Owner shall constitute an irrevocable offer to sell:

(A) the principal amount of Series 2002G Bonds of a subseries specified in such Sell Order; or

(B) such principal amount or a lesser principal amount of Series 2002G Bonds of a subseries as described in subsection (b)(iv) of "Allocation of Series 2002G Bonds of a Subseries" hereof if Sufficient Clearing Bids do not exist.

(iii) A Bid by a Potential Owner shall constitute an irrevocable offer to purchase:

(A) the principal amount of Series 2002G Bonds of a subseries specified in such Bid if the rate determined by the Auction Procedures on such Auction Date shall be higher than the rate specified therein; or

(B) such principal amount or a lesser principal amount of Series 2002G Bonds of a subseries as described in subsection (a)(vi) of "Allocation of Series 2002G Bonds of a Subseries" hereof if the rate determined by the Auction Procedures on such Auction Date shall be equal to such specified rate.

(c)        Anything herein to the contrary notwithstanding:

(i) for purposes of any Auction, any Order which specifies Series 2002G Bonds of a subseries to be held, purchased or sold in a principal amount which is not equal to the Authorized Denomination for

ATTACHMENT 4 - 9

Series 2002G Bonds of such subseries or an integral multiple thereof shall be rounded down to the nearest amount that is equal to the Authorized Denomination for Series 2002G Bonds of such subseries, and the Auction Agent shall conduct the Auction Procedures as if such Order had been submitted in such lower amount;

(ii) for purposes of any Auction other than during a daily Auction Period, any portion of an Order of an Existing Owner which relates to a Series 2002G Bond of a subseries which has been called for redemption on or prior to the Interest Payment Date next succeeding such Auction shall be invalid with respect to such portion and the Auction Agent shall conduct the Auction Procedures as if such portion of such Order had not been submitted;

(iii) for purposes of any Auction other than during a daily Auction Period, no portion of a Series 2002G Bond of a subseries which has been called for redemption on or prior to the Interest Payment Date next succeeding such Auction shall be included in the calculation of Available Bonds for such Auction; and

(iv) the Auction Procedures shall be suspended with respect to the Series 2002G Bonds of a subseries during the period commencing on the date of the Auction Agent's receipt of notice from the Trustee of the occurrence of a default of TBTA in the payment of principal, sinking fund installment, interest or premium on any Series 2002G Bond of such subseries after the same shall have become due, whether at maturity, upon call for redemption or on an Interest Payment Date (provided however that for purposes of this provision only payment by the Insurer shall be deemed to cure such default and no such suspension of the Auction Procedures shall occur) but shall resume two Business Days after the date on which the Auction Agent receives notice from the Trustee that such default has been waived or cured, with the next Auction to occur on the next regularly scheduled Auction Date occurring thereafter.

**Submission of Orders by Broker-Dealers to Auction Agent**

(a) Each Broker-Dealer shall submit to the Auction Agent in writing or by such other method as shall be reasonably acceptable to the Auction Agent, including such electronic communication acceptable to the parties, prior to the Submission Deadline on each Auction Date, all Orders obtained by such Broker-Dealer and, if requested, specifying with respect to each Order:

(i) the name of the Bidder placing such Order;

(ii) the aggregate principal amount of Series 2002G Bonds of each subseries, if any, that are the subject of such Order;

(iii) to the extent that such Bidder is an Existing Owner;

(A) the principal amount of Series 2002G Bonds of each subseries, if any, subject to any Hold Order placed by such Existing Owner;

(B) the principal amount of Series 2002G Bonds of each subseries, if any, subject to any Bid placed by such Existing Owner and the rate specified in such Bid; and

(C) the principal amount of Series 2002G Bonds of each subseries, if any, subject to any Sell Order placed by such Existing Owner;

(iv) to the extent such Bidder is a Potential Owner, the rate specified in such Bid.

(b) If any rate specified in any Bid contains more than three figures to the right of the decimal point, the Auction Agent shall round such rate up to the next highest one thousandth of one percent (0.001%).

ATTACHMENT 4 - 10

(c) If an Order or Orders covering all of the Series 2002G Bonds of a particular subseries held by an Existing Owner is not submitted to the Auction Agent prior to the Submission Deadline, the Auction Agent shall deem a Hold Order to have been submitted on behalf of such Existing Owner covering the principal amount of Series 2002G Bonds of such subseries held by such Existing Owner and not subject to Orders submitted to the Auction Agent; provided, however, that if there is a conversion from one Auction Period to another Auction Period or an amendment or modification to the Subordinate Revenue Resolution as described in the section entitled "Miscellaneous Provisions Regarding Auctions" in this Attachment 4 and Orders have not been submitted to the Auction Agent prior to the Submission Deadline covering the aggregate principal amount of Series 2002G Bonds of the subseries held by such Existing Owner, the Auction Agent shall deem a Sell Order to have been submitted on behalf of such Existing Owner covering the principal amount of Series 2002G Bonds of such subseries held by such Existing Owner not subject to Orders submitted to the Auction Agent.

(d) If one or more Orders covering in the aggregate more than the principal amount of Outstanding Series 2002G Bonds of a subseries held by any Existing Owner are submitted to the Auction Agent, such Orders shall be considered valid as follows:

(i) all Hold Orders shall be considered Hold Orders, but only up to and including in the aggregate the principal amount of Series 2002G Bonds of such subseries held by such Existing Owner;

(ii)    (A) any Bid of an Existing Owner shall be considered valid as a Bid of an Existing Owner up to and including the excess of the principal amount of Series 2002G Bonds of such subseries held by such Existing Owner over the principal amount of the Series 2002G Bonds of such subseries subject to Hold Orders referred to in paragraph (i) above;

(B) subject to clause (A) above, all Bids of an Existing Owner with the same rate shall be aggregated and considered a single Bid of an Existing Owner up to and including the excess of the principal amount of Series 2002G Bonds of such subseries held by such Existing Owner over the principal amount of Series 2002G Bonds of such subseries held by such Existing Owner subject to Hold Orders referred to in paragraph (i) above;

(C) subject to clause (A) above, if more than one Bid with different rates is submitted on behalf of such Existing Owner, such Bids shall be considered Bids of an Existing Owner in the ascending order of their respective rates up to the amount of the excess of the principal amount of Series 2002G Bonds of such subseries held by such Existing Owner over the principal amount of Series 2002G Bonds of such subseries held by such Existing Owner subject to Hold Orders referred to in paragraph (i) above; and

(D) the principal amount, if any, of such Series 2002G Bonds of such subseries subject to Bids not considered to be Bids of an Existing Owner under this paragraph (ii) shall be treated as the subject of a Bid by a Potential Owner;

(iii) all Sell Orders shall be considered Sell Orders, but only up to and including a principal amount of Series 2002G Bonds of such subseries equal to the excess of the principal amount of Series 2002G Bonds of such subseries held by such Existing Owner over the sum of the principal amount of the Series 2002G Bonds considered to be subject to Hold Orders pursuant to paragraph (i) above and the principal amount of Series 2002G Bonds of such subseries considered to be subject to Bids of such Existing Owner pursuant to paragraph (ii) above.

(e) If more than one Bid is submitted on behalf of any Potential Owner, each Bid submitted with the same rate shall be aggregated and considered a single Bid and each Bid submitted with a different rate shall be considered a separate Bid with the rate and the principal amount of Series 2002G Bonds of such subseries specified therein.

(f) Neither TBTA, the Trustee nor the Auction Agent shall be responsible for the failure of any Broker-Dealer to submit an Order to the Auction Agent on behalf of any Existing Owner or Potential Owner.

**Determination of Auction Period Rate**

(a) Not later than 9:30 a.m., New York City time, on each Auction Date for Series 2002G Bonds of each subseries in an Auction Rate Mode, the Auction Agent shall advise the Broker-Dealers and the Trustee by telephone or other electronic communication acceptable to the parties of the All Hold Rate, the Maximum Auction Rate and the Index for the Series 2002G Bonds of such subseries.

(b) Promptly after the Submission Deadline on each Auction Date for Series 2002G Bonds of each subseries in an Auction Rate Mode, the Auction Agent shall assemble all Orders submitted or deemed submitted to it by the Broker-Dealers (each such Order as submitted or deemed submitted by a Broker-Dealer being hereinafter referred to as a "Submitted Hold Order," a "Submitted Bid" or a "Submitted Sell Order," as the case may be, and collectively as a "Submitted Order") and shall determine (i) the Available Bonds, (ii) whether there are Sufficient Clearing Bids, and (iii) the Auction Rate.

(c) Promptly after the Auction Agent has made the determinations pursuant to subsection (b) above, the Auction Agent shall advise the Trustee by telephone (promptly confirmed in writing), telex or facsimile transmission or other electronic communication acceptable to the parties of the Auction Rate for the next succeeding Auction Period and the Trustee shall promptly notify the Securities Depository of such Auction Rate.

(d) In the event the Auction Agent fails to calculate or, for any reason, fails to timely provide the Auction Rate for any Auction Period, (i) if the preceding Auction Period was a period of 35 days or less, the new Auction Period shall be the same as the preceding Auction Period and the Auction Period Rate for the new Auction Period shall be the same as the Auction Period Rate for the preceding Auction Period, and (ii) if the preceding Auction Period was a period of greater than 35 days, the preceding Auction Period shall be extended to the seventh day following the day that would have been the last day of such Auction Period had it not been extended (or if such seventh day is not followed by a Business Day then to the next succeeding day which is followed by a Business Day) and the Auction Period Rate in effect for the preceding Auction Period will continue in effect for the Auction Period as so extended.  In the event an Auction Period is extended as set forth in clause (ii) of the preceding sentence, an Auction shall be held on the last Business Day of the Auction Period as so extended to take effect for an Auction Period beginning on the Business Day immediately following the last day of the Auction Period as extended which Auction Period will end on the date it would otherwise have ended on had the prior Auction Period not been extended.

(e) In the event that the Auction Procedures are suspended pursuant to paragraph (iv) of subsection (c) of "Orders by Existing Owners and Potential Owners" of this Attachment 4 with respect to any Series 2002G Bond of subseries, the Auction Period Rate for the next succeeding Auction Period shall be the Default Rate.

(f) In the event that all of the conditions for a change in the Mode applicable to the Series 2002G Bonds of a subseries from an Auction Mode to any other Mode pursuant to the Subordinate Revenue Resolution have not been met or in the event of a failure to change the length of the current Auction Period due to the lack of Sufficient Clearing Bids at the Auction on the Auction Date for the first new Auction Period, the Auction Period Rate for the next Auction Period shall be the Maximum Auction Rate and the Auction Period shall be a seven-day Auction Period.

(g) If the Series 2002G Bonds of a subseries are not rated or if the Series 2002G Bonds of a subseries are no longer maintained in book-entry form by the Securities Depository, then the Auction Period Rate shall be the Maximum Auction Rate.

(h) If the Auction Period Rate for the Series 2002G Bonds of a subseries is equal to the Maximum Auction Rate or the Default Rate for the longer of (i) two consecutive Auction Dates or (ii) ninety (90) days, the Insurer shall have the right to direct TBTA to change the Mode applicable to the Series 2002G Bonds of such subseries to the fixed rate and upon such direction TBTA shall change such Mode to the fixed rate in accordance with the Subordinate Revenue Resolution.

**Allocation of Series 2002G Bonds of a Subseries**

(a) In the event of Sufficient Clearing Bids for Series 2002G Bonds of a subseries, subject to the further provisions of subsections (c) and (d) below, Submitted Orders for such subseries shall be accepted or rejected as follows in the following order of priority:

(i) the Submitted Hold Order of each Existing Owner shall be accepted, thus requiring each such Existing Owner to continue to hold the Series 2002G Bonds of a subseries that are the subject of such Submitted Hold Order;

(ii) the Submitted Sell Order of each Existing Owner shall be accepted and the Submitted Bid of each Existing Owner specifying any rate that is higher than the Winning Bid Rate shall be rejected, thus requiring each such Existing Owner to sell the Series 2002G Bonds of a subseries that are the subject of such Submitted Sell Order or Submitted Bid;

(iii) the Submitted Bid of each Existing Owner specifying any rate that is lower than the Winning Bid Rate shall be accepted, thus requiring each such Existing Owner to continue to hold the Series 2002G Bonds of a subseries that are the subject of such Submitted Bid;

(iv) the Submitted Bid of each Potential Owner specifying any rate that is lower than the Winning Bid Rate shall be accepted, thus requiring each such Potential Owner to purchase the Series 2002G Bonds of a subseries that are the subject of such Submitted Bid;

(v) the Submitted Bid of each Existing Owner specifying a rate that is equal to the Winning Bid Rate shall be accepted, thus requiring each such Existing Owner to continue to hold the Series 2002G Bonds of a subseries that are the subject of such Submitted Bid, but only up to and including the principal amount of Series 2002G Bonds of a subseries obtained by multiplying (A) the aggregate principal amount of Outstanding Series 2002G Bonds of a subseries which are not the subject of Submitted Hold Orders described in paragraph (i) above or of Submitted Bids described in paragraphs (iii) or (iv) above by (B) a fraction the numerator of which shall be the principal amount of Outstanding Series 2002G Bonds of a subseries held by such Existing Owner subject to such Submitted Bid and the denominator of which shall be the aggregate principal amount of Outstanding Series 2002G Bonds of a subseries subject to such Submitted Bids made by all such Existing Owners that specified a rate equal to the Winning Bid Rate, and the remainder, if any, of such Submitted Bid shall be rejected, thus requiring each such Existing Owner to sell any excess amount of Series 2002G Bonds of a subseries;

(vi) the Submitted Bid of each Potential Owner specifying a rate that is equal to the Winning Bid Rate shall be accepted, thus requiring each such Potential Owner to purchase the Series 2002G Bonds of a subseries that are the subject of such Submitted Bid, but only in an amount equal to the principal amount of Series 2002G Bonds of a subseries obtained by multiplying (A) the aggregate principal amount of Outstanding Series 2002G Bonds of a subseries which are not the subject of Submitted Hold Orders described in paragraph (i) above or of Submitted Bids described in paragraphs (iii), (iv) or (v) above by (B) a fraction the numerator of which shall be the principal amount of Outstanding Series 2002G Bonds of a subseries subject to such Submitted Bid and the denominator of which shall be the sum of the aggregate principal amount of Outstanding Series 2002G Bonds of a subseries subject to such Submitted Bids made by all such Potential Owners that specified a rate equal to the Winning Bid Rate, and the remainder of such Submitted Bid shall be rejected; and

(vii) the Submitted Bid of each Potential Owner specifying any rate that is higher than the Winning Bid Rate shall be rejected.

(b) In the event there are not Sufficient Clearing Bids for Series 2002G Bonds of a subseries, subject to the further provisions of subsections (c) and (d) below, Submitted Orders, for each Series 2002G Bond of a subseries shall be accepted or rejected as follows in the following order of priority:

(i) the Submitted Hold Order of each Existing Owner shall be accepted, thus requiring each such Existing Owner to continue to hold the Series 2002G Bonds of a subseries that are the subject of such Submitted Hold Order;

(ii) the Submitted Bid of each Existing Owner specifying any rate that is not higher than the Maximum Auction Rate with respect to Series 2002G Bonds of a subseries, shall be accepted, thus requiring each such Existing Owner to continue to hold the Series 2002G Bonds of a subseries that are the subject of such Submitted Bid;

(iii) the Submitted Bid of each Potential Owner specifying any rate that is not higher than the Maximum Auction Rate with respect to Series 2002G Bonds of a subseries, shall be accepted, thus requiring each such Potential Owner to purchase the Series 2002G Bonds of a subseries that are the subject of such Submitted Bid;

(iv) the Submitted Sell Orders of each Existing Owner shall be accepted as Submitted Sell Orders and the Submitted Bids of each Existing Owner specifying any rate that is higher than the Maximum Auction Rate with respect to Series 2002G Bonds of a subseries, shall be deemed to be and shall be accepted as Submitted Sell Orders, in both cases only up to and including the principal amount of Series 2002G Bonds of a subseries obtained by multiplying (A) the aggregate principal amount of Series 2002G Bonds of a subseries subject to Submitted Bids described in paragraph (iii) of this subsection (b) by (B) a fraction the numerator of which shall be the principal amount of Outstanding Series 2002G Bonds of a subseries held by such Existing Owner subject to such Submitted Sell Order or such Submitted Bid deemed to be a Submitted Sell Order and the denominator of which shall be the principal amount of Outstanding Series 2002G Bonds of a subseries subject to all such Submitted Sell Orders and such Submitted Bids deemed to be Submitted Sell Orders, and the remainder of each such Submitted Sell Order or Submitted Bid shall be deemed to be and shall be accepted as a Hold Order and each such Existing Owner shall be required to continue to hold such excess amount of Series 2002G Bonds of a subseries; and

(v) the Submitted Bid of each Potential Owner specifying any rate that is higher than the Maximum Auction Rate with respect to the Series 2002G Bonds of a subseries shall be rejected.

(c) If, as a result of the procedures described in subsection (a) or (b) above, any Existing Owner or Potential Owner would be required to purchase or sell an aggregate principal amount of Series 2002G Bonds of a subseries which is not an integral multiple of the Authorized Denomination for Series 2002G Bonds of such subseries on any Auction Date, the Auction Agent shall by lot, in such manner as it shall determine in its sole discretion, round up or down the principal amount of Series 2002G Bonds of a subseries to be purchased or sold by any Existing Owner or Potential Owner on such Auction Date so that the aggregate principal amount of Series 2002G Bonds of a subseries purchased or sold by each Existing Owner or Potential Owner on such Auction Date shall be an integral multiple of the Authorized Denomination for Series 2002G Bonds or such subseries, even if such allocation results in one or more of such Existing Owners or Potential Owners not purchasing or selling any Series 2002G Bonds of a subseries on such Auction Date.

(d) If, as a result of the procedures described in subsection (a) above, any Potential Owner would be required to purchase a principal amount of Series 2002G Bonds of a subseries that is less than the Authorized Denomination for Series 2002G Bonds of such subseries on any Auction Date, the Auction Agent shall by lot, in such manner as it shall determine in its sole discretion, allocate such Series 2002G Bonds for purchase among Potential Owners so that the principal amount of Series 2002G Bonds of a subseries purchased on such Auction Date by any Potential Owner shall be an integral multiple of the Authorized Denomination for Series 2002G Bonds of such subseries, even if such allocation results in one or more of such Potential Owners not purchasing such Series 2002G Bonds on such Auction Date.

**Notice of Auction Period Rate**

(a) On each Auction Date, the Auction Agent shall notify by telephone or other telecommunication device or other electronic communication acceptable to the parties or in writing each Broker-Dealer that participated in the

Auction held on such Auction Date of the following with respect to Series 2002G Bonds of each subseries for which an Auction was held on such Auction Date:

(i) the Auction Period Rate determined on such Auction Date for the succeeding Auction Period;

(ii) whether sufficient Clearing Bids existed for the determination of the Winning Bid Rate;

(iii) if such Broker-Dealer submitted a Bid or a Sell Order on behalf of an Existing Owner, whether such Bid or Sell Order was accepted or rejected and the principal amount of Series 2002G Bonds of a subseries, if any, to be sold by such Existing Owner;

(iv) if such Broker-Dealer submitted a Bid on behalf of a Potential Owner, whether such Bid was accepted or rejected and the principal amount of Series 2002G Bonds of a subseries, if any, to be purchased by such Potential Owner;

(v) if the aggregate principal amount of the Series 2002G Bonds of a subseries to be sold by all Existing Owners on whose behalf such Broker-Dealer submitted Bids or Sell Orders is different from the aggregate principal amount of Series 2002G Bonds of a subseries to be purchased by all Potential Owners on whose behalf such Broker-Dealer submitted a Bid, the name or names of one or more Broker-Dealers (and the Agent Member, if any, of each such other Broker Dealer) and the principal amount of Series 2002G Bonds of a subseries to be (A) purchased from one or more Existing Owners on whose behalf such other Broker-Dealers submitted Bids or Sell Orders or (B) sold to one or more Potential Owners on whose behalf such Broker-Dealer submitted Bids; and

(vi) the immediately succeeding Auction Date.

(b) On each Auction Date, with respect to Series 2002G Bonds of each subseries for which an Auction was held on such Auction Date, each Broker-Dealer that submitted an Order on behalf of any Existing Owner or Potential Owner shall: (i) advise each Existing Owner and Potential Owner on whose behalf such Broker-Dealer submitted an Order as to (A) the Auction Period Rate determined on such Auction Date, (B) whether any Bid or Sell Order submitted on behalf of each such Owner was accepted or rejected and (C) the immediately succeeding Auction Date; (ii) instruct each Potential Owner on whose behalf such Broker-Dealer submitted a Bid that was accepted, in whole or in part, to instruct such Existing Owner's Agent Member to pay to such Broker-Dealer (or its Agent Member) through the Securities Depository the amount necessary to purchase the principal amount of such Series 2002G Bonds of a subseries to be purchased pursuant to such Bid (including, with respect to such Series 2002G Bonds of a subseries in a daily Auction Period, accrued interest if the purchase date is not an Interest Payment Date for such Series 2002G Bond) against receipt of such Series 2002G Bonds of a subseries; and (iii) instruct each Existing Owner on whose behalf such Broker-Dealer submitted a Sell Order that was accepted or a Bid that was rejected, in whole or in part, to instruct such Existing Owner's Agent Member to deliver to such Broker-Dealer (or its Agent Member) through the Securities Depository the principal amount of such Series 2002G Bonds of a subseries to be sold pursuant to such Bid or Sell Order against payment therefor.

**Index**

(a) The Index on any Auction Date with respect to Series 2002G Bonds of a subseries in any Auction Period of 35 days or less shall be the One Month LIBOR Rate on such date. The Index with respect to Series 2002G Bonds of subseries in any Auction Period greater than 35 days shall be the yield on United States Treasury Securities having a maturity which most closely approximates the length of the Auction Period, as last published in *The Bond Buyer*. If either rate is unavailable, the Index for the Series 2002G Bonds of a subseries shall be an index or rate agreed to by all Broker-Dealers and consented to by TBTA.

"One Month LIBOR Rate" means, as of any date of determination, the offered rate for deposits in U.S. dollars for a one-month period which appears on the Telerate Page 3750 at approximately 11:00 a.m., London time, on such date, or if such date is not a date on which dealings in U.S. dollars are transacted in the London interbank market, then on the next preceding day on which such dealings were transacted in such market.

(b) If for any reason on any Auction Date the Index shall not be determined as provided in this Section, the Index shall be the Index for the Auction Period ending on such Auction Date.

(c) The determination of the Index as provided herein shall be conclusive and binding upon TBTA, the Trustee, the Broker-Dealers, the Auction Agent and the Owners of the Series 2002G Bonds of a subseries.

**Miscellaneous Provisions Regarding Auctions**

(a) In this Attachment 4, each reference to the purchase, sale or holding of "Series 2002G Bonds" shall refer to beneficial interests in such Series 2002G Bonds, unless the context clearly requires otherwise.

(b) During an Auction Rate Mode, with respect to the Series 2002G Bonds of a subseries, the provisions of the Subordinate Revenue Resolution and the definitions contained therein and described in this Attachment 4, including without limitation the definitions of Maximum Rate, Maximum Auction Rate, All Hold Rate, Index, Default Rate, Auction Multiple and the Auction Period Rate, may be amended, with the consent of the Insurer, pursuant to the Subordinate Revenue Resolution by obtaining the consent of the owners of all Outstanding Series 2002G Bonds of such subseries as follows; provided, however, that no such amendments that adversely affect the rights, duties or obligations of the Auction Agent shall be made without the consent of the Auction Agent. If on the first Auction Date occurring at least 20 days after the date on which the Trustee mailed notice of such proposed amendment to the registered owners of the Outstanding Series 2002G Bonds of a subseries as required by the Supplemental Resolution, (i) the Auction Period Rate which is determined on such date is the Winning Bid Rate and (ii) there is delivered to TBTA and the Trustee a Favorable Opinion of Bond Counsel, the proposed amendment shall be deemed to have been consented to by the owners of all affected Outstanding Series 2002G Bonds of such subseries.

(c) If the Securities Depository notifies TBTA that it is unwilling or unable to continue as Owner of the Series 2002G Bonds of a subseries or if at any time the Securities Depository shall no longer be registered or in good standing under the Securities Exchange Act of 1934, as amended, or other applicable statute or regulation and a successor to the Securities Depository is not appointed by TBTA within 90 days after TBTA receives notice or becomes aware of such condition, as the case may be, TBTA shall execute and the Trustee shall authenticate and deliver certificates representing the Series 2002G Bonds of such subseries. Such Series 2002G Bonds shall be authorized in such names and authorized denominations as the Securities Depository, pursuant to instructions from the Agent Members or otherwise, shall instruct TBTA and the Trustee.

(d) During an Auction Rate Mode, so long as the ownership of the Series 2002G Bonds of a subseries is maintained in book-entry form by the Securities Depository, an Existing Owner or a beneficial owner may sell, transfer or otherwise dispose of a Series 2002G Bond only pursuant to a Bid or Sell Order in accordance with the Auction Procedures or to or through a Broker-Dealer, provided that (i) in the case of all transfers other than pursuant to Auctions such Existing Owner or its Broker-Dealer or its Agent Member advises the Auction Agent of such transfer and (ii) a sale, transfer or other disposition of Series 2002G Bonds of a subseries from a customer of a Broker-Dealer who is listed on the records of that Broker-Dealer as the holder of such Series 2002G Bonds to that Broker-Dealer or another customer of that Broker-Dealer shall not be deemed to be a sale, transfer or other disposition for purposes of this paragraph if such Broker-Dealer remains the Existing Owner of Series 2002G Bonds of a subseries so sold, transferred or disposed of immediately after such sale, transfer or disposition.

**Changes in Auction Period or Auction Date**

(a) *Changes in Auction Period.*

(i) During any Auction Rate Mode, TBTA may from time to time on any Interest Payment Date, change the length of the Auction Period with respect to all of the Series 2002G Bonds of any subseries among daily, seven-days, 28-days, 35-days, three months, six months and a Special Auction Period in order to accommodate economic and financial factors that may affect or be relevant to the length of the Auction Period and the interest rate borne by Series 2002G Bonds of such subseries. TBTA shall initiate the change in the length of the Auction Period by giving written notice to the Insurer, the Auction Agent, the Broker-

Dealers and the Securities Depository that the Auction Period shall change if the conditions described herein are satisfied and the proposed effective date of the change, at least 10 Business Days prior to the Auction Date for such Auction Period; provided, however, that in the case of a change from a Special Auction Period of 92 or more days, the date of such change shall be the Interest Payment Date immediately following the last day of such Special Auction Period.

(ii) Any such changed Auction Period shall be for a period of one day, seven-days, 28-days, 35-days, three months, six months or a Special Auction Period and shall be for all of the Series 2002G Bonds of a subseries in an Auction Rate Mode.

(iii) The change in the length of the Auction Period for Series 2002G Bonds of any subseries shall not be allowed unless Sufficient Clearing Bids existed at both the Auction before the date on which the notice of the proposed change was given as provided in this subsection (a) and the Auction immediately preceding the proposed change.

(iv) The change in length of the Auction Period for Series 2002G Bonds of any subseries shall take effect only if (A) the Trustee and the Auction Agent receive, by 11:00 a.m., New York City time, on the Business Day before the Auction Date for the first such Auction Period, a certificate from TBTA consenting to the change in the length of the Auction Period specified in such certificate and (B) Sufficient Clearing Bids exist at the Auction on the Auction Date for such first Auction Period. For purposes of the Auction for such first Auction Period only, each Existing Owner shall be deemed to have submitted Sell Orders with respect to all of its Series 2002G Bonds of a subseries for which there is to be a change in the length of the Auction Period except to the extent such Existing Owner submits an Order with respect to such Series 2002G Bonds. If the condition referred to in (A) above is not met, the Auction Rate for the next Auction Period shall be determined pursuant to the Auction Procedures and the Auction Period shall be the Auction Period determined without reference to the proposed change. If the condition referred to in (A) is met but the condition referred to in (B) above is not met, the Auction Rate for the next Auction Period shall be the Maximum Auction Rate and the Auction Period shall be a seven-day Auction Period.

(v) On the conversion date for Series 2002G Bonds of a subseries from one Auction Period to another, any Series 2002G Bonds of such subseries which are not the subject of a specific Hold Order or Bid shall be deemed to be subject to a Sell Order.

(b) *Changes in Auction Date.* During any Auction Rate Mode, the Auction Agent, with the written consent of TBTA, may specify an earlier Auction Date for Series 2002G Bonds of any subseries (but in no event more than five Business Days earlier) than the Auction Date that would otherwise be determined in accordance with the definition of "Auction Date" in order to conform with then current market practice with respect to similar securities or to accommodate economic and financial factors that may affect or be relevant to the day of the week constituting an Auction Date and the interest rate borne on such Series 2002G Bonds. The Auction Agent shall provide notice of its determination to specify an earlier Auction Date for an Auction Period by means of a written notice delivered at least 45 days prior to the proposed changed Auction Date to the Trustee, TBTA, the Insurer, the Broker-Dealers and the Securities Depository.

## Auction Agent

(a) The Auction Agent shall be appointed by the Trustee at the written direction of TBTA, to perform the functions specified herein. The Auction Agent shall designate its Principal Office and signify its acceptance of the duties and obligations imposed upon it hereunder by an Auction Agreement delivered to TBTA, the Trustee and each Broker-Dealer which shall set forth such procedural and other matters relating to the implementation of the Auction Procedures as shall be satisfactory to TBTA and the Trustee.

(b) Subject to any applicable governmental restrictions, the Auction Agent may be or become the owner of or trade in Series 2002G Bonds with the same rights as if such entity were not the Auction Agent.

ATTACHMENT 4 - 17

**Qualifications of Auction Agent; Resignation; Removal.**

The Auction Agent shall be (a) a bank or trust company organized under the laws of the United States or any state or territory thereof having a combined capital stock, surplus and undivided profits of at least $30,000,000, or (b) a member of National Association of Securities Dealers having a capitalization of at least $30,000,000 and, in either case, authorized by law to perform all the duties imposed upon it by the Supplemental Resolution and a member of or a participant in, the Securities Depository. The Auction Agent may at any time resign and be discharged of the duties and obligations created by the Supplemental Resolution by giving at least ninety (90) days notice to TBTA, the Insurer, each Broker-Dealer and the Trustee. The Auction Agent may be removed at any time by TBTA by written notice, delivered to the Auction Agent, TBTA, the Insurer, each Broker-Dealer and the Trustee. Upon any such resignation or removal, the Trustee shall appoint a successor Auction Agent meeting the requirements of this Section. In the event of the resignation or removal of the Auction Agent, the Auction Agent shall pay over, assign and deliver any moneys and Series 2002G Bonds held by it in such capacity to its successor. The Auction Agent shall continue to perform its duties hereunder until its successor has been appointed by the Trustee. In the event that the Auction Agent has not been compensated for its services, the Auction Agent may resign by giving thirty (30) days notice to TBTA and the Trustee even if a successor Auction Agent has not been appointed.

ATTACHMENT 5
SPECIMEN FINANCIAL GUARANTY INSURANCE POLICY

# FINANCIAL GUARANTY INSURANCE POLICY
## MBIA Insurance Corporation
### Armonk, New York 10504

[NUMBER]

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to

or its successor (the "Paying Agent ") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

[PAR]
[LEGAL NAME OF ISSUE]

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

This policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this [DAY] day of [MONTH, YEAR].

MBIA Insurance Corporation

SPECIMEN

President

Attest:

Assistant Secretary

STD-R-NY-6
4/95

ATTACHMENT 5-1

[THIS PAGE INTENTIONALLY LEFT BLANK]

**ATTACHMENT 6**
**INFORMATION RELATING TO THE REFUNDED BONDS**

\*   Maturities indicated by an asterisk are sinking fund payments
\*\* Refunded Bonds indicated by a double asterisk are callable bonds escrowed to maturity which TBTA has retained its right to redeem prior to maturity.
T   Bonds indicated by a **T** are final maturities of term bonds.

The following tables provide information regarding the Refunded Bonds, including the bonds being refunded by these Series 2002G Bonds.

## REFUNDED BY SERIES 2002G

| Old TBTA Resolution | Series | Original CUSIP † | Maturity Date | Coupon | Refunded Principal Amount | Redemption Date | Redemption Price |
|---|---|---|---|---|---|---|---|
| 1980 Resolution | 1997SR | | 1/1/2004 | 5.000% | $13,340,000 * | Maturity | N/A |
| | 1997SR | | 1/1/2005 | 5.000% | 14,005,000 * | Maturity | N/A |
| | 1997SR | | 1/1/2006 | 5.000% | 14,710,000 * | Maturity | N/A |
| | 1997SR | 896029P41¹ | 1/1/2007 | 5.000% | 15,440,000 T | Maturity | N/A |
| | 1997SR | | 1/1/2004 | 5.500% | 1,710,000 * | Maturity | N/A |
| | 1997SR | | 1/1/2005 | 5.500% | 1,805,000 * | Maturity | N/A |
| | 1997SR | | 1/1/2006 | 5.500% | 1,905,000 * | Maturity | N/A |
| | 1997SR | | 1/1/2007 | 5.500% | 2,010,000 * | Maturity | N/A |
| | 1997SR | | 1/1/2008 | 5.500% | 18,335,000 * | Maturity | N/A |
| | 1997SR | | 1/1/2009 | 5.500% | 19,345,000 * | Maturity | N/A |
| | 1997SR | 896029P58² | 1/1/2010 | 5.500% | 20,410,000 * | Maturity | N/A |
| | | | | | $123,015,000 | | |
| Special Obligation 1994 | 1998A | 896033PR2 | 1/1/2004 | 4.000% | $6,625,000 | Maturity | N/A |
| | 1998A | 896033PS0 | 1/1/2005 | 4.000% | 6,895,000 | Maturity | N/A |
| | 1998A | 896033PT8 | 1/1/2006 | 5.000% | 3,340,000 | Maturity | N/A |
| | 1998A | 896033QH3 | 1/1/2006 | 4.100% | 3,855,000 | Maturity | N/A |
| | 1998A | 896033PU5 | 1/1/2007 | 5.000% | 1,035,000 | Maturity | N/A |
| | 1998A | 896033QJ9 | 1/1/2007 | 4.100% | 6,485,000 | Maturity | N/A |
| | 1998A | 896033PV3 | 1/1/2008 | 5.000% | 7,875,000 | Maturity | N/A |
| | 1998A | 896033PW1 | 1/1/2009 | 5.125% | 8,285,000 | Maturity | N/A |
| | | | | | $44,395,000 | | |

---

¹ The remaining sinking fund payments of this term bond maturing January 1, 2007 were refunded by the Series 2002F Bonds.

² The remaining sinking fund payments of this term bond maturing January 1, 2012 were refunded by the Series 2002D Bonds and the Series 2002E Bonds.

† CUSIP numbers have been assigned by an organization not affiliated with TBTA and are included solely for the convenience of bondholders. TBTA is not responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to their correctness. Bonds for which no CUSIP number is shown are sinking fund payments of the term bond which follows and have that CUSIP number.

# ATTACHMENT 6
## INFORMATION RELATING TO THE REFUNDED BONDS

\*   Maturities indicated by an asterisk are sinking fund payments
\*\* Refunded Bonds indicated by a double asterisk are callable bonds escrowed to maturity which TBTA has retained its right to redeem prior to maturity.
T   Bonds indicated by a T are final maturities of term bonds.

## REFUNDED BY SERIES 2002B

| Old TBTA Resolution | Series | Original CUSIP† | Maturity Date | Coupon | Refunded Principal Amount | Redemption Date | Redemption Price |
|---|---|---|---|---|---|---|---|
| 1980 Resolution | Q | | 01/01/06 | 6.750% | $7,595,000 * | Maturity | N/A |
| | Q | | 01/01/07 | 6.750% | 8,105,000 * | Maturity | N/A |
| | Q | | 01/01/08 | 6.750% | 12,945,000 * | Maturity | N/A |
| | Q | 896029RH0 | 01/01/09 | 6.750% | 13,825,000 T | Maturity | N/A |
| | | | | | $42,470,000 | | |
| | X | 896029WW1 | 01/01/03 | 6.200% | $13,975,000 | Maturity | N/A |
| | X | | 01/01/09 | 6.600% | 23,830,000 * | Maturity | N/A |
| | X | 896029XH3 | 01/01/10 | 6.600% | 25,415,000 T | Maturity | N/A |
| | X | | 01/01/11 | 6.625% | 37,675,000 * | Maturity | N/A |
| | X | 896029XJ9 | 01/01/12 | 6.625% | 40,200,000 T | Maturity | N/A |
| | | | | | $141,095,000 | | |
| | Y | 896029YL3 | 01/01/03 | 5.500% | $15,345,000 | Maturity | N/A |
| | Y | 896029YM1 | 01/01/04 | 5.625% | 16,185,000 | Maturity | N/A |
| | Y | 896029YN9 | 01/01/05 | 5.750% | 23,885,000 | Maturity | N/A |
| | Y | 896029YP4 | 01/01/06 | 5.800% | 25,250,000 | Maturity | N/A |
| | Y | 896029YQ2 | 01/01/07 | 5.900% | 26,720,000 | Maturity | N/A |
| | Y | 896029YR0 | 01/01/08 | 5.900% | 28,295,000 | Maturity | N/A |
| | Y | | 01/01/09 | 6.000% | 29,970,000 * | Maturity | N/A |
| | Y | | 01/01/10 | 6.000% | 31,760,000 * | Maturity | N/A |
| | Y | | 01/01/11 | 6.000% | 33,665,000 * | Maturity | N/A |
| | Y | 896029YS8 | 01/01/12 | 6.000% | 41,560,000 T | Maturity | N/A |
| | Y | | 01/01/13 | 5.500% | 57,030,000 * | Maturity | N/A |
| | Y | | 01/01/14 | 5.500% | 27,375,000 * | Maturity | N/A |
| | Y | | 01/01/15 | 5.500% | 28,890,000 * | Maturity | N/A |
| | Y | | 01/01/16 | 5.500% | 71,430,000 * | Maturity | N/A |
| | Y | 896029YE9 | 01/01/17 | 5.500% | 22,650,000 T | Maturity | N/A |
| | Y | | 01/01/18 | 6.125% | 4,420,000 * | Maturity | N/A |
| | Y | | 01/01/19 | 6.125% | 25,340,000 * | Maturity | N/A |
| | Y | | 01/01/20 | 6.125% | 26,890,000 * | Maturity | N/A |
| | Y | 896029YU3 | 01/01/21 | 6.125% | 11,600,000 T | Maturity | N/A |
| | | | | | $548,260,000 | | |
| | 1993A | 896029ZE8 | 01/01/04 | 4.600% | $30,930,000 | Maturity | N/A |
| | 1993A | 896029ZF5 | 01/01/05 | 4.750% | 22,830,000 | Maturity | N/A |
| | 1993A | 896029ZG3 | 01/01/06 | 4.800% | 29,275,000 | Maturity | N/A |
| | 1993A | 896029ZH1 | 01/01/07 | 5.000% | 30,675,000 | Maturity | N/A |
| | 1993A | 896029ZJ7 | 01/01/08 | 5.000% | 32,210,000 | Maturity | N/A |
| | 1993A | | 01/01/16 | 4.750% | 1,250,000 * | Maturity | N/A |
| | 1993A | | 01/01/17 | 4.750% | 1,320,000 * | Maturity | N/A |
| | 1993A | | 01/01/18 | 4.750% | 1,375,000 * | Maturity | N/A |
| | 1993A | | 01/01/19 | 4.750% | 1,440,000 * | Maturity | N/A |
| | 1993A | | 01/01/20 | 4.750% | 1,510,000 * | Maturity | N/A |
| | 1993A | | 01/01/21 | 4.750% | 1,580,000 * | Maturity | N/A |
| | 1993A | 896029ZM0 | 01/01/22 | 4.750% | 1,660,000 T | Maturity | N/A |
| | | | | | $156,055,000 | | |
| | 1993B | 896029A62 | 01/01/03 | 6.000% | $7,720,000 | Maturity | N/A |
| | 1993B | 896029A70 | 01/01/04 | 6.000% | 8,180,000 | Maturity | N/A |
| | 1993B | 896029A88 | 01/01/05 | 5.750% | 8,140,000 | 01/01/04 | 101.500% |
| | 1993B | 896029A96 | 01/01/06 | 4.700% | 3,340,000 | 01/01/04 | 101.500% |
| | 1993B | 896029B20 | 01/01/07 | 4.800% | 3,495,000 | 01/01/04 | 101.500% |
| | 1993B | 896029B38 | 01/01/08 | 4.900% | 3,665,000 | 01/01/04 | 101.500% |
| | 1993B | 896029B61 | 01/01/09 | 0.000% | 3,845,000 | Maturity | N/A |
| | 1993B | 896029B79 | 01/01/10 | 0.000% | 3,845,000 | Maturity | N/A |
| | 1993B | 896029B87 | 01/01/11 | 0.000% | 3,845,000 | Maturity | N/A |
| | 1993B | 896029B95 | 01/01/12 | 0.000% | 3,845,000 | Maturity | N/A |

† CUSIP numbers have been assigned by an organization not affiliated with TBTA and are included solely for the convenience of bondholders.  TBTA is not responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to their correctness.  Bonds for which no CUSIP number is shown are sinking fund payments of the term bond which follows and have that CUSIP number.

## ATTACHMENT 6
### INFORMATION RELATING TO THE REFUNDED BONDS

\* Maturities indicated by an asterisk are sinking fund payments
\*\* Refunded Bonds indicated by a double asterisk are callable bonds escrowed to maturity which TBTA has retained its right to redeem prior to maturity.
T  Bonds indicated by a **T** are final maturities of term bonds.

## REFUNDED BY SERIES 2002B

| Old TBTA Resolution | Series | Original CUSIP † | Maturity Date | Coupon | Refunded Principal Amount | Redemption Date | | Redemption Price |
|---|---|---|---|---|---|---|---|---|
| 1980 Resolution | 1993B | 896029B46 | 01/01/13 | 0.000% | $3,845,000 | Maturity | | N/A |
| (cont'd) | 1993B | 896029C29 | 01/01/14 | 5.000% | 22,815,000 | Maturity | | N/A |
| | 1993B | 896029C37 | 01/01/15 | 0.000% | 23,960,000 | Maturity | | N/A |
| | 1993B | 896029C45 | 01/01/16 | 0.000% | 2,640,000 | Maturity | | N/A |
| | 1993B | 896029C52 | 01/01/17 | 0.000% | 11,770,000 | Maturity | | N/A |
| | 1993B | | 01/01/18 | 5.000% | 11,770,000 * | Maturity | | N/A |
| | 1993B | | 01/01/19 | 5.000% | 12,350,000 * | Maturity | | N/A |
| | 1993B | 896029C86 | 01/01/20 | 5.000% | 12,975,000 T | Maturity | | N/A |
| | 1993B | 896029C94 | 01/01/21 | 0.000% | 19,105,000 | Maturity | | N/A |
| | 1993B | 896029B53 | 01/01/22 | 0.000% | 19,100,000 | Maturity | | N/A |
| | | | | | $190,250,000 | | | |
| | 1994A | 896029E84 | 01/01/04 | 4.400% | $15,340,000 | Maturity | | N/A |
| | 1994A | 896029E92 | 01/01/05 | 4.500% | 16,015,000 | Maturity | ** | N/A |
| | 1994A | 896029F26 | 01/01/06 | 4.600% | 16,735,000 | Maturity | ** | N/A |
| | 1994A | 896029F34 | 01/01/07 | 4.700% | 17,505,000 | Maturity | ** | N/A |
| | 1994A | 896029F42 | 01/01/08 | 4.800% | 18,330,000 | Maturity | | N/A |
| | 1994A | 896029F59 | 01/01/09 | 6.500% | 19,210,000 | Maturity | | N/A |
| | 1994A | 896029F67 | 01/01/10 | 6.000% | 20,455,000 | Maturity | | N/A |
| | 1994A | 896029G25 | 01/01/11 | 6.000% | 21,685,000 | Maturity | | N/A |
| | 1994A | 896029G33 | 01/01/12 | 4.750% | 22,985,000 | Maturity | ** | N/A |
| | 1994A | | 01/01/13 | 4.750% | 24,075,000 * | Maturity | | N/A |
| | 1994A | 896029F75 | 01/01/14 | 4.750% | 25,220,000 T | Maturity | | N/A |
| | 1994A | | 01/01/15 | 4.750% | 26,420,000 * | Maturity | | N/A |
| | 1994A | | 01/01/16 | 4.750% | 27,675,000 * | Maturity | | N/A |
| | 1994A | | 01/01/17 | 4.750% | 28,990,000 * | 01/01/16 | | 100.000% |
| | 1994A | | 01/01/18 | 4.750% | 30,365,000 * | 01/01/16 | | 100.000% |
| | 1994A | 896029F83 | 01/01/19 | 4.750% | 31,810,000 T | 01/01/16 | | 100.000% |
| | | | | | $362,815,000 | | | |
| | 1996B | 896029N27 | 01/01/04 | 4.500% | $3,965,000 | Maturity | | N/A |
| | 1996B | 896029N35 | 01/01/05 | 4.600% | 4,140,000 | Maturity | | N/A |
| | 1996B | 896029N43 | 01/01/06 | 6.000% | 4,330,000 | Maturity | | N/A |
| | 1996B | 896029N50 | 01/01/07 | 6.000% | 4,590,000 | Maturity | | N/A |
| | 1996B | 896029N68 | 01/01/08 | 4.900% | 4,865,000 | Maturity | ** | N/A |
| | 1996B | 896029N76 | 01/01/09 | 5.000% | 5,105,000 | Maturity | ** | N/A |
| | 1996B | 896029N84 | 01/01/10 | 5.100% | 5,360,000 | Maturity | ** | N/A |
| | 1996B | | 01/01/11 | 5.300% | 5,635,000 * | Maturity | | N/A |
| | 1996B | | 01/01/12 | 5.300% | 5,930,000 * | 01/01/11 | | 100.000% |
| | 1996B | | 01/01/13 | 5.300% | 6,245,000 * | 01/01/11 | | 100.000% |
| | 1996B | | 01/01/14 | 5.300% | 6,580,000 * | 01/01/11 | | 100.000% |
| | 1996B | | 01/01/15 | 5.300% | 6,925,000 * | 01/01/11 | | 100.000% |
| | 1996B | | 01/01/16 | 5.300% | 7,295,000 * | 01/01/11 | | 100.000% |
| | 1996B | 896029N92 | 01/01/17 | 5.300% | 7,680,000 T | 01/01/11 | | 100.000% |
| | 1996B | | 01/01/18 | 5.200% | 8,085,000 * | 01/01/11 | | 100.000% |
| | 1996B | | 01/01/19 | 5.200% | 8,505,000 * | 01/01/11 | | 100.000% |
| | 1996B | | 01/01/20 | 5.200% | 8,950,000 * | 01/01/11 | | 100.000% |
| | 1996B | | 01/01/21 | 5.200% | 9,415,000 * | 01/01/11 | | 100.000% |
| | 1996B | 896029P25 | 01/01/22 | 5.200% | 9,905,000 T | 01/01/11 | | 100.000% |
| | | | | | $123,505,000 | | | |
| | 1997A | 896029R31 | 01/01/04 | 4.500% | $4,125,000 | Maturity | | N/A |
| | 1997A | 896029R49 | 01/01/05 | 4.600% | 4,310,000 | Maturity | | N/A |
| | 1997A | 896029R56 | 01/01/06 | 4.625% | 4,510,000 | Maturity | | N/A |
| | 1997A | 896029R64 | 01/01/07 | 5.500% | 4,715,000 | Maturity | | N/A |
| | 1997A | 896029R72 | 01/01/08 | 5.500% | 4,975,000 | Maturity | | N/A |
| | 1997A | 896029R80 | 01/01/09 | 5.500% | 5,250,000 | Maturity | ** | N/A |
| | 1997A | 896029R98 | 01/01/10 | 5.000% | 5,540,000 | Maturity | ** | N/A |
| | 1997A | 896029S22 | 01/01/11 | 5.500% | 5,815,000 | Maturity | ** | N/A |
| | 1997A | 896029S30 | 01/01/12 | 5.500% | 6,135,000 | Maturity | ** | N/A |

† CUSIP numbers have been assigned by an organization not affiliated with TBTA and are included solely for the convenience of bondholders. TBTA is not responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to their correctness. Bonds for which no CUSIP number is shown are sinking fund payments of the term bond which follows and have that CUSIP number.

## ATTACHMENT 6
## INFORMATION RELATING TO THE REFUNDED BONDS

\*  Maturities indicated by an asterisk are sinking fund payments
\*\* Refunded Bonds indicated by a double asterisk are callable bonds escrowed to maturity which TBTA has retained its right to redeem prior to maturity.
**T** Bonds indicated by a **T** are final maturities of term bonds.

## REFUNDED BY SERIES 2002B

| Old TBTA Resolution | Series | Original CUSIP † | Maturity Date | Coupon | Refunded Principal Amount | Redemption Date | | Redemption Price |
|---|---|---|---|---|---|---|---|---|
| 1980 Resolution (cont'd) | 1997A | 896029S48 | 01/01/13 | 5.500% | $6,475,000 | 01/01/12 | | 100.000% |
| | 1997A | 896029S55 | 01/01/14 | 5.500% | 6,830,000 | 01/01/12 | | 100.000% |
| | 1997A | | 01/01/15 | 5.125% | 7,205,000 * | 01/01/12 | | 100.000% |
| | 1997A | | 01/01/16 | 5.125% | 7,575,000 * | 01/01/12 | | 100.000% |
| | 1997A | 896029S63 | 01/01/17 | 5.125% | 7,960,000 T | 01/01/12 | | 100.000% |
| | 1997A | | 01/01/18 | 5.125% | 8,370,000 * | 01/01/12 | | 100.000% |
| | 1997A | | 01/01/19 | 5.125% | 8,800,000 * | 01/01/12 | | 100.000% |
| | 1997A | | 01/01/20 | 5.125% | 9,250,000 * | 01/01/12 | | 100.000% |
| | 1997A | | 01/01/21 | 5.125% | 9,725,000 * | 01/01/12 | | 100.000% |
| | 1997A | 896029S71 | 01/01/22 | 5.125% | 10,220,000 T | 01/01/12 | | 100.000% |
| | | | | | $127,785,000 | | | |
| | 1999A | 896029U86 | 01/01/03 | 3.600% | $90,000 | Maturity | | N/A |
| | 1999A | 896029U94 | 01/01/04 | 3.700% | 95,000 | Maturity | | N/A |
| | 1999A | 896029V28 | 01/01/05 | 3.800% | 100,000 | Maturity | | N/A |
| | 1999A | 896029V36 | 01/01/06 | 4.000% | 105,000 | Maturity | | N/A |
| | 1999A | 896029V44 | 01/01/07 | 4.000% | 110,000 | Maturity | | N/A |
| | 1999A | 896029V51 | 01/01/08 | 4.000% | 115,000 | Maturity | | N/A |
| | 1999A | 896029V69 | 01/01/09 | 4.100% | 120,000 | Maturity | | N/A |
| | 1999A | 896029V77 | 01/01/10 | 4.200% | 120,000 | 07/01/09 | | 100.500% |
| | 1999A | 896029V85 | 01/01/11 | 4.300% | 130,000 | 07/01/09 | | 100.500% |
| | 1999A | 896029V93 | 01/01/12 | 4.400% | 135,000 | 07/01/09 | | 100.500% |
| | 1999A | 896029W27 | 01/01/13 | 4.500% | 140,000 | 07/01/09 | | 100.500% |
| | 1999A | 896029W35 | 01/01/14 | 4.600% | 145,000 | 07/01/09 | | 100.500% |
| | 1999A | 896029W43 | 01/01/15 | 4.700% | 155,000 | 07/01/09 | | 100.500% |
| | 1999A | 896029W50 | 01/01/16 | 4.750% | 14,295,000 | 07/01/09 | | 100.500% |
| | 1999A | 896029W68 | 01/01/17 | 5.250% | 14,975,000 | 07/01/09 | | 100.500% |
| | 1999A | 896029W76 | 01/01/18 | 5.125% | 38,040,000 | 07/01/09 | | 100.500% |
| | 1999A | 896029W84 | 01/01/19 | 5.000% | 16,375,000 | 07/01/09 | | 100.500% |
| | | | | | $85,245,000 | | | |
| | 1999B | 896029X67 | 01/01/04 | 4.750% | $3,575,000 | Maturity | | N/A |
| | 1999B | 896029X75 | 01/01/05 | 5.500% | 3,745,000 | Maturity | | N/A |
| | 1999B | 896029X83 | 01/01/06 | 5.500% | 3,950,000 | Maturity | | N/A |
| | 1999B | 896029X91 | 01/01/07 | 5.500% | 4,170,000 | Maturity | | N/A |
| | 1999B | 896029Y25 | 01/01/08 | 5.500% | 4,395,000 | Maturity | | N/A |
| | 1999B | 896029Y33 | 01/01/09 | 5.500% | 4,640,000 | Maturity | | N/A |
| | 1999B | 896029Y41 | 01/01/10 | 5.625% | 4,895,000 | Maturity | | N/A |
| | 1999B | 896029Y58 | 01/01/11 | 5.750% | 5,170,000 | Maturity | | N/A |
| | 1999B | 896029Y66 | 01/01/12 | 5.750% | 5,465,000 | Maturity | | N/A |
| | 1999B | 896029Y74 | 01/01/13 | 5.750% | 5,780,000 | Maturity | ** | N/A |
| | 1999B | 896029Y82 | 01/01/14 | 5.750% | 6,115,000 | Maturity | ** | N/A |
| | 1999B | 896029Y90 | 01/01/15 | 5.750% | 6,465,000 | Maturity | ** | N/A |
| | 1999B | | 01/01/16 | 5.375% | 6,835,000 * | Maturity | | N/A |
| | 1999B | | 01/01/17 | 5.375% | 7,205,000 * | 01/01/16 | | 100.000% |
| | 1999B | | 01/01/18 | 5.375% | 7,590,000 * | 01/01/16 | | 100.000% |
| | 1999B | 896029Z24 | 01/01/19 | 5.375% | 8,000,000 T | 01/01/16 | | 100.000% |
| | | | | | $87,995,000 | | | |
| BIC Resolution | 1993 | 896028AL1 | 01/01/04 | 5.100% | $9,050,000 | Maturity | | N/A |
| | 1993 | 896028AM9 | 01/01/05 | 5.200% | 9,515,000 | Maturity | | N/A |
| | | | | | $18,565,000 | | | |

† CUSIP numbers have been assigned by an organization not affiliated with TBTA and are included solely for the convenience of bondholders.  TBTA is not responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to their correctness.  Bonds for which no CUSIP number is shown are sinking fund payments of the term bond which follows and have that CUSIP number.

ATTACHMENT 6-4

**ATTACHMENT 6**
**INFORMATION RELATING TO THE REFUNDED BONDS**

\*   Maturities indicated by an asterisk are sinking fund payments
\*\*  Refunded Bonds indicated by a double asterisk are callable bonds escrowed to maturity which TBTA has retained its right to redeem prior to maturity.
T   Bonds indicated by a T are final maturities of term bonds.

## REFUNDED BY SERIES 2002B

| Old TBTA Resolution | Series | Original CUSIP † | Maturity Date | Coupon | Refunded Principal Amount | Redemption Date | | Redemption Price |
|---|---|---|---|---|---|---|---|---|
| Special Obligation 1991 | 1998A | 896033MA2 | 01/01/04 | 5.000% | $14,775,000 | Maturity | | N/A |
| | 1998A | 896033MB0 | 01/01/05 | 5.500% | 15,505,000 | Maturity | | N/A |
| | 1998A | 896033MC8 | 01/01/06 | 5.500% | 16,365,000 | Maturity | | N/A |
| | 1998A | 896033MD6 | 01/01/07 | 5.500% | 17,260,000 | Maturity | | N/A |
| | 1998A | 896033ME4 | 01/01/08 | 5.500% | 18,205,000 | Maturity | | N/A |
| | 1998A | 896033MM6 | 01/01/15 | 5.000% | 26,170,000 | Maturity | \*\* | N/A |
| | 1998A | 896033MN4 | 01/01/16 | 5.000% | 28,525,000 | Maturity | \*\* | N/A |
| | 1998A | 896033MP9 | 01/01/17 | 5.000% | 14,280,000 | Maturity | \*\* | N/A |
| | | | | | $151,085,000 | | | |
| Special Obligation 1994 | 1998A | 896033PX9 | 01/01/10 | 5.125% | $8,720,000 | Maturity | \*\* | N/A |
| | 1998A | 896033PY7 | 01/01/11 | 5.125% | 9,175,000 | Maturity | \*\* | N/A |
| | 1998A | 896033PZ4 | 01/01/12 | 5.125% | 9,660,000 | Maturity | \*\* | N/A |
| | 1998A | 896033QA8 | 01/01/13 | 5.125% | 10,170,000 | Maturity | \*\* | N/A |
| | 1998A | 896033QB6 | 01/01/14 | 5.125% | 10,700,000 | Maturity | \*\* | N/A |
| | 1998A | 896033QC4 | 01/01/15 | 5.125% | 11,265,000 | 01/01/14 | | 100.000% |
| | 1998A | 896033QD2 | 01/01/16 | 4.750% | 1,480,000 | 01/01/14 | | 100.000% |
| | 1998A | 896033QK6 | 01/01/16 | 5.125% | 10,375,000 | 01/01/14 | | 100.000% |
| | | | | | $71,545,000 | | | |

† CUSIP numbers have been assigned by an organization not affiliated with TBTA and are included solely for the convenience of bondholders. TBTA is not responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to their correctness. Bonds for which no CUSIP number is shown are sinking fund payments of the term bond which follows and have that CUSIP number.

ATTACHMENT 6-5

## ATTACHMENT 6
## INFORMATION RELATING TO THE REFUNDED BONDS

 \*  Maturities indicated by an asterisk are sinking fund payments
\*\* Refunded Bonds indicated by a double asterisk are callable bonds escrowed to maturity which TBTA has retained its right to redeem prior to maturity.
T  Bonds indicated by a **T** are final maturities of term bonds.

### REFUNDED BY SERIES 2002C

| Old TBTA Resolution | Series | Original CUSIP † | Maturity Date | Coupon | Refunded Principal Amount | Redemption Date | Redemption Price |
|---|---|---|---|---|---|---|---|
| 1980 Resolution | 1999C | | 1/1/2003 | Variable | $7,700,000 * | 11/14/2002 | 100.000% |
| | 1999C | | 1/1/2004 | Variable | 8,100,000 * | 11/14/2002 | 100.000% |
| | 1999C | | 1/1/2005 | Variable | 8,600,000 * | 11/14/2002 | 100.000% |
| | 1999C | | 1/1/2008 | Variable | 100,000 * | 11/14/2002 | 100.000% |
| | 1999C | | 1/1/2009 | Variable | 100,000 * | 11/14/2002 | 100.000% |
| | 1999C | | 1/1/2010 | Variable | 17,600,000 * | 11/14/2002 | 100.000% |
| | 1999C | | 1/1/2011 | Variable | 18,700,000 * | 11/14/2002 | 100.000% |
| | 1999C | | 1/1/2012 | Variable | 19,800,000 * | 11/14/2002 | 100.000% |
| | 1999C | 896029Z57 | 1/1/2013 | Variable | 20,900,000 T | 11/14/2002 | 100.000% |
| | | | | | $101,600,000 | | |

† CUSIP numbers have been assigned by an organization not affiliated with TBTA and are included solely for the convenience of bondholders. TBTA is not responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to their correctness. Bonds for which no CUSIP number is shown are sinking fund payments of the term bond which follows and have that CUSIP number.

ATTACHMENT 6-6

## ATTACHMENT 6
## INFORMATION RELATING TO THE REFUNDED BONDS

\*   Maturities indicated by an asterisk are sinking fund payments
\*\*  Refunded Bonds indicated by a double asterisk are callable bonds escrowed to maturity which TBTA has retained its right to redeem prior to maturity.
T   Bonds indicated by a T are final maturities of term bonds.

## REFUNDED BY SERIES 2002D

| Old TBTA Resolution | Series | Original CUSIP † | Maturity Date | Coupon | Refunded Principal Amount | | Redemption Date | Redemption Price |
|---|---|---|---|---|---|---|---|---|
| 1980 Resolution | 1993A | | 01/01/09 | 5.000% | $33,825,000 | * | 01/01/03 | 100.000% |
| | 1993A | | 01/01/10 | 5.000% | 35,515,000 | * | 01/01/03 | 100.000% |
| | 1993A | | 01/01/11 | 5.000% | 26,065,000 | * | 01/01/03 | 100.000% |
| | 1993A | 896029ZK4 | 01/01/12 | 5.000% | 21,380,000 | T | 01/01/03 | 100.000% |
| | 1993A | | 01/01/13 | 5.000% | 22,450,000 | * | 01/01/03 | 100.000% |
| | 1993A | | 01/01/14 | 5.000% | 23,570,000 | * | 01/01/03 | 100.000% |
| | 1993A | 896029ZL2 | 01/01/15 | 5.000% | 64,000,000 | T | 01/01/03 | 100.000% |
| | | | | | $226,805,000 | | | |
| | 1996B | 896029M93 | 01/01/03 | 4.400% | $3,795,000 | | Maturity | N/A |
| | | | | | $3,795,000 | | | |
| | 1997SR | 896029P58 [2] | 01/01/03 | 5.500% | $1,620,000 | * | Maturity | N/A |
| | | | | | $1,620,000 | | | |
| | 1999B | 896029X59 | 01/01/03 | 4.500% | $3,420,000 | | Maturity | N/A |
| | | | | | $3,420,000 | | | |
| BIC Resolution | 1993 | 896028AK3 | 01/01/03 | 5.100% | $8,610,000 | | Maturity | N/A |
| | | | | | $8,610,000 | | | |
| Special Obligation 1994 | 1998A | 896033PQ4 | 01/01/03 | 3.900% | $6,370,000 | | Maturity | N/A |
| | | | | | $6,370,000 | | | |

[2] The remaining sinking fund payments of this term bond maturing January 1, 2012 were refunded by the Series 2002E Bonds and the Series 2002G Bonds.

† CUSIP numbers have been assigned by an organization not affiliated with TBTA and are included solely for the convenience of bondholders. TBTA is not responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to their correctness. Bonds for which no CUSIP number is shown are sinking fund payments of the term bond which follows and have that CUSIP number.

**ATTACHMENT 6**
**INFORMATION RELATING TO THE REFUNDED BONDS**

\*   Maturities indicated by an asterisk are sinking fund payments
\*\* Refunded Bonds indicated by a double asterisk are callable bonds escrowed to maturity which TBTA has retained its right to redeem prior to maturity.
T   Bonds indicated by a T are final maturities of term bonds.

### REFUNDED BY SERIES 2002E

| Old TBTA Resolution | Series | Original CUSIP † | Maturity Date | Coupon | Refunded Principal Amount | Redemption Date | | Redemption Price |
|---|---|---|---|---|---|---|---|---|
| 1980 Resolution | 1994A | 896029G41 | 1/1/2020 | 5.200% | $33,320,000 T | Maturity | ** | N/A |
| | 1994A | | 1/1/2021 | 5.000% | 35,050,000 * | Maturity | ** | N/A |
| | 1994A | | 1/1/2022 | 5.000% | 36,805,000 * | Maturity | ** | N/A |
| | 1994A | | 1/1/2023 | 5.000% | 38,645,000 * | Maturity | ** | N/A |
| | 1994A | 896029F91 | 1/1/2024 | 5.000% | 40,575,000 T | Maturity | ** | N/A |
| | | | | | $184,395,000 | | | |
| | 1996B | | 1/1/2023 | 5.200% | $10,420,000 * | 01/01/2022 | | 100.000% |
| | 1996B | | 1/1/2024 | 5.200% | 10,960,000 * | 01/01/2022 | | 100.000% |
| | 1996B | | 1/1/2025 | 5.200% | 11,530,000 * | 01/01/2022 | | 100.000% |
| | 1996B | | 1/1/2026 | 5.200% | 12,130,000 * | 01/01/2022 | | 100.000% |
| | 1996B | 896029P33 | 1/1/2027 | 5.200% | 12,760,000 T | 01/01/2022 | | 100.000% |
| | | | | | $57,800,000 | | | |
| | 1997A | | 1/1/2023 | 5.250% | $10,745,000 * | 01/01/2022 | | 100.000% |
| | 1997A | | 1/1/2024 | 5.250% | 11,310,000 * | 01/01/2022 | | 100.000% |
| | 1997A | | 1/1/2025 | 5.250% | 11,905,000 * | 01/01/2022 | | 100.000% |
| | 1997A | | 1/1/2026 | 5.250% | 12,530,000 * | 01/01/2022 | | 100.000% |
| | 1997A | | 1/1/2027 | 5.250% | 13,185,000 * | 01/01/2022 | | 100.000% |
| | 1997A | 896029S89 | 1/1/2028 | 5.250% | 13,875,000 T | 01/01/2022 | | 100.000% |
| | | | | | $73,550,000 | | | |
| | 1997SR | | 1/1/2011 | 5.500% | $21,530,000 * | Maturity | | N/A |
| | 1997SR | 896029P58² | 1/1/2012 | 5.500% | 22,715,000 T | Maturity | | N/A |
| | | | | | $44,245,000.00 | | | |
| | 1999B | | 1/1/2020 | 5.500% | $8,430,000 * | Maturity | | N/A |
| | 1999B | | 1/1/2021 | 5.500% | 8,895,000 * | Maturity | | N/A |
| | 1999B | | 1/1/2022 | 5.500% | 9,380,000 * | Maturity | | N/A |
| | 1999B | | 1/1/2023 | 5.500% | 9,900,000 * | 01/01/2022 | | 100.000% |
| | 1999B | | 1/1/2024 | 5.500% | 10,445,000 * | 01/01/2022 | | 100.000% |
| | 1999B | | 1/1/2025 | 5.500% | 11,015,000 * | 01/01/2022 | | 100.000% |
| | 1999B | | 1/1/2026 | 5.500% | 11,625,000 * | 01/01/2022 | | 100.000% |
| | 1999B | | 1/1/2027 | 5.500% | 12,260,000 * | 01/01/2022 | | 100.000% |
| | 1999B | | 1/1/2028 | 5.500% | 12,935,000 * | 01/01/2022 | | 100.000% |
| | 1999B | | 1/1/2029 | 5.500% | 13,650,000 * | 01/01/2022 | | 100.000% |
| | 1999B | 896029Z32 | 1/1/2030 | 5.500% | 14,400,000 T | 01/01/2022 | | 100.000% |
| | | | | | $122,935,000 | | | |
| Special Obligation 1991 | 1998A | 896033MF1 | 1/1/2009 | 5.500% | $19,210,000 | Maturity | ** | N/A |
| | 1998A | 896033MG9 | 1/1/2010 | 5.250% | 20,265,000 | Maturity | ** | N/A |
| | 1998A | 896033MH7 | 1/1/2011 | 5.250% | 21,325,000 | Maturity | ** | N/A |
| | 1998A | 896033MJ3 | 1/1/2012 | 5.250% | 22,450,000 | Maturity | ** | N/A |
| | 1998A | 896033MK0 | 1/1/2013 | 5.250% | 23,635,000 | Maturity | ** | N/A |
| | 1998A | 896033ML8 | 1/1/2014 | 5.250% | 24,870,000 | Maturity | ** | N/A |
| | | | | | $131,755,000 | | | |

² The remaining sinking fund payments of this term bond maturing January 1, 2012 were refunded by the Series 2002D Bonds and the Series 2002G Bonds.

† CUSIP numbers have been assigned by an organization not affiliated with TBTA and are included solely for the convenience of bondholders. TBTA is not responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to their correctness. Bonds for which no CUSIP number is shown are sinking fund payments of the term bond which follows and have that CUSIP number.

## ATTACHMENT 6
## INFORMATION RELATING TO THE REFUNDED BONDS

\*    Maturities indicated by an asterisk are sinking fund payments
\*\* Refunded Bonds indicated by a double asterisk are callable bonds escrowed to maturity which TBTA has retained its right to redeem prior to maturity.
**T**   Bonds indicated by a **T** are final maturities of term bonds.

## REFUNDED BY SERIES 2002E

| Old TBTA Resolution | Series | Original CUSIP [†] | Maturity Date | Coupon | Refunded Principal Amount | | Redemption Date | | Redemption Price |
|---|---|---|---|---|---|---|---|---|---|
| Special Obligation 1994 | 1998A | 896033QE0 | 1/1/2017 | 5.000% | $12,470,000 | | Maturity | \*\* | N/A |
| | 1998A | 896033QF7 | 1/1/2018 | 4.750% | 2,020,000 | | Maturity | \*\* | N/A |
| | 1998A | 896033QL4 | 1/1/2018 | 5.125% | 11,090,000 | | Maturity | \*\* | N/A |
| | 1998A | | 1/1/2019 | 4.750% | 13,770,000 | \* | Maturity | \*\* | N/A |
| | 1998A | | 1/1/2020 | 4.750% | 14,440,000 | \* | Maturity | \*\* | N/A |
| | 1998A | | 1/1/2021 | 4.750% | 15,145,000 | \* | Maturity | \*\* | N/A |
| | 1998A | | 1/1/2022 | 4.750% | 15,880,000 | \* | Maturity | \*\* | N/A |
| | 1998A | | 1/1/2023 | 4.750% | 16,655,000 | \* | Maturity | \*\* | N/A |
| | 1998A | 896033QG5 | 1/1/2024 | 4.750% | 17,465,000 | T | Maturity | \*\* | N/A |
| | | | | | $118,935,000 | | | | |

[†] CUSIP numbers have been assigned by an organization not affiliated with TBTA and are included solely for the convenience of bondholders. TBTA is not responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to their correctness. Bonds for which no CUSIP number is shown are sinking fund payments of the term bond which follows and have that CUSIP number.

ATTACHMENT 6-9

# ATTACHMENT 6
## INFORMATION RELATING TO THE REFUNDED BONDS

*   Maturities indicated by an asterisk are sinking fund payments
**  Refunded Bonds indicated by a double asterisk are callable bonds escrowed to maturity which TBTA has retained its right to redeem prior to maturity.
T   Bonds indicated by a T are final maturities of term bonds.

## REFUNDED BY SERIES 2002F

| Old TBTA Resolution | Series | Original CUSIP † | Maturity Date | Coupon | Refunded Principal Amount | Redemption Date | Redemption Price |
|---|---|---|---|---|---|---|---|
| 1980 Resolution | Q | | 1/1/2014 | 5.000% | $18,625,000 * | 12/13/2002 | 100.000% |
| | Q | | 1/1/2015 | 5.000% | 19,565,000 * | 12/13/2002 | 100.000% |
| | Q | | 1/1/2016 | 5.000% | 20,535,000 * | 12/13/2002 | 100.000% |
| | Q | 896029RK3 | 1/1/2017 | 5.000% | 8,240,000 T | 12/13/2002 | 100.000% |
| | | | | | $66,965,000 | | |
| | V | 896029UT0 | 1/1/2003 | 6.700% | $3,665,000 | Maturity | N/A |
| | V | 896029UW3 | 1/1/2004 | 6.800% | 3,905,000 | 1/1/2003 | 100.000% |
| | V | 896029UZ6 | 1/1/2005 | 6.875% | 4,175,000 | 1/1/2003 | 100.000% |
| | V | 896029VB8 | 1/1/2006 | 7.000% | 4,460,000 | 1/1/2003 | 100.000% |
| | V | 896029VC6 | 1/1/2007 | 7.000% | 4,780,000 | 1/1/2003 | 100.000% |
| | | | | | $20,985,000 | | |
| | 1993A | 896029ZD0 | 1/1/2003 | 4.500% | $39,660,000 | Maturity | N/A |
| | | | | | $39,660,000 | | |
| | 1994A | 896029E76 | 1/1/2003 | 4.300% | $14,710,000 | Maturity | N/A |
| | | | | | $14,710,000 | | |
| | 1997A | 896029R23 | 1/1/2003 | 5.500% | $3,910,000 | Maturity | N/A |
| | | | | | $3,910,000 | | |
| | 1997SR | 896029P41¹ | 1/1/2003 | 5.000% | $1,350,000 * | Maturity | N/A |
| | | | | | $1,350,000 | | |
| Special Obligation 1991 | 1992 | 896033KT3 | 1/1/2003 | 5.900% | $3,315,000 | Maturity | N/A |
| | 1992 | 896033KU0 | 1/1/2004 | 6.000% | 3,515,000 | 1/1/2003 | 100.750% |
| | 1992 | 896033KV8 | 1/1/2005 | 6.100% | 3,725,000 | 1/1/2003 | 100.750% |
| | 1992 | 896033KW6 | 1/1/2006 | 6.150% | 3,950,000 | 1/1/2003 | 100.750% |
| | 1992 | 896033KX4 | 1/1/2007 | 6.200% | 4,195,000 | 1/1/2003 | 100.750% |
| | 1992 | 896033KY2 | 1/1/2008 | 6.200% | 4,455,000 | 1/1/2003 | 100.750% |
| | 1992 | | 1/1/2009 | 6.250% | 4,730,000 * | 1/1/2003 | 100.750% |
| | 1992 | | 1/1/2010 | 6.250% | 5,025,000 * | 1/1/2003 | 100.750% |
| | 1992 | | 1/1/2011 | 6.250% | 5,340,000 * | 1/1/2003 | 100.750% |
| | 1992 | 896033KZ9 | 1/1/2012 | 6.250% | 5,670,000 T | 1/1/2003 | 100.750% |
| | 1992 | | 1/1/2013 | 6.000% | 6,025,000 * | 1/1/2003 | 100.750% |
| | 1992 | | 1/1/2014 | 6.000% | 6,390,000 * | 1/1/2003 | 100.750% |
| | 1992 | 896033LA3 | 1/1/2015 | 6.000% | 6,770,000 T | 1/1/2003 | 100.750% |
| | 1992 | | 1/1/2016 | 5.500% | 7,175,000 * | 12/13/2002 | 100.000% |
| | 1992 | 896033LB1 | 1/1/2017 | 5.500% | 3,860,000 T | 12/13/2002 | 100.000% |
| | | | | | $74,140,000 | | |
| | 1998A | 896033LZ8 | 1/1/2003 | 5.000% | $14,065,000 | Maturity | N/A |
| | | | | | $14,065,000 | | |

---

¹ The remaining sinking fund payments of this term bond maturing January 1, 2007 were refunded by the Series 2002G Bonds.

† CUSIP numbers have been assigned by an organization not affiliated with TBTA and are included solely for the convenience of bondholders.  TBTA is not responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to their correctness.  Bonds for which no CUSIP number is shown are sinking fund payments of the term bond which follows and have that CUSIP number.

## ATTACHMENT 6
### INFORMATION RELATING TO THE REFUNDED BONDS

\* Maturities indicated by an asterisk are sinking fund payments
\*\* Refunded Bonds indicated by a double asterisk are callable bonds escrowed to maturity which TBTA has retained its right to redeem prior to maturity.
T  Bonds indicated by a T are final maturities of term bonds.

## REFUNDED BY 2002 CASH DEFEASANCE

| Old TBTA Resolution | Series | Original CUSIP † | Maturity Date | Coupon | Refunded Principal Amount | Redemption Date | Redemption Price |
|---|---|---|---|---|---|---|---|
| 1980 Resolution | Q | | 01/01/06 | 6.750% | $1,450,000 * | Maturity | N/A |
| | Q | | 01/01/07 | 6.750% | 1,545,000 * | Maturity | N/A |
| | Q | | 01/01/08 | 6.750% | 2,470,000 * | Maturity | N/A |
| | Q | 896029RH0 | 01/01/09 | 6.750% | 2,635,000 T | Maturity | N/A |
| | Q | | 01/01/14 | 5.000% | 3,550,000 * | 12/13/02 | 100.000% |
| | Q | | 01/01/15 | 5.000% | 3,730,000 * | 12/13/02 | 100.000% |
| | Q | | 01/01/16 | 5.000% | 3,915,000 * | 12/13/02 | 100.000% |
| | Q | 896029RK3 | 01/01/17 | 5.000% | 1,570,000 T | 12/13/02 | 100.000% |
| | | | | | $20,865,000 | | |
| | X | 896029WW1 | 01/01/03 | 6.200% | $2,860,000 | Maturity | N/A |
| | X | | 01/01/09 | 6.600% | 4,880,000 * | Maturity | N/A |
| | X | 896029XH3 | 01/01/10 | 6.600% | 5,200,000 T | Maturity | N/A |
| | X | | 01/01/11 | 6.625% | 7,710,000 * | Maturity | N/A |
| | X | 896029XJ9 | 01/01/12 | 6.625% | 8,230,000 T | Maturity | N/A |
| | | | | | $28,880,000 | | |
| | Y | 896029YL3 | 01/01/03 | 5.500% | $2,390,000 | Maturity | N/A |
| | Y | 896029YM1 | 01/01/04 | 5.625% | 2,520,000 | Maturity | N/A |
| | Y | 896029YN9 | 01/01/05 | 5.750% | 3,715,000 | Maturity | N/A |
| | Y | 896029YP4 | 01/01/06 | 5.800% | 3,925,000 | Maturity | N/A |
| | Y | 896029YQ2 | 01/01/07 | 5.900% | 4,155,000 | Maturity | N/A |
| | Y | 896029YR0 | 01/01/08 | 5.900% | 4,400,000 | Maturity | N/A |
| | Y | | 01/01/09 | 6.000% | 4,660,000 * | Maturity | N/A |
| | Y | | 01/01/10 | 6.000% | 4,940,000 * | Maturity | N/A |
| | Y | | 01/01/11 | 6.000% | 5,235,000 * | Maturity | N/A |
| | Y | 896029YS8 | 01/01/12 | 6.000% | 6,465,000 T | Maturity | N/A |
| | Y | | 01/01/13 | 5.500% | 8,865,000 * | Maturity | N/A |
| | Y | | 01/01/14 | 5.500% | 4,260,000 * | Maturity | N/A |
| | Y | | 01/01/15 | 5.500% | 4,495,000 * | Maturity | N/A |
| | Y | | 01/01/16 | 5.500% | 11,105,000 * | Maturity | N/A |
| | Y | 896029YE9 | 01/01/17 | 5.500% | 3,525,000 T | Maturity | N/A |
| | Y | | 01/01/18 | 6.125% | 690,000 * | Maturity | N/A |
| | Y | | 01/01/19 | 6.125% | 3,940,000 * | Maturity | N/A |
| | Y | | 01/01/20 | 6.125% | 4,180,000 * | Maturity | N/A |
| | Y | 896029YU3 | 01/01/21 | 6.125% | 1,805,000 T | Maturity | N/A |
| | | | | | $85,270,000 | | |
| | 1993A | 896029ZD0 | 01/01/03 | 4.500% | $5,250,000 | Maturity | N/A |
| | 1993A | 896029ZE8 | 01/01/04 | 4.600% | 4,095,000 | Maturity | N/A |
| | 1993A | 896029ZF5 | 01/01/05 | 4.750% | 3,025,000 | Maturity | N/A |
| | 1993A | 896029ZG3 | 01/01/06 | 4.800% | 3,880,000 | Maturity | N/A |
| | 1993A | 896029ZH1 | 01/01/07 | 5.000% | 4,065,000 | Maturity | N/A |
| | 1993A | 896029ZJ7 | 01/01/08 | 5.000% | 4,265,000 | Maturity | N/A |
| | 1993A | | 01/01/09 | 5.000% | 4,480,000 * | 01/01/03 | 100.000% |
| | 1993A | | 01/01/10 | 5.000% | 4,705,000 * | 01/01/03 | 100.000% |
| | 1993A | | 01/01/11 | 5.000% | 3,455,000 * | 01/01/03 | 100.000% |
| | 1993A | 896029ZK4 | 01/01/12 | 5.000% | 2,830,000 T | 01/01/03 | 100.000% |
| | 1993A | | 01/01/13 | 5.000% | 2,975,000 * | 01/01/03 | 100.000% |
| | 1993A | | 01/01/14 | 5.000% | 3,125,000 * | 01/01/03 | 100.000% |
| | 1993A | 896029ZL2 | 01/01/15 | 5.000% | 8,475,000 T | 01/01/03 | 100.000% |
| | 1993A | | 01/01/16 | 4.750% | 170,000 * | Maturity | N/A |
| | 1993A | | 01/01/17 | 4.750% | 175,000 * | Maturity | N/A |
| | 1993A | | 01/01/18 | 4.750% | 185,000 * | Maturity | N/A |
| | 1993A | | 01/01/19 | 4.750% | 195,000 * | Maturity | N/A |
| | 1993A | | 01/01/20 | 4.750% | 200,000 * | Maturity | N/A |
| | 1993A | | 01/01/21 | 4.750% | 210,000 * | Maturity | N/A |
| | 1993A | 896029ZM0 | 01/01/22 | 4.750% | 225,000 T | Maturity | N/A |
| | | | | | $55,985,000 | | |

† CUSIP numbers have been assigned by an organization not affiliated with TBTA and are included solely for the convenience of bondholders. TBTA is not responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to their correctness. Bonds for which no CUSIP number is shown are e sinking fund payments of the term bond which follows and have that CUSIP number.

## ATTACHMENT 6
### INFORMATION RELATING TO THE REFUNDED BONDS

\*    Maturities indicated by an asterisk are sinking fund payments
\*\*   Refunded Bonds indicated by a double asterisk are callable bonds escrowed to maturity which TBTA has retained its right to redeem prior to maturity.
T    Bonds indicated by a T are final maturities of term bonds.

### REFUNDED BY 2002 CASH DEFEASANCE

| Old TBTA Resolution | Series | Original CUSIP † | Maturity Date | Coupon | Refunded Principal Amount | Redemption Date | Redemption Price |
|---|---|---|---|---|---|---|---|
| 1980 Resolution (cont'd) | 1993B | 896029A62 | 01/01/03 | 6.000% | $1,165,000 | Maturity | N/A |
| | 1993B | 896029A70 | 01/01/04 | 6.000% | 1,235,000 | Maturity | N/A |
| | 1993B | 896029A88 | 01/01/05 | 5.750% | 1,230,000 | 01/01/04 | 101.500% |
| | 1993B | 896029A96 | 01/01/06 | 4.700% | 505,000 | 01/01/04 | 101.500% |
| | 1993B | 896029B20 | 01/01/07 | 4.800% | 530,000 | 01/01/04 | 101.500% |
| | 1993B | 896029B38 | 01/01/08 | 4.900% | 555,000 | 01/01/04 | 101.500% |
| | 1993B | 896029B61 | 01/01/09 | 0.000% | 580,000 | Maturity | N/A |
| | 1993B | 896029B79 | 01/01/10 | 0.000% | 580,000 | Maturity | N/A |
| | 1993B | 896029B87 | 01/01/11 | 0.000% | 580,000 | Maturity | N/A |
| | 1993B | 896029B95 | 01/01/12 | 0.000% | 580,000 | Maturity | N/A |
| | 1993B | 896029B46 | 01/01/13 | 0.000% | 580,000 | Maturity | N/A |
| | 1993B | 896029C29 | 01/01/14 | 5.000% | 3,440,000 | Maturity | N/A |
| | 1993B | 896029C37 | 01/01/15 | 0.000% | 3,610,000 | Maturity | N/A |
| | 1993B | 896029C45 | 01/01/16 | 0.000% | 400,000 | Maturity | N/A |
| | 1993B | 896029C52 | 01/01/17 | 0.000% | 1,775,000 | Maturity | N/A |
| | 1993B | | 01/01/18 | 5.000% | 1,775,000 * | Maturity | N/A |
| | 1993B | | 01/01/19 | 5.000% | 1,865,000 * | Maturity | N/A |
| | 1993B | 896029C86 | 01/01/20 | 5.000% | 1,955,000 T | Maturity | N/A |
| | 1993B | 896029C94 | 01/01/21 | 0.000% | 2,880,000 | Maturity | N/A |
| | 1993B | 896029B53 | 01/01/22 | 0.000% | 2,880,000 | Maturity | N/A |
| | | | | | $28,700,000 | | |
| | 1999A | 896029U86 | 01/01/03 | 3.600% | $5,000 | Maturity | N/A |
| | 1999A | 896029U94 | 01/01/04 | 3.700% | 5,000 | Maturity | N/A |
| | 1999A | 896029V28 | 01/01/05 | 3.800% | 5,000 | Maturity | N/A |
| | 1999A | 896029V36 | 01/01/06 | 4.000% | 5,000 | Maturity | N/A |
| | 1999A | 896029V44 | 01/01/07 | 4.000% | 5,000 | Maturity | N/A |
| | 1999A | 896029V51 | 01/01/08 | 4.000% | 5,000 | Maturity | N/A |
| | 1999A | 896029V69 | 01/01/09 | 4.100% | 5,000 | Maturity | N/A |
| | 1999A | 896029V77 | 01/01/10 | 4.200% | 5,000 | 07/01/09 | 100.500% |
| | 1999A | 896029V85 | 01/01/11 | 4.300% | 5,000 | 07/01/09 | 100.500% |
| | 1999A | 896029V93 | 01/01/12 | 4.400% | 5,000 | 07/01/09 | 100.500% |
| | 1999A | 896029W27 | 01/01/13 | 4.500% | 5,000 | 07/01/09 | 100.500% |
| | 1999A | 896029W35 | 01/01/14 | 4.600% | 5,000 | 07/01/09 | 100.500% |
| | 1999A | 896029W43 | 01/01/15 | 4.700% | 5,000 | 07/01/09 | 100.500% |
| | 1999A | 896029W50 | 01/01/16 | 4.750% | 150,000 | 07/01/09 | 100.500% |
| | 1999A | 896029W68 | 01/01/17 | 5.250% | 155,000 | 07/01/09 | 100.500% |
| | 1999A | 896029W76 | 01/01/18 | 5.125% | 390,000 | 07/01/09 | 100.500% |
| | 1999A | 896029W84 | 01/01/19 | 5.000% | 170,000 | 07/01/09 | 100.500% |
| | | | | | $930,000 | | |

† CUSIP numbers have been assigned by an organization not affiliated with TBTA and are included solely for the convenience of bondholders. TBTA is not responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to their correctness. Bonds for which no CUSIP number is shown are sinking fund payments of the term bond which follows and have that CUSIP number.



Recycled Paper - Printed by
IMAGEMASTER 800-452-5152

# EXHIBIT C

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, MARK SCHARFF, hereby certify as follows:

1.      I am one of the plaintiffs. I am also the President of plaintiff, Pine Sash Door & Lumber Co., Inc. I am the Managing Member of plaintiffs, Mark Scharff & Associates LLC, 2170 Mill Avenue LLC and 6202-6217 Realty LLC. I am also the trustee for the remaining plaintiffs' family trusts.

2. I have reviewed the complaint prepared for plaintiffs concerning JP Morgan Chase & Co., J.P. Morgan Securities, Inc. and Chase Investment Services Corp. to be brought under the federal securities laws, and have authorized the filing of such an action on my behalf.

3.      Plaintiffs did not purchase, or otherwise acquire, the securities from defendants, that are the subject of this action, at the direction of plaintiffs' counsel, or in order to participate in any private action arising under the federal securities laws.

4.      I am willing to serve as a representative party on behalf of the class, and will provide testimony at a deposition and/or at trial, if necessary. I intend, in any event, to fully participate in this action due to the fact that I have invested my the majority my life savings and also my children's college trust funds, companies' working capital and other funds all for the purchase of the auction rate securities. Defendants never told me that they were purchasing this type of security. Defendants made the investment decision. All of the investments needed to be in safe liquid funds as represented by defendants'.

5.      I support the appointment of the law office of Marc E. Scollar, Esq. as co-lead counsel with the Law Offices of Curtis V. Trinko, LLP. As to the attorney, Marc E. Scollar, Esq., I have known Mr. Scollar well over twenty (20) years. I understand that, once he was admitted to the New York State Bar Association, I became, with my companies, one of his first clients. I am comfortable with and highly satisfied with his expertise and the level of representation that I have received over the course of the years. The companies and I have

1

retained Mr. Scollar on at least twenty (20) separate lawsuits on a variety of different issues and I am pleased with the results.

6.      Plaintiffs' transactions in auction rate securities, that are the subject of this litigation during the class period set forth in the complaint, are as follows:

a)      Plaintiffs purchased approximately $1,400,000.00 worth of shares of various securities purchased at various intervals (see Exhibit _____); and

b)      Plaintiffs still hold the shares.

7.      During the three years prior to the date hereof, plaintiff Mark Scharff and the remaining plaintiffs have not filed an action in which they have sought to serve, or have served, as a representative party for a class in any action filed under the federal securities laws.

8.      Plaintiff Mark Scharff will not accept any payment for serving as a representative party on behalf of the class beyond his pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 4th day of August 2008 at Staten Island, New York.

_____
MARK SCHARFF

2

# EXHIBIT A

## ACCOUNTS OPENED BY MARK SCHARFF

| Account Name | Date Purchased | Amount | Due Date | Type |
|---|---|---|---|---|
| Mark Scharff & Associates, LLC | 9/24/07 | $550,000 | 2038 | Educational FDG South Tenn. |
| Mark Scharff & Associates, LLC | 10/11/07 | $400,000 | 2039 | Nelnet Student Ln. |
| Pine Sash Door & Lumber Co. | 11/02/07 | $ 50,000 | 2032 | Nelnet Student Ln. |
| 6202-6217 Realty LLC | 9/24/07 | $ 50,000 | 2038 | Educational FDG South Tenn. |
| 2170 Mill Ave. LLC | 10/19/07 | $200,000 | 2038 | Nelnet Student Ln. |
| Mark Scharff ITF (son) | 10/17/07 | $ 50,000 | 2042 | Student Loan Calif. |
| Mark Scharff ITF (daughter) | 10/17/07 | $ 50,000 | 2042 | Student Loan Calif. |
| Mark Scharff ITF (son) | 10/17/07 | $ 50,000 | 2042 | Student Loan Calif. |